**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Emily Gallagher, Suraj Patel, Katherine Stabile, Jillian Santella, Aaron Seabright, James C. McNamee, Kristin Sage Rockerman, Maria Barva, Miriam Lazewatsky, Myles Peterson, Samantha Pinsky, Christian O'Toole, Tess Harkin, Caitlin Phung, Antonio Pontex-Nunez, *individually, and on behalf of all others similarly situated,* | Docket No. _____ |
| *Plaintiffs,* | **COMPLAINT** |
| v. | |
| New York State Board of Elections; Peter S. Kosinski, Andrew Spano, and Douglas Kellner, *individually and in their official capacities as Commissioners of the New York State Board of Elections;* Todd D. Valentine, Robert A. Brehm, *individually and in their official capacities as Co-Executive Directors of the New York State Board of Elections; and* Andrew Cuomo *as Governor of the State of New York,* | |
| *Defendants.* | |

Plaintiffs, for their complaint, allege as follows:

## **INTRODUCTION**

1.     This action concerns an election law snafu, created by executive order in the middle of a pandemic, that stands to disenfranchise a massive number of voters, without any warning or anything resembling Constitutionally adequate protections. In Brooklyn alone, it is estimated that almost 4% or over 16,000 ballots will be invalidated due to no fault of the voter.[1] The problem is simple:

---

[1] Interview with Brooklyn Democratic Chairperson Rodneyse Bichotte on NY1
https://www.ny1.com/nyc/all-boroughs/inside-city-hall/2020/07/10/assemblymember-rodneyse-bichotte--some-mail-in-ballots-could-be-thrown-out#

a. The United States Postal Service ("USPS") traditionally only postmarks envelopes that have postage on them (in part to prevent postage from being re-used). USPS does *not* traditionally postmark prepaid envelopes.[2]

b. Under Governor Cuomo's Executive Order 202.26, New York shifted from a voter-paid absentee voting system (voters applied their own stamps to the envelopes, which would then be postmarked by USPS) to a pre-paid absentee voting system (voters do not apply stamps to envelopes, and the USPS would therefore *not* postmark the envelopes).

c. NY Elec. L. §8-412 requires[3] that absentee ballots to "show[] a cancellation mark of the United States postal service or a foreign country's postal service, or showing a dated endorsement of receipt by another agency of the United States government, with a date which is ascertained to be not later than the day of the election."

2.     The net effect is that thousands of voters will simply have their votes discarded, because they did not know to demand USPS step outside of its normal procedures and stamp their ballots (or indeed, did not know that they should not drop the ballots in a corner mailbox).

3.     As the Supreme Court has long recognized, the right to vote is *the* "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). This jurisprudential and political touch point has become so well accepted that that the qualification that preceded the declaration in *Yick Wo* – that voting is a "privilege merely conceded by society according to its will, under certain conditions" – sounds unfathomably

---

[2] That is, envelopes that state "NO POSTAGE NECESSARY IF MAILED IN THE UNITED STATES" and "POSTAGE WILL BE PAID BY THE ADDRESSEE."

[3] Technically speaking, §8-412 provides that a "board of elections **shall** cause all absentee ballots" with a postmark "to be cast and counted," but contains corresponding no limit on the discretion to count other ballots. *Id* (emphasis added). That said, since the Board has interpreted the law to included an implied "shall not," this suit will take the point as given.

foreign.  *Id.  Compare, e.g., Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.").  In short:  "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

4.      Yet, the Board of Elections would simply throw out thousands of ballots as a cost of doing business.

5.      This action primarily seeks what might be construed as two kinds of relief:  first, emergency relief relating to the counting of votes currently going on with regard to the June 23, 2020 election – whose result will be certified on or about August 3, 2020 – and second, relief looking forward to any other election conducted under Executive Order 202.26.  In both cases, however, the relief itself is straightforward:  count every ballot received before the already-existing cut-off (e.g., June 30 for the June 23 election), regardless of whether the USPS happens to have disregarded its long-standing practice in order to specially stamp the ballot.

## JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

7.      Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and§ 2202.

8.      The Court has ancillary jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, as some of the Plaintiffs live in this district and the acts, and many of the transactions that give rise to this action occurred, in substantial part, in this district.

10.     Venue is also proper in this district because Defendants' principal place of business in this District.

## PARTIES

11.     Plaintiff Emily Gallagher is a registered Democrat in Kings County and is a candidate on the ballot in the Democratic Primary for Assembly District 50 in Kings County.

12.     Plaintiff Suraj Patel is a registered Democrat in New York County and is a candidate on the ballot in the Democratic Primary for Congress in the 12th Congressional District encompassing New York, Kings and Queens counties.

13.     Plaintiff Katherine Stabile is a registered voter enrolled in the Democratic Party and a resident of Queens County. Ms. Stabile did not receive her ballot until June 23. Ms. Stabile promptly submitted her completed ballot to a United States Postal Service mailbox on the same day on June 23. Ms. Stabile's ballot envelope was postmarked later than June 23 and has been deemed "invalid" by Board of Elections.

14.     Plaintiff Jillian Santella is a registered voter enrolled in the Democratic Party and a resident of Queens County. Ms. Santella voted by absentee ballot on June 22, delivering her ballot to a United States Postal Service mailbox. Ms. Santella's ballot envelope was postmarked later than June 23, and has been deemed "invalid" by the Board of Elections.

15.     Plaintiff Aaron Seawright is a registered voter enrolled in the Democratic Party and a resident of Kings County. Mr. Seawright voted by absentee ballot on June 22, delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Mr. Seawright's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

16.     Plaintiff James McNamee is a registered voter enrolled in the Democratic Party and a resident of Kings County. Mr. McNamee voted by absentee ballot on June 22, delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Mr. Seawright's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

17.     Plaintiff Kristin Sage Rockerman is a registered voter enrolled in the Democratic Party and a resident of Kings County. Mr. McNamee voted by absentee ballot on June 22, delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Ms. Rockerman's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

18.     Plaintiff James McNamee is a registered voter enrolled in the Democratic Party and a resident of Kings County. Mr. McNamee voted by absentee ballot on June 22, delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Mr. Seawright's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

19.     Plaintiff Maria Barva is a registered voter enrolled in the Democratic Party and a resident of Kings County. Ms. Barva voted by absentee ballot on June 22, delivering her ballot to a United States Postal Service mailbox. Upon information and belief, Ms. Barva's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

20.     Plaintiff Miriam Lazewatsky is a registered voter enrolled in the Democratic Party and a resident of Kings County. Ms. Lazewatsky voted by absentee ballot on June 22, delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Ms.

Lazewatsky's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

21.     Plaintiff Myles Peterson is a registered voter enrolled in the Democratic Party and a resident of Kings County. Mr. Peterson voted by absentee ballot on June 22, delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Mr. Peterson's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

22.     Plaintiff Samantha Pinsky is a registered voter enrolled in the Democratic Party and a resident of Kings County. Ms. Pinsky voted by absentee ballot on June 22, delivering her ballot to a United States Postal Service mailbox. Upon information and belief, Ms. Pinsky's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

23.     Plaintiff Christian O'Toole is a registered voter enrolled in the Democratic Party and a resident of Kings County. Mr. O'Toole voted by absentee ballot on June 22, delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Mr. O'Toole's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

24.     Plaintiff Tess Harkin is a registered voter enrolled in the Democratic Party and a resident of Kings County. Ms. Harkin voted by absentee ballot on June 22, delivering her ballot to a United States Postal Service mailbox. Upon information and belief, Ms. Harkin's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

25.     Plaintiff Caitlin Phung is a registered voter enrolled in the Democratic Party and a resident of Kings County. Ms. Phung voted by absentee ballot on June 22, delivering her ballot to a United States Postal Service mailbox. Upon information and belief, Ms. Phung's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

26.     Plaintiff Antoio Pontex-Nunez is a registered voter enrolled in the Democratic

Party and a resident of Kings County. Mr. Pontex-Nunez voted by absentee ballot on June 23,

delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Mr.

Pontex-Nunez's ballot was not timely postmarked on June 23, and will be invalidated by the

Board of Elections.

27.     Defendant NY New York State Board of Elections ("NYS BOE") is the bipartisan

agency vested with the responsibility for administration and enforcement of all laws relating to

elections in New York State.

28.     Defendants Peter S. Kosinski, Douglas A. Kellner, and Andrew J. Spano are

commissioners and co-chairs of NYS BOE, and are sued in their official capacity under *Ex Parte*

*Young*.

29.     Defendants Todd D. Valentine and Robert A. Brehm are co-executive directors of

the NYS BOE, and are sued in their official capacity under *Ex Parte Young*.

30.     Defendant Andrew Cuomo is the Governor of the State of New York, and is sued

in his official capacity under *Ex Parte Young*.

31.     All Defendants (collectively, when not just "Defendants", the "Board"), to the

extent personally involved with the decisions and policies discussed below, are also sued in their

individual capacities.

32.     The NY BOE, and the Board collectively, have created what Defendant Kellner

described as "partnership" with the United States Postal Service ("USPS") "for conducting the

election."[4]

---

[4] https://gothamist.com/news/heres-what-could-invalidate-your-absentee-ballot-and-its-beyond-your-control ("Gothamist").

33.     That "partnership" has involved extensive coordination, and extensive communication, as described in reporting in the Gothamist (*see* note 4).

34.     In that partnership, USPS acts as an agent for the Board, and its acts and omissions can be attributed to the Board because through that partnership, the USPS's policies and practices have been implemented by the Board.  *Cf. Monell v. Department of Social Services*, 436 U.S. 658 (1978).  *See also*, note 5, below.

35.     Upon information and belief, the Defendants collectively possess the authority and power to provide the relief requested by Plaintiffs, and are therefore the correct *Ex Parte Young* defendants.[5]

## FACTUAL ALLEGATIONS

**Background and Facts on Absentee Ballots.**

36.     In April and May of 2020, and in light of the ongoing pandemic, Governor Cuomo issued four relevant executive order concerning the use of absentee voting for upcoming elections. See N.Y. Exec. Order No. 202.15 (Apr. 9, 2020); N.Y. Exec. Order No. 202.23 (Apr. 24, 2020); N.Y. Exec. Order No. 202.26 (May 1, 2020); and N.Y. Exec. Order No. 202.28 (May 7, 2020). Of these:

   a. Executive Order 202.15 permitted voters affected by COVID-19, including those who are at risk of contracting COVID-19, to check the box "Temporary Illness" as the

---

[5] In the alternative, if the Court finds that the Board's "partnership" with the USPS does not require the Board to assure non-arbitrary treatment of votes by the USPS, Plaintiffs intend to seek leave to amend the Complaint to include USPS and request correction of all postmarks for envelopes placed in the mail on or before June 23.  *Cf. Barbieri v. Hartsdale Post Office*, 863 F. Supp. 152, 153 (SDNY 1994) (a postmark is "subject to correction by the Postal Service" and New York's "insist[ance] that the original erroneous postmark once affixed to the envelope containing the tax return is the only operative one" is wrong and runs afoul of the Supremacy Clause).  Given the sheer scope of that undertaking, however, Plaintiffs believe such a request is premature.

reason for requesting an absentee ballot in connection with the June 23, 2020 primary election. N.Y. Exec. Order No. 202.15, at 3 (Apr. 9, 2020).

b.  Executive Order 202.23 required County Boards of Elections to send absentee ballot applications to all eligible voters.

c.  Executive Order 202.28 addressed other issues relating to absentee ballot eligibility.

d.  And, most relevantly to this case, Executive Order 202.26 "modified [N.Y. Elec. L. § 8-406] to the extent that any absentee ballot sent to a voter for a primary or special election to be held on June 23, 2020 shall be provided with a postage paid return envelope."

37.  Prior to N.Y. Exec. Order No. 202.26, however, absentee ballots sent to voters did not indicate they could be sent without postage, and the Board generally instructed voters to attach postage to their ballots.[6]

38.  Thus, Executive Order 202.26 created a situation that never existed before: USPS's national, general policy and practice would be to **not** stamp absentee ballots with a postmark, since there would be no stamp that needed to be cancelled.

39.  Because of the new, general availability of absentee ballots, Board officials became overwhelmed with the record setting applications for absentee ballots. In New York City alone, more than 750,000 absentee applications were received.[7]

---

[6] https://www.propublica.org/article/mail-in-ballot-postage-becomes-a-surprising-and-unnecessary-cause-of-voter-anxiety
[7] https://nypost.com/2020/06/23/750k-nyc-democrats-requested-absentee-ballots-for-primary/

40.     However, there were widespread complaints of ballots never arriving and many arriving late.[8] Nonetheless, ultimately an unprecedented number of New Yorkers cast their votes by absentee ballot, an achievement that should be celebrated.

41.     In terms of the absentee voting process, once a county board approves a voter's request to vote absentee, the board mails the voter the ballot(s) and return envelope.  N.Y. Elec. Law § 8-406.

42.     The voter is instructed to mark the absentee ballot, enclose it in the provided return envelope, and seal the envelope – which, under N.Y. Exec. Order No. 202.28, indicates "NO POSTAGE NECESSARY IF MAILED IN THE UNITED STATES" and "POSTAGE WILL BE PAID BY THE ADDRESSEE" (*see* Exhibit 1).

43.     Public promotional materials and voter guides (and indeed, the absentee ballot envelope itself – see Exhibit 1) created by the NY BOE instructed voters that this cycle that there was no need to affix postage to their ballots – again, a departure from prior practice.

44.     On June 7, 2020, Governor Cuomo signed legislation (S.8130-D/A.10516-A) extending the deadline to submit absentee ballots until the day of the election to June 23 given the concerns of late arriving ballots. The requirement for a postmark, despite Governor Cuomo's Exec. Order No. 202.26 virtually ensuring that no postmark would be on many ballots, was left untouched.

45.     Thus, N.Y. Elec. L. § 8-412, for the purposes of the June 23 election, provides:

> The board of elections shall cause all absentee ballots received by it before the close of the polls on election day and all ballots contained in envelopes showing a cancellation mark of the United States postal service or a foreign country's postal service, or showing a dated endorsement of receipt by another agency of the United States government, with a date which is ascertained to be not later than the

---

[8] https://www.cityandstateny.com/articles/politics/campaigns-elections/heres-whos-blame-tuesdays-disenfranchisement.html

day of the election and received by such board of elections not later than seven days following the day of election to be cast and counted.

46.     In other words (with the caveat in note 3), the law has a belt and suspenders to assure timeliness:  it both requires (1) postmarks from election day or earlier *and* (2) receipt of the ballot by the board of elections by (in the present election cycle) June 30.

47.     Upon information and belief, there is no *additional* assurance of timeliness of a ballot provided by the postmark when the receipt-by-June 30 requirement is in place.

**USPS Handling of Ballots.**

48.     Upon information and belief, across the country, for decades, USPS locations have not and do not stamp ballots with postmarks when the postage is prepaid.

49.     Upon information and belief, it has only been at the request of the Board that any USPS location postmarked ballots at all, a process that involved much "back and forth" and ultimately involved USPS confirming that it "would ensure election mail was postmarked, even though it was postage paid" and providing nominal "assurance that any ballot envelopes run through their automated machines would receive the necessary marking."  *See,* Gothamist, *supra,* note 4.

50.     Upon information and belief, while the Board coordinated with New York State post offices, it failed to even notify many post office locations across the country.[9]

51.     Thus, upon information and belief, there were out-of-state New York voters who were not even near a post office the Board *attempted* to get to change the longstanding practice of not postmarking pre-paid envelopes.

---

[9] Admitted, such an endeavor would be an immense and likely futile undertaking.  Changing USPS's regular practice that has existed for decades, across the country, to account for a simultaneously novel and arcane application of New York State Election Law so that it was applied consistently in every local post office would be virtually impossible.

52.     As Defendant Kellner has admitted, even in the coordination that the Board *did* engage in with the USPS "there were complaints [that] the postmark problem was never resolved."

53.     And, upon information and belief, while the USPS made efforts to have trainings on handling ballots, those trainings were rushed, incomplete, and failed to reach every location even within New York such that many locations handled every ballot they received without applying postmarks.

54.     For example, as set out in the Gothamist's reporting (*supra* note 4), upon information and belief, the USPS location in Rosedale, Queens did not place postmarks on any absentee ballots, instead informing even those voters who asked for postmarks and demanded to speak to supervisors that "[USPS] did not postmark business reply postage paid envelopes, like the ones mailed in this election."

**The June 23, 2020 Primary Election and Counting Ballots.**

55.     Because of the unprecedented volume of absentee ballot requests, some voters, such as Plaintiff Katherine Stabile, did not receive a ballot until June 23 in the mail.

56.     When she received it, Ms. Stabile promptly returned her ballot to the nearest USPS mailbox, despite her being in poor health and recently discharged from the hospital (hence, her need for an absentee ballot).

57.     Notwithstanding it being mailed on June 23, the USPS failed to postmark her ballot until June 25, 2020.

58.     Ultimately, therefore, Ms. Stabile's vote was deemed invalid because it was not postmarked – through no fault of her own – until June 25.  This was also despite Ms. Sabile

literally writing "Ballot was received 6/23 in the afternoon" on her ballot.  *See* Ex. 1 at 1, at 2 for "Preliminary Invalid" stamp.

59.     A true copy of Ms. Stabile's invalidated ballot envelope is attached as **Exhibit 1.**

60.     Upon information and belief, there exists a large group of voters numbering in the thousands, if not tens of thousands, similarly situated to Ms. Stabile in that:

    i.   They mailed a ballot on or before June 23;

    ii.   The USPS did not postmark it correctly or at all; and

    iii.   Because of a lack of postmark from June 23 or earlier, their votes will not be counted.

61.     Even voters who put ballots in the mail on June 22 and earlier have had their ballots invalidated. Plaintiff Jillian Santella deposited her ballot on June 22 at a USPS postal facility, only to find out that the Board of Elections in Queens County invalidated her ballot for an untimely postmark.

62.     Plaintiffs Aaron Seabright, James C. McNamee, Kristin Sage Rockerman, Maria Barva, Miriam Lazewatsky, Myles Peterson, Samantha Pinsky, Christian O'Toole, Tess Harkin, Caitlin Phung, and Antonio Pontex-Nunez are voters in Kings County from districts which have not been counted yet by the Board of Elections. Upon information and belief all of their ballots, all deposited in a USPS mailbox by June 22, will also be invalidated for untimely postmarks.

63.     This is, of course, for ballots that received postmarks at all.  According to Defendant Kellner, "Several commissioners were reporting that they got large batches of envelopes with voted absentee ballots without any postmarks."  *See,* Gothamist, *supra*, note 4.

64.     Upon information and belief, therefore:

    i.   NY BOE and local boards do not intend to count *any* ballots without postmarks.[10]

    ii.   In the alternative:  NY BOE and local boards do not intend to count those ballots that were (1) mailed on or before June 23, as required by the Election Law but (2) either (a) do not have a postmark and were marked received by the local board between June 23 and June 30 or (b) have a (incorrect) postmark of June 24 or later.

65.    This problem in Brooklyn is especially alarming. Assembly Member Rodneyse Bichotte, The Democratic Chairperson of the Kings County Democratic Committee (also sometimes just called the "Brooklyn Democratic Party"), has stated publicly in an interview on the cable news station NY1 that nearly 4% of ballots, or more than 16,000 ballots in Brooklyn have been invalidated because of issues around postmarks.  In her capacity as Democratic Chairperson for Kings County, Assembly Member Bichotte is privy and entitled to data and information not easily available to others.[11]

66.    Therefore, upon information and belief, if allowed to throw out ballots as they intend to, the Board will disenfranchise more than 16,000 voters in Brooklyn alone, and hundreds of thousands statewide – all for reasons beyond those voters' control.

67.    Upon information and belief, rather than turning on voter conduct, the validity of tens of thousands of votes will essentially turn on the entirely arbitrary question of which USPS location or box a voter used.

---

[10] As noted above, this approach would square better with the "we're just following the law"-type justifications offered by the Board for this situation.  The same section that requires a cancellation mark from on or before election day, read as mandatory (*but see* note 3) would also require a cancellation mark even if the ballot were received after election day.

[11] https://www.cityandstateny.com/articles/politics/campaigns-elections/heres-whos-blame-tuesdays-disenfranchisement.html

**Board Comments and Public Statements.**

68.     Defendant Douglas Kellner, a Democratic commissioner and co-chair of the state BOE has said: "One of the big problems of going to a vote by mail system is that the Boards of Elections are now in partnership with the U.S. Postal Service for conducting the election."

69.     Upon information and belief, and according to Gothamist, in a conference call with local election officials two days after the primary, Defendant Kellner said that there were complaints that the postmark problem was never resolved.  *See,* Gothamist, *supra*, note 4.

70.     Upon information and belief, Defendant Kellner said: "Several commissioners were reporting that they got large batches of envelopes with voted absentee ballots without any postmarks." *Id*.

71.     Gothamist also reported that Dustin Czarny, the Democratic elections commissioner in Onondaga County in Central New York, and an officer in the New York State Elections Commissioners Association has characterized this as "a persistent problem." *Id*. Specifically, upon information and belief, Czarny said, "they [e.g., the Board] have had an ongoing issue with the postal service not postmarking election mail, even if it had a stamp." *Id*.

72.     Czarny has been quoted as saying: "The Boards [of Elections] are bound by the law and the law is clear. If a postmark is not on there and we receive them after June 23rd, we cannot count those ballots." *Id*.

73.     Upon information and belief, Czarny also commented, in sum and substance, "What's worse … is that without those markings election officials have little choice but to toss the ballot." *Id*.

74.     The Board's "Spokesperson Valerie Vasquez-Diaz said the Board will follow the law until they receive direction otherwise." *Id* (direct quotation from reporting).

75.     The New York City Board of Elections has publicly tweeted and confirmed their unlawful policy of discarding valid votes as long as the USPS has failed to postmark them.  On July 14, 2020, "Joey De Jesus for NY State Assembly D38" Tweeted at the New York City Board of Elections, alerting them to the fact that the BOE and USPS were disenfranchising voters by way of their policy of refusing to count valid votes which the USPS refused to postmark:



https://twitter.com/BOENYC/status/1283165134614073344?s=20.

76.     In the interest of being specific with allegations: "Joey De Jesus for NY State Assembly D38" tagged two voters in the Tweet, alerting the BOE that "even though they each attest to submitting materials in time – they each submitted ballots along with their husbands'" that "[t]heir husbands [sic] ballots were date-stamped appropriately, theirs were marked 25th by @USPS."

77.     The New York City Board of Elections Tweeted their response that "[t]he ballots had to be postmarked by 6/23 in order to be valid."

78.     "Joey De Jesus for NY State Assembly D38" replied to the New York City Board of Elections with the following Tweet: "What I'm telling you is that they were mailed well in advance but their ballots weren't postmarked in time while their husbands [sic] were despite being submitted together."

79.     The New York City Board of Elections doubled down, replying: "We can't comment on USPS error. If the ballot is not time stamped by 6/23 it will be deemed invalid."

80.     A longer version of the same Twitter exchange is attached as **Exhibit 2**.

81.     Thus, it is clear in light of the above detailed admissions and complaints, that the Defendant BOE has long been aware that they are discounting otherwise valid votes for lack of a postmark.

## COUNT I
*(42 U.S.C. § 1983:  First Amendment Right to Vote; New York State Constitution Art. II)*

82.     Plaintiffs incorporate by references all of the allegations above.

83.     The right to vote is *the* "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  "Undoubtedly, the right of suffrage

is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).

84.     When a case "call[s] upon" the Court "to consider the constitutionality of [an election restriction] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of constitutionality. *Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (cleaned up), *quoting Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983).  Rather, the Court "conduct[s] a two-step inquiry that applies to election-related restrictions." *Id*.  In the first stage, the Court evaluates the burden the restriction places on voters and in the second applies the "*Anderson-Burdick* balancing test" if the restriction is reasonable and nondiscriminatory and "the more familiar test of 'strict scrutiny'" if the restriction is severe.  *Id*.

85.     The burden on voters of having their votes simply tossed aside is severe, and therefore requires strict scrutiny.

86.     Defendants have unquestionably not used the least restrictive means of achieving whatever government interest they offer, and therefore automatically fail strict scrutiny.

87.     However, under either level of review, the restrictions at issue here (e.g., requiring a postmark on a ballot but distributing ballots that will likely not be postmarked by the USPS) do not sufficiently advance any government interest to past muster.

88.     First, the Board's official statements make clear that – as the Board has stated – in their own view, *no* government interest is advanced by the postmark requirement at all.

89.     Second, any government interest served by the restriction is already well-served by other (non-restrictive) parts of the election law, to the point where the restriction fails to *additionally* further whatever government interest is claimed.  For example, Any state interest in assuring timely voting is already well-served by the June 30 hardstop *also* contained in NY Elec.

L. §8-412 (stating boards of election should only count ballots "received by such board of elections not later than seven days following the day of election").  Any *additional* assurance of timeliness is far outweighed by the significant burden on voters involved in simply tossing out more than 4% of votes.

90.    Finally, as the Board's official statements seem to concede, any balancing of the state interest against its burden decidedly tips in favor of *not* disenfranchising voters.

91.    Thus, as applied, the postmark requirement in conjunction with N.Y. Exec. Order No. 202.26 unduly burden the right to vote.

### COUNT II
*(42 U.S.C. § 1983:  Equal Protection and One Person, One Vote and related New York State Constitutional Provisions)*

92.    Plaintiffs incorporate by references all of the allegations above.

93.    The principle of "one person, one vote" requires that courts seek to "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's." *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970).

94.    And the Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated [] be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

95.    Indeed, "[a]n early case in our one person, one vote jurisprudence arose when a State accorded arbitrary and disparate treatment to voters in its different counties [and t]he [Supreme] Court found a constitutional violation." *Bush v. Gore*, 531 U.S. 98, 107 (2000), *describing Gray v. Sanders*, 372 U.S. 368, (1963).

96.    In the absence of statewide – and indeed, nationwide – consistency in how the USPS handles ballots, the NY Elec. L. §8-412 postmark requirement subjects absentee voters to

arbitrary differences in the way their ballots are counted depending on where they reside and, in some circumstances, depending on who happens to be collecting mail.

97.     As detailed above, then, voters' absentee ballots will be counted or not counted with lightning-like randomness:  depending on where the voter lived and what their local USPS office was doing or told, two voters could cast identical ballots, at exactly the same time, on the same day, and yet one ballot would be counted and one would not.

98.     And, even in the presence of full information (something Plaintiffs and those similarly situated did not have), the burden of handling this randomness would fall much more heavily on people with significant health risks or other factors making the risk of voting in person during a pandemic more severe.

99.     Thus, as applied, the postmark requirement in conjunction with N.Y. Exec. Order No. 202.26 violates the Constitution's promise of Equal Protection and its promise of fundamental Due Process.

## **COUNT III**
*(42 U.S.C. § 1983:  Due Process and related New York State Constitutional Provisions)*

100.     Plaintiffs incorporate by references all of the allegations above.

101.     As alleged above, Defendants have given Plaintiffs numerous assurances that their votes would be counted if they simply dropped absentee ballots in a USPS box by June 23, 2020.

102.     More specifically, and misleadingly given the positions they are now taking, Defendants assured Plaintiffs that:

      i.   There was no need to affix, or benefit to affixing, postage to an absentee ballot;

ii.   Absentee ballots could be placed in a mailbox up through June 23;[12]

103.    Just as, "[w]hen a candidate relies on the Board of Elections for procedural guidance, that candidate may have a viable due process claim if he is excluded from the ballot because of errors resulting from his reasonable reliance on the Board," a voter so relying also has their due process rights violated.  *Farrell v. Bd. Of Elections in NY*, 1985 US Dist LEXIS 16669, at *5, n 1 (SDNY Aug. 20, 1985), No. 85 Civ. 6099 (JES).

104.    And similarly, courts have long excused errors introduced in the voting process, that technically would render some document as having "a fatal defect," where those errors are created by the Board of Elections.  *Green v DiNapoli*, 96 NY2d 910, 912 (2001).

105.    As a result, to throw out the ballots of Plaintiffs and other similarly situated would be to violate their due process rights under the Fourteenth Amendment and corresponding portions of the New York State Constitution.

**WHEREFORE**, Plaintiffs respectfully requests that this Court:

(a) Issue a declaratory judgment that Defendants' actions have violated Plaintiffs rights under the Federal and New York State Constitutions;

(b) Enter an order requiring Defendants to ensure that each and every local board of elections counts all ballots received on or before June 30, 2020;

(c) Grant Plaintiffs their attorney's fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12133;

(d) Grant any other and further relief that the Court may determine to be necessary and proper

---

[12] Indeed, one Plaintiff did not even receive her absentee ballot until June 23 – if there was no possibility of that ballot being counted, that places someone in a remarkably difficult position.

Dated:  July 16, 2020.

Respectfully submitted,

/s/

_____

J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016
T: (212) 401-6222
F: (888) 370-2397
ali@najmilaw.com