**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

Emily Gallagher, Suraj Patel, Katherine Stabile, Jillian Santella,
Aaron Seabright, James C. McNamee, Kristin Sage Rockerman,
Maria Barva, Miriam Lazewatsky, Myles Peterson, Samantha
Pinsky, Christian O'Toole, Tess Harkin, Caitlin Phung, Antonio
Pontex-Nunez, *individually, and on behalf of all others similarly situated,*

Plaintiffs,

v.

New York State Board of Elections; Peter S. Kosinski, Andrew
Spano, and Douglas Kellner, *individually and in their official capacities
as Commissioners of the New York State Board of Elections*; Todd D.
Valentine, Robert A. Brehm, *individually and in their official capacities
as Co-Executive Directors of the New York State Board of Elections*; and
Andrew Cuomo *as Governor of the State of New York,*

Defendants.

Docket No. _____

---

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

---

J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016

*Attorneys for Plaintiffs*

July 17, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES ...........................................................................iii

PRELIMINARY STATEMENT........................................................................1

FACTUAL HISTORY ....................................................................................3

ARGUMENT.................................................................................................4

I.   A Mandatory Injunction is the Appropriate Remedy to Redress the Deprivation of the Plaintiffs' Rights. .....................................................................................4

II.  Plaintiffs' Claims Will Succeed on the Merits Because §8-412 Is Unconstitutional When Applied In Conjunction With Executive Order 202-26. ............................................6

   A.  The restrictions here require strict scrutiny...........................................7

     i.   The burden is severe, standing alone. ...................................................8

     ii.  The burden falls differently on different voters, presenting equal protection and one-person, one-vote problems. ...................................................................9

     iii. Because the measures adding up to the snafu at issue were, in part, enacted in the middle of the election, the burden they pose increases. ...........................................10

   B.  If not strict scrutiny, the restrictions here require analysis on the high end of *Anderson-Burdick*'s sliding scale. ...................................................................13

   C.  Under any level of scrutiny, the restrictions are not supported by any cognizable justification.........................................................................................13

   D.  The restrictions also pose due process problems.........................................17

III.    The Balance of the Equities Favors Injunctive Relief and Irreparable Harm is Presumed. 18

CONCLUSION.................................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
460 U.S. 780, 789 (1983) ........................................................................................... 13, 14

*Ayers-Schaffner v. Distefano,*
37 F.3d 726 (1st Cir. 1994) ............................................................................................ 11

*Barbieri v. Hartsdale Post Office,*
863 F. Supp. 152 (SDNY 1994) ..................................................................................... 10

*Briscoe v. Kusper,*
435 F.2d 1046 (7th Cir. 1970) ....................................................................................... 11

*Burdick v. Takushi,*
504 U.S. 428, 434 (1992) ................................................................................................. 7

*Bush v. Gore,*
531 U.S. 98 (2000) ........................................................................................................ 9, 10

*Bush v. Hillsborough County Canvassing Bd.,*
123 F. Supp. 2d 1305 (ND Fla. 2000) ........................................................................ 5, 9

*Credico v. N.Y. State Bd. of Elections,*
751 F. Supp. 2d 417 (E.D.N.Y. 2010) ................................................................ 13, 15, 19

*Credico v. New York State Bd. Of Elections,*
2013 US Dist. LEXIS 109737 (EDNY 2013), 10-cv-4555-(RJD)-(CLP) ................. 13, 16

*Daunt v. Benson,*
956 F.3d 396 (6th Cir. 2020) (Readler, J., concurring) ................................................ 10

*Democratic Nat'l Comm. v. Hobbs,*
948 F.3d 989 (9th Cir.2020) ............................................................................................ 5

*Democratic Nat'l Comm. v. Reagan,*
904 F.3d 686 (9th Cir. 2018) (Thomas, J., dissenting) ................................................... 8

*Dudum v. Arntz,*
640 F.3d 1098 (9th Cir. 2011) ......................................................................................... 8

*Farrell v. Bd. Of Elections in NY,*
1985 US Dist LEXIS 16669 (SDNY Aug. 20, 1985), No. 85-Civ-6099 (JES) ............... 17

*Gray v. Sanders,*
    372 U.S. 368 (1963) ............................................................................................. 10

*Green Party v. N.Y. State Bd. of Elections,*
    389 F.3d 411 (2d Cir. 2004) ............................................................................... *passim*

*Green v DiNapoli,*
    96 NY2d 910 (2001) ........................................................................................... 17

*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir. 1978) .......................................................................... 8, 9

*Hadley v. Junior Coll. Dist. of Metro. Kan. City,*
    397 U.S. 50 (1970) .............................................................................................. 9

*Harman v. Forssenius,*
    380 U.S. 528 (1965) ............................................................................................ 5

*Hirschfeld v. Bd. of Elections,*
    799 F. Supp. 394 (SDNY 1992) .................................................................. 16, 17

*Hudler v. Austin,*
    419 F. Supp. 1002 (ED Mich. 1976), *aff'd sub. nom., Allen v. Austin,* 430 U.S. 924
    (1977) ................................................................................................................. 11

*Kermani v. N.Y. State Bd. of Elections,*
    487 F. Supp. 2d 101 (NDNY 2006) ................................................................ 18

*Lerman v. Bd. Of Elections,*
    232 F3d 135 (2d Cir. 2000) ..................................................................... 14, 16, 17

*Libertarian Party of Ohio v. Husted,*
    2014 U.S. Dist. LEXIS 187771 (SD Ohio, 2014) ............................................ 11

*Lichtman v. Office of Personnel Management,*
    785 F.2d 299 (Fed. Cir. 1988) ......................................................................... 17

*Lynch v. City of New York,*
    589 F.3d 94 (2d Cir. 2009) ................................................................................ 4

*Mastrovincenzo v. City of New York,*
    435 F.3d 78 (2d Cir. 2006) ................................................................................ 4

*Medina v. City of Osawatomie,*
    992 F Supp 1269 (D Kan 1998) ........................................................................ 7

*Norman v. Reed,*
    502 U.S. 279 (1992) ........................................................................................... 8

*Northeast Ohio Coal. v. Husted,*
  696 F.3d 580 (6th Cir. 2012) ................................................................5, 11

*Obama for Am. v. Husted,*
  697 F.3d 423 (6th Cir. 2012) ........................................................................6

*Obama for Am. v. Husted,*
  697 F3d 423 (6th Cir. 2012) ..........................................................................7

*Pitts v. Black,*
  608 F. Supp. 696 (SDNY 1984) ..................................................................19

*Poindexter v. Strach,*
  324 F. Supp. 3d 625 (E.D.N.C. 2018) .........................................................11

*Price v. N.Y. State Bd. of Elections,*
  540 F.3d 101 (2d Cir. 2008) ...............................................................5, 7, 13

*Raimone v. Sanchez,*
  253 AD2d 506 (2d Dept 1998) ....................................................................12

*Reynolds v. Sims,*
  377 U.S. 533 (1964) .......................................................................................1

*Rossito-Canty v. Cuomo,*
  86 F. Supp. 3d 175 (E.D.N.Y. 2015) .............................................................4

*Schulz v. Williams,*
  44 F.3d 48 (2d Cir. 1994) ........................................................................6, 18

*Storer v. Brown,*
  415 U.S. 724 (1974) .....................................................................................13

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) .....................................................................................14

*Vanasco v. Schwartz,*
  401 F. Supp. 87 (SDNY 1975), *aff'd* 1976 U.S. LEXIS 921 (1976) ...........19

*Wesberry v. Sanders,*
  376 U.S. 1 (1964) ...........................................................................................1

*Williams v. Salerno,*
  792 F.2d 323 (2d Cir. 1986) .....................................................................6, 19

*Yang v. Kellner,*
  __ F. Supp. 3d __, 2020 US Dist. LEXIS 79331 (SDNY May 5, 2020) ...............4, 5, 13

*Yang v. Kosinski*,
  960 F3d 119 (2d Cir. 2020) ......................................................................................*passim*

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ............................................................................................................ 1

**Statutes**

NY Elec. L. §1-106 .................................................................................................................... 12

NY Elec. L. §8-412 ............................................................................................................ 2, 6, 17

**Other Authorities**

Brigid Bergin, *Here's What Could Invalidate Your Absentee Ballot. And It's Beyond Your Control*, GOTHAMIST (July 6, 2020) ........................................................................ 14, 15

Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) ........................................ 5

N.Y. Exec. Order No. 202.26 ............................................................................................. 1, 11

Newberg on Class Actions § 24:83 (4th ed. 2002) ................................................................... 5

Ryan Grim, *New York Could Throw Out 1 In 5 Mail-In Ballots In One District, Disproportionately Hitting Brooklyn*, GOTHAMIST (July 16, 2020) ........................... 3, 15

U.S. Const., amend. I ..................................................................................................... 7, 18, 19

## PRELIMINARY STATEMENT

As the Supreme Court has long recognized, the right to vote is *the* "fundamental political

right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).[1]  This

jurisprudential and political touch point has become so well accepted that the qualification that

preceded the declaration in *Yick Wo* – that voting is a "privilege merely conceded by society

according to its will, under certain conditions" – sounds unfathomably foreign.  *Id.  Compare, e.g.,*

*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964) ("Undoubtedly, the right of suffrage is a fundamental

matter in a free and democratic society.").  In short: "No right is more precious in a free country

than that of having a voice in the election of those who make the laws under which, as good

citizens, we must live."  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

Yet, because of what amounts to an administrative snafu and lack of forethought,

Defendants (collectively, for convenience, the "Board") have clarified they intend to simply toss out

massive numbers of absentee ballots.  The problem is simple:

1.  The United States Postal Service ("USPS") only postmarks envelopes that have postage
    on them (in part to prevent postage from being re-used).  USPS does *not* traditionally
    postmark prepaid envelopes.[2]

2.  Under N.Y. Exec. Order No. 202.26, New York shifted from a voter-paid absentee
    voting system (voters applied their own stamps to the envelopes, which would then be
    postmarked by USPS) to a pre-paid absentee voting system (voters do not apply stamps
    to envelopes, and the USPS would therefore *not* postmark the envelopes).

---

[1] Though, perhaps the statement in *Yick Wo* has a certain irony, given the broad, then-existing denials of the
franchise
[2] That is, envelopes that state "NO POSTAGE NECESSARY IF MAILED IN THE UNITED STATES" and
"POSTAGE WILL BE PAID BY THE ADDRESSEE."  *See* Comp. Ex. 1 at 1

3.  NY Elec. L. §8-412 requires[3] absentee ballots to "show[] a cancellation mark of the United States postal service or a foreign country's postal service, or showing a dated endorsement of receipt by another agency of the United States government, with a date which is ascertained to be not later than the day of the election."

And the Board has made clear there will be no accommodation – instead casting blame on the USPS for not implementing a massive change in the way they process mail (on a national scale) in just weeks:



https://twitter.com/BOENYC/status/1283165134614073344?s=20; Complaint ("Comp.") ¶¶ 74-80.

The Constitution requires any restriction on the right to vote – and tossing out ballots for "a USPS error" is such a restriction – to "in fact" advance a valuable state interest.  *Green Party v. NY State Bd. Of Elections*, 389 F3d 411, 421 (2d Cir. 2004), *citing Lerman v. Bd. Of Elections*, 232 F3d 135, 149 (2d Cir. 2000).  The arbitrary, differential treatment of ballots – depending on whether the post office happens to have (contrary to longstanding practice) postmarked it – serves no interest at all.

The Court should grant the Plaintiffs' injunction motion and direct the Board to count every duly cast vote, so long as the Board received the ballot by June 30.

---

[3] Technically speaking, §8-412 provides that a "board of elections **shall** cause all absentee ballots" with a postmark "to be cast and counted," but contains no corresponding limit on the discretion to count other ballots.  *Id* (emphasis added).  That said, since the Board has interpreted the law to included an implied "shall not," this memorandum proceeds on that basis.

## **FACTUAL HISTORY**

The Plaintiffs incorporate by reference the facts set out in Complaint as well as the terms defined there, in the interest of time and space, and given the limited time available to brief this case.

In brief, in addition to the "problem" set out above:

The Board intends not to count tens – if not hundreds – of thousands of duly cast votes, because of what it characterizes as a "USPS error." Comp. ¶¶ 66; 68-75.  An Assembly Member and party chairperson recently gave an interview in which she revealed that in Brooklyn, nearly 4% of all ballots cast – more than 16,000 ballots in Brooklyn alone – have been invalidated because of "issues around postmarks. Comp. ¶¶ 65-6.  Other reporting has suggested it may be a far, far greater share.[4]

Across the state, then, the number disenfranchised is likely to be well over 100,000 voters.[5]  And the "error" amounts to USPS failing to change its decades old practice of *not* stamping pre-paid envelopes, at the Board's request, during a pandemic. Comp. ¶¶ 48-54.  Thus, identically situated voters will either have or not have their ballot counted based entirely on whether the Board happens to have ensured employees at a particular USPS location were appropriately trained – or whether the USPS location happens to have had delays in processing mail in the days leading up to and including June 23.  Comp. ¶¶ 62-67; 96-99.

Ultimately, while the scale of disenfranchisement is unclear, there is no doubt it will be substantial – and too much like lightning in its randomness.  The Constitution demands better.

---

[4] *See* Ryan Grim, *New York Could Throw Out 1 In 5 Mail-In Ballots In One District, Disproportionately Hitting Brooklyn*, GOTHAMIST (July 16, 2020), available at https://theintercept.com/2020/07/16/new-york-mail-in-ballots-thrown-out/ (finding, on review, that the "rejection rate in the staff review was a staggering 28 percent" of absentee ballots).

[5] Brooklyn has approximately 1.7 million active voters, about 13% of the approximately 13 million voters statewide.  https://www.elections.ny.gov/EnrollmentCounty.html.  Extrapolating the Brooklyn number, there would be at least 120,000 voters disenfranchised statewide.  And if that pattern *doesn't* hold, then the impermissible randomness of this problem (*see* Point II.A.ii below) makes the tossing of ballots all the more pernicious.

## ARGUMENT

### I.  A Mandatory Injunction is the Appropriate Remedy to Redress the Deprivation of the Plaintiffs' Rights.

"In general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus [(3)] a balance of the hardships tipping decidedly in favor of the moving party." *Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted).  Where, as here, the injunction sought would essentially "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the movant must show a "'clear' or 'substantial' likelihood of success on the merits." *Yang v. Kellner*, __ F. Supp. 3d __, 2020 US Dist. LEXIS 79331, at *18 (SDNY May 5, 2020), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020), *quoting People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  Thus, a "district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Mastrovincenzo v. City of New York,* 435 F.3d 78, 89 (2d Cir. 2006), *citing No Spray Coal., Inc. v. City of New York,* 252 F.3d 148, 150 (2d Cir. 2001).

This case meets those exacting criteria.  As explained in more detail below, the substantive legal theories here are meritorious and the challenged actions and laws are unconstitutional as applied.  "'No right is more precious in a free country than that of having a voice in the election of those who make the laws … The right to vote remains, at bottom, a federally protected right … The federal protections of the right to vote also include those against interference from the states." *Rossito-Canty v. Cuomo,* 86 F. Supp. 3d 175, 180-1 (E.D.N.Y. 2015) (quotation marks and citations omitted).  "The right to vote freely for the candidate of one's choice is of the essence of a

democratic society, and any restrictions on that right strike at the heart of representative

government." *Harman v. Forssenius,* 380 U.S. 528, 537 (1965).  Nor are there any substantive factual

disputes.  The voter-Plaintiffs will have their votes solely tossed out because USPS – as it has done

for decades – did not stamp pre-paid envelopes.  The Board has acknowledged this is their plan, and

the only justification proffered is that there has been "a USPS error" – and that, per Commissioner

Kellner, "[o]ne of the big problems of going to a vote by mail system is that the Boards of Elections

are now in partnership with the U.S. Postal Service for conducting the election" and "[s]everal

commissioners … [have received] large batches of envelopes with voted absentee ballots without

any postmarks."  **Comp. ¶¶ 68-70, 75**; see also, Comp. Ex. 1 (example of ballot cancelled).

As to the relief sought,[6] setting the rules in how votes are tallied and ballots are distributed is

a significant part of the Federal Courts' toolkit for redressing unconstitutional rejection of votes

(and likely the only possible remedy to such wrongs).  *Northeast Ohio Coal. v. Husted*, 696 F.3d

580 (6th Cir. 2012) (affirming order "requiring the counting of certain … provisional ballots where

poll-worker error caused the nonconformity"); *Bush v. Hillsborough County Canvassing Bd.*, 123 F. Supp.

2d 1305 (ND Fla. 2000) (Board could not reject mail in ballots lacking postmark); *Democratic Nat'l

Comm. v. Hobbs*, 948 F.3d 989 (9th Cir.2020) ("Arizona's policy of wholly discarding, rather than

counting or partially counting, out-of-precinct ballots, and H.B. 2023's criminalization of the

collection of another person's ballot, have a discriminatory impact on American Indian, Hispanic,

and African American voters in Arizona").  *See also, generally, Price v. N.Y. State Bd. of Elections*, 540

F.3d 101, 105-6 (2d Cir. 2008) (invalidating poorly justified state rule which excluded absentee

ballots in a single type of election).

---

[6] The claims here are styled as on behalf of all voters in New York, and "[t]he Court need not formally certify a class in order to issue the requested preliminary relief." *Yang*, 2020 U.S. Dist. LEXIS 79331 at *42 n. 5, *citing* Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief.") *and* Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit.").

Finally, as discussed in more depth below, in cases about the right to vote, the injunction test largely collapses into a single question of whether the alleged act is unconstitutional (at least where, as here, there are few real factual disputes). *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986). That is, an injunction requires a showing of "(a) irreparable harm and (b) likelihood of success on the merits." *Id.* But voters "would certainly suffer irreparable harm if their right to vote were impinged upon." *Id.* And so, an "injunction [is] properly issued [in a voting rights case] if the district court" finds a probability of success on the constitutional question. *Id.*

Put more simply: the showing of probability of success on the merits entails "[t]he typical remedy" of an injunction. *Schulz*, 44 F.3d at 61 ("permanent injunction was not an abuse of discretion, as it represented appropriate relief" for an unconstitutional restriction of access to the ballot). Ultimately, then, if the Court finds that Plaintiffs have made their clear showing of probability of success on the Constitutional questions, the balance of the equities is all but automatically tipped in their favor by the "'strong interest in exercising the fundamental political right to vote'" and fact that "[t]he public interest … favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012), *quoting Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

## II.   Plaintiffs' Claims Will Succeed on the Merits Because §8-412 Is Unconstitutional When Applied In Conjunction With Executive Order 202-26.

When a case "call[s] upon" the Court "to consider the constitutionality of [an election restriction] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of constitutionality. *Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (cleaned up), *quoting Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983). Rather, the Court "conduct[s] a two-step inquiry that applies to election-related restrictions." *Id.*

"First, [the Court] ascertain[s] the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake[:] The restriction could qualify as 'reasonable

[and] nondiscriminatory' or as 'severe.'" *Id*, *quoting Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Second, the Court applies scrutiny:  a restriction is subject to the "*Anderson-Burdick* balancing test"[7] if

the restriction is reasonable and nondiscriminatory and to "the more familiar test of 'strict scrutiny'"

if the restriction is severe.  *Id.*  See *also*, *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir.

2008) ("[t]he standards for review are clear[:]  If the plaintiffs' rights are severely burdened, the

statute is subject to strict scrutiny.  If the burden is minor, but non-trivial, *Burdick's* balancing test is

applied."); *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004).[8]

Under either level of review, as applied, the effect of combining the postmark requirement

and the executive order making absentee ballots postage pre-paid is unconstitutional.  And

ultimately, the Court may effectively skip the first stage of analysis (determining the burden/level of

scrutiny) given the lack of cognizable government interest.  *Yang*, 960 F.3d at 129 ("in these

circumstances, we need not decide whether the strict-scrutiny test applies here, since Plaintiffs …

are clearly or substantially likely to prevail on the merits of their claim even under the more flexible

and less exacting standard").

A.        The restrictions here require strict scrutiny.

The burden stage of *Anderson-Burdick* asks whether restrictions are reasonable and

nondiscriminatory on one hand, or severe on the other.  The burden here is both problematically

---

[7] The *Anderson-Burdick* test, discussed below, provides that the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate, and then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment under this more flexible standard, [the Court] must determine both the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights."  *Yang*, 960 F.3d at 129 (alterations adopted).

[8] Some courts (outside this Circuit) have theorized that neither strict scrutiny nor rational basis exists in *Anderson-Burdick* jurisprudence, but that the flexible *Anderson-Burdick* balancing test may bend to "approximat[e]" both standards.  *See, e.g.*, *Medina v. City of Osawatomie*, 992 F Supp 1269, 1275 (D Kan 1998).  *See also*, *Obama for Am. v. Husted*, 697 F3d 423, 440 (6th Cir. 2012) (White, J., concurring in part, dissenting in part) ("*Anderson-Burdick* balancing test … is flexible enough to *approximate* the rational-basis test when appropriate, i.e., where the burden is slight, the required showing by the state is correspondingly light.") (emphasis added).  This Second Circuit, however, seems to have foreclosed this alternative approach with some finality in *Yang*.

discriminatory and severe, which is only amplified by the fact that the rules have changed in the middle of this election.

                *i.*   *The burden is severe, standing alone.*

In terms of severity, the burden of having one's vote thrown out, after following exactly the instructions given by the Board, is severe for voters and the candidates they support alike. At the risk of stating the obvious, there can be no more severe burden on the right to vote than arbitrarily discarding a vote (or, indeed, tens of thousands of votes). *Norman v. Reed*, 502 U.S. 279, 288-89 (1992) (denial of access to the ballot through unjustified signature measures – independently a non-burden – constitutes a severe burden and any law therefore "must be narrowly drawn to advance a state interest of compelling importance"); Green Party v. N.Y. State Bd. of Elections, 389 F.3d 411, 422 (2d Cir. 2004) (removing a party's ballot line for failure to obtain enough votes is a severe burden, triggering strict scrutiny).

Even in cases with split decisions, there is broad agreement that simply throwing out votes – at least where the relevant "burden" cannot be recast as simply requiring the voter to avoid making an error – is a severe burden. *See Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 742 (9th Cir. 2018) (Thomas, J., dissenting) (opining that the "burden imposed by Arizona's refusal to count [votes incorrectly cast in the wrong precinct] is severe," even where voter error was involved). *Cf. also*, *Dudum v. Arntz*, 640 F.3d 1098, 1113 (9th Cir. 2011) (finding no severe burden for a multi-stage vote counting system because the "appearance that some votes are not 'counted' is just a product of how the algorithm operates for efficiency's sake"—implying that if votes *actually* were not counted, the burden would be severe).

Though decided pre-*Anderson* (and thus without a comment on whether the burden posed was "severe"), the First Circuit's reasoning in *Griffin* on strikingly similar facts is persuasive:

        "Rhode Island could not, constitutionally, invalidate the absentee and shut-in ballots that state officials had offered to the voters in this primary, where the effect of the

> state's action had been to induce the voters to vote by this means rather than in person. The state's action is said to amount - in result, if not in design - to a fraud upon the absent voters, effectively stripping them of their vote in the primary"

*Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978) (reciting plaintiffs' argument, before agreeing with it).

In short, when the state throws out ballots that voters cast without any misstep of their own, it imposes a severe burden on the right to vote.  In order to toss out such votes, then, the government must satisfy strict scrutiny.

> ii.  *The burden falls differently on different voters, presenting equal protection and one-person, one-vote problems.*

The varying treatment of ballots without Post Office date stamps in different New York counties raises issues indistinguishable from those in *Bush v. Gore*, 531 U.S. 98 (2000), which involved varying standards for recounts of ballots in Florida counties.  The same principle that requires that "[w]hen a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment....are satisfied" applies with just as much force (if not more so) to a mid-election Executive Order.  *Id.* at 109.  In sum, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Id.* at 104-5.

While, of course, *Bush*'s precedential value is unclear, the striking similarity of the facts and the sound principle that vote counting should be free from arbitrariness suggests its vitality as applied here.  The central principle, of course, being that one-person, one-vote jurisprudence always seeks to "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's."  *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970).

Just as *Bush* demanded that the infamous "hanging" and "dimpled chads" be treated similarly across Florida, here the same "minimum requirements for the nonarbitrary treatment of voters" require that ballots mailed on the same day be treated identically.  531 U.S. at 105-7 ("Palm Beach

County, for example, began the process with a 1990 guideline which precluded counting completely attached chads, switched to a rule that considered a vote to be legal if any light could be seen through a chad, changed back to the 1990 rule, and then abandoned any pretense of a per se rule, only to have a court order that the county consider dimpled chads legal.  This is not a process with sufficient guarantees of equal treatment"); 134.  *See also*, *id.* at 107 ("An early case in our one person, one vote jurisprudence arose when a State accorded arbitrary and disparate treatment to voters in its different counties. The Court found a constitutional violation."), *describing Gray v. Sanders*, 372 U.S. 368, (1963).

The USPS,[9] being "in partnership with" with the Board, acts as its agent and must clear the same constitutional hurdles.  Comp. ¶¶ 32-4.  If two voters each place their ballot in the mail on June 22 without a postage stamp, there is little question that counting one vote and not the other is *exactly* the kind of arbitrariness that one person, one vote jurisprudence forbids.  Yet that is *just* what the Board ("in partnership with" the USPS) has done here.  The burden that lightning-like arbitrary treatment poses is severe, and requires strict scrutiny.[10]

        iii.   *Because the measures adding up to the snafu at issue were, in part, enacted in the middle of the election, the burden they pose increases.*

---

[9] In the alternative, if the Court finds that the Board's "partnership" with the USPS does not require the Board to assure non-arbitrary treatment of votes by the USPS, Plaintiffs intend to seek leave to amend the Complaint to include USPS and request correction of all postmarks for envelopes placed in the mail on or before June 23.  *Cf. Barbieri v. Hartsdale Post Office*, 863 F. Supp. 152, 153 (SDNY 1994) (a postmark is "subject to correction by the Postal Service" and New York's "insist[ance] that the original erroneous postmark once affixed to the envelope containing the tax return is the only operative one" is wrong and runs afoul of the Supremacy Clause).  Given the sheer scope of that undertaking, however, Plaintiffs believe such a request is premature.

[10] There is an open, academic question of how best to conceive of the relationship between *Anderson-Burdick* jurisprudence and equal protection jurisprudence – and at least one Circuit Judge has concluded that "in the Equal Protection setting, we would be wise to forego *Anderson-Burdick*."  *See, for example, Daunt v. Benson*, 956 F.3d 396, 423 (6th Cir. 2020) ("The temptation to overindulge in the *Anderson-Burdick* test has not gone unnoticed" and "we recently questioned 'whether the Supreme Court ever intended *Anderson-Burdick* to apply to Equal Protection claims,' as the Supreme Court has 'only applied the framework in the context of generally applicable laws.'") (Readler, J., concurring), *quoting Mays v. LaRose*, 951 F.3d 775, 783 n.4 (6th Cir. 2020).

That said, Second Circuit cases treat such issues as intertwined – that is, if there is disparate treatment, it makes the unequally treated party's "situation even more difficult" and thereby makes the "burden" a "severe" one – and there is no reason to depart from that approach in this case.  *See, e.g., Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419-22 (2d Cir. 2004).

Prior to Executive Order 202.26, absentee ballots in New York required a voter to affix postage.  Comp. ¶¶ 36-8.  Executive Order 202.26 was issued May 1, 2020, in the middle of this election, changing the rules midcycle:  the problem that the USPS's default practice would result in an invalid ballot did not exist in any other election until this one, and the problem only became possible as of May 1, 2020.  Thus, the as-applied restriction at issue here falls into the category of "legislation … enacted during an election cycle," which receives heightened scrutiny.  *Poindexter v. Strach*, 324 F. Supp. 3d 625, 632 (E.D.N.C. 2018).

As the Second Circuit recently recognized in *Yang*, "application of [a mid-election-cycle change in law] in 2024 may raise different issues that are not implicated in the circumstances presented" when it is challenged in that initial election cycle:  a law that poses a trivial burden when on the books four years in advance can still pose a severe burden when passed in and applied to an ongoing election.  960 F.3d at 129.  In other words, when there is a mid-cycle change in law, "[t]he long line of cases upholding ballot access requirements are patently inapplicable, as limiting candidates through reasonable advance requirements provides no justification for the retroactive restriction of the right to vote" and that is harm of an "obviously severe nature."  *Ayers-Schaffner v. Distefano,* 37 F.3d 726, 730 (1st Cir. 1994).  *See also, Poindexter v. Strach*, 324 F. Supp. 3d 625, 632 (E.D.N.C. 2018) ("the court [is not] aware, of any legislation that has been found constitutionally sound when enacted <u>during an election cycle</u> that disqualifies previously qualifying candidates from appearing on a ballot") (emphasis in original); *Libertarian Party of Ohio v. Husted,* 2014 U.S. Dist. LEXIS 187771 (SD Ohio, 2014); *Hudler v. Austin,* 419 F. Supp. 1002 (ED Mich. 1976), *aff'd sub. nom.*, *Allen v. Austin,* 430 U.S. 924 (1977); *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970).  *Cf. Ne. Ohio Coal. v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) ("substantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they 'result in

significant disenfranchisement and vote dilution'"), *quoting Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978).

These cases – though not explicitly – seem to add up to a rule:  any change in the way elections are administered, if applied in the middle of an election cycle, poses a "severe" burden (requiring strict scrutiny) when applied to that same election cycle.  As a policy matter, this rule makes sense.  While a highly technical[11] change in an election law might not pose a significant burden should voters and candidates have time to adapt their behavior, without that time it is a "different issue[]" entirely.  *Yang*, 960 F.3d at 129.  In other words, imagine the postmark requirement applying in 2024:  Rather than the scramble to get USPS to change its practice, the Board might have had appropriate time to have USPS train its employees to stamp all envelopes nationwide.[12]  Candidates and the Board alike would also have time (and notice of the need) to caution voters that they *needed* to ensure a postmark be on their ballot if they were mailing it towards the end of the absentee period.  Instead, here, the Board repeatedly assured voters that they only needed to have ballots in the mailbox – because of the *change* in rules, without a stamp – by June 23.  Whatever burdens a version of this rule might pose when voters and candidates have full notice of its effects, the burden it poses when it comes into being in the same election are severe precisely because of the lack of notice.

---

[11] It is notable that, for voters and candidates alike, New York's Election Law is notoriously hyper-technical and formalistic.  *See, for example,* NY Elec. L. §1-106 (declaring several issues with nominating petitions to be "fatal defect[s]"); *and, relevantly, Raimone v. Sanchez*, 253 AD2d 506 (2d Dept 1998) ("absence of a postmark on the envelope as required by statute was a 'fatal defect'" to the general objections to a nominating petition in the envelope).

[12] This is not to concede that the postmark requirement combined with the pre-paid absentee ballot would be valid if the combination had existed for longer (it would not).  It is only to say that whatever the level of burden that would exist with months or years of notice, without such notice, the combination naturally imposes a profoundly more severe burden.

**B.**     If not strict scrutiny, the restrictions here require analysis on the high end of *Anderson-Burdick*'s sliding scale.

When it comes to burdens on the right to vote, the Second Circuit and the Supreme Court alike have cautioned that there "is no litmus-paper test for separating those restrictions that are valid from those that are invidious" and the "rule is not self-executing and [it] is no substitute for the hard judgments that must be made." *Storer v. Brown*, 415 U.S. 724, 730 (1974). *See also, Yang*, 960 F.3d at 129, *quoting Anderson*, 460 U.S. at 789. And, of course, the "results of this evaluation [cannot] be automatic." *Anderson*, 460 U.S. at 789.

If a burden is not necessarily "severe," but still is a "weighty imposition on Plaintiffs' … right[s]," *Anderson-Burdick*'s sliding scale requires much more than rational basis review. *Yang*, 2020 U.S. Dist. LEXIS 79331, at *32. As Chief Judge Dearie explained in *Credico*:

> "That the plaintiffs' associational rights will not be severely burdened, however, does not end my inquiry. As the Second Circuit recently instructed in *Price*, while 'review in such circumstances will be quite deferential,' I must actually "weigh the burdens imposed on the plaintiff against the *precise* interests put forward by the State" and 'take into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights,' *Price* directs me to conduct more than just a rational basis review, and I am not to give much weight to 'flimsy' or 'extraordinarily weak' justifications proffered by the State."

*Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 422 (E.D.N.Y. 2010) (citations omitted, emphasis added in *Credico*), *citing Price*, 540 F.3d at 108-11.

As explained above, even assuming the burden is not severe (it is), throwing out a voter's ballot with no chance to correct it and because of a "USPS error" is – at a minimum – a "weighty imposition." *Anderson-Burdick* requires such an imposition to be balanced by real and precise justifications. As explained below, the Board cannot present such justifications here.

**C.**     Under any level of scrutiny, the restrictions are not supported by any cognizable justification.

Once a plaintiff shows a burden on the right of access to the ballot – even if that "burden … is not large" – it becomes the State's responsibility to justify that burden. *Price*, 540 F.3d at 112. The

Court should weigh "the precise interests *put forward by the State as justifications* for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (emphasis added). *See also, Green Party v. NY State Bd. of Elections*, 389 F3d 411, 421 (2d Cir. 2004), *Lerman v. Bd. of Elections*, 232 F3d 135, 149 (2d Cir. 2000); *and Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). Moreover, the mere "fact that the defendants' asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests.'" *Green Party* at 421, *quoting Lerman* at 149-50 ("we cannot uphold a statutory provision that substantially burdens political speech and association … without insisting that the defendants do more than simply posit the existence of the disease sought to be cured.") (cleaned up).

In analyzing the justification, the Court should "examine each justification in turn and consider whether they make it necessary to burden the constitutional rights of Plaintiffs." *Yang*, 960 F.3d at 134 (cleaned up), *citing Anderson*, 460 U.S. at 789. The measure chosen by the State here, under any level of scrutiny, fails spectacularly to "in fact advance [its proffered] interests." *Id.* Where the restrictions enacted fail to balance against the burden they pose, the restriction is unconstitutional.

First and determinatively, the State has "put forward" *no* interests at all – in large part because the effect occurring here appears to have genuinely been an unintended mistake (by the government). Indeed, every public statement put out by the Board *laments* that they "do not have the ability to accept a ballot that was not postmarked by 6/23." Comp. Ex. 2. Specifically:

- Commissioner Kellner called the postmark issue a "big problem[]," noting that "[s]everal commissioners were reporting that they got large batches of envelopes with voted absentee ballots without any postmarks." Comp. ¶¶ 68-70, citing Brigid Bergin, *Here's What Could Invalidate Your Absentee Ballot. And It's Beyond Your Control*, GOTHAMIST (July 6, 2020) ("Bergin").

- Dustin Czarny, the Democratic elections commissioner in Onondaga County in Central New York, called this "a persistent problem," even noting that the Board

has "an ongoing issue with the postal service not postmarking election mail, even if it had a stamp."  Comp. ¶ 71, *citing* Bergin.

- Commissioner Czarny even said (quote paraphrased in reporting), "What's worse … is that without those markings election officials **have little choice** but to toss the ballot."  Comp. ¶ 73 (emphasis added), *citing* Bergin.

- The New York City Board of Elections commented, in a tweet, "I apologize but we can't comment on @USPS actions." https://twitter.com/BOENYC/status/1283168694521167872?s=20

And to that end, the Board's Spokesperson seemingly confirmed that the Board *wants* the Court (or at least, the Governor) to direct the Board to fix the "problem":  "Spokesperson Valerie Vasquez-Diaz said the Board will follow the law **until they receive direction otherwise**."  Comp. ¶ 74. (emphasis added).  One outlet even paraphrased Vasquez-Diaz as providing a roadmap for the Court to grant relief here: "'The only way for us to determine timeliness is the postmark,'" Vazquez-Diaz said — unless an executive or judicial order changed the criteria for timeliness to make votes received within reasonable mail delivery valid."  *See* Grim, GOTHAMIST, *supra* note 4 (emphasis added).

Where the government does not actually assert an interest in seeing the law enforced as applied, there is no cognizable government interest.  That is, "[o]f course, while a State may have a "general, and quite understandable, interest in seeing state laws enforced, to the letter, as written," "to accept that rationale and nothing more would be tantamount to a categorical rejection of any 'as applied' challenge."  *Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 422 (E.D.N.Y. 2010). Thus, "resorting only to" a general interest in seeing state laws enforced "carries no weight as a justification."  *Id.*

Where courts have faced this kind of non-justification – or justifications not tailored at all to the action the Board is taking – they have uniformly rejected them.  Most recently, in *Yang*, the Second Circuit took a hard look at what all parties conceded was a state interest of the highest order (at least, in the abstract):  "protecting the public from the health risks posed by COVID-19."  960

F.3d at 134.  Despite the obvious importance of that interest in the abstract, the Second Circuit took a fine comb to whether the measure employed – canceling a primary election to reduce in-person voting – advanced the interest asserted, finding that the justification was "overstated for at least two reasons":  in-person voting was likely to be significantly lower than in past years and the reduction of in-person voting largely occurred in places with less (but not *no*) risk of COVID-19.  *Id.* at 135-6. *See also, Credico v. New York State Bd. Of Elections*, 2013 US Dist. LEXIS 109737 at *71-72 (EDNY 2013), 10-cv-4555-(RJD)-(CLP) (state's anti-confusion "justification carries no weight in the context of this case, because the application of Section 7-104(4)(e) did not reduce clutter on the 2010 ballot and, if anything, enforcement of the Statute increased voter confusion."); *and cf. Hirschfeld v. Bd. of Elections*, 799 F. Supp. 394 (SDNY 1992) (finding it "seem[ed] unnecessary to examine the various statutory provisions claimed here to be relevant" because "if it is the Board's contention that on the facts above outlined the statutes of the state of New York give it the right to reject plaintiff's certificate of acceptance, it is equally clear that the statutes as so applied are unconstitutional.").

Similarly, any (*post hac*) justification offered by the State during this litigation – presumably something like: the interest in assuring all votes are cast by a certain date – would be insufficient to the extent "that interest already is advanced by [another, existing] requirement."  *Lerman v. Bd. of Elections*, 232 F.3d 135, 151 (2d Cir. 2000).  Both the burden on speech and the State justification are "not evaluated in isolation, but within the context of the state's overall scheme of election regulations."  *Id.* at 145.  Thus, in *Lerman*, the Second Circuit rejected a belt-and-suspenders argument applied to signature requirements and the "well-established … state interest" in "[r]equiring a candidate to have a 'modicum of support' within their district before their name appears on the ballot."  *Id.* at 151.  Because that "modicum of support" interest "already is advanced by the requirement that candidates obtain a minimum number of signatures by district residents," the Second Circuit reasoned that an additional requirement that witnesses to nominating petitions

also be residents of the relevant district – in context – "bears no relationship whatsoever" to the state interest.  *Id.*

So too here. Any state interest in assuring timely voting is already well-served by the June 30 hardstop *also* contained in NY Elec. L. §8-412 (stating boards of election should only count ballots "received by such board of elections not later than seven days following the day of election").  Any *additional* assurance of timeliness is far outweighed by the significant burden on voters involved in simply tossing out more than 4% of votes.  Comp. ¶ 65-6.

> D.       The restrictions also pose due process problems.

Just as, "[w]hen a candidate relies on the Board of Elections for procedural guidance, that candidate may have a viable due process claim if he is excluded from the ballot because of errors resulting from his reasonable reliance on the Board," a voter so relying also has their due process rights violated.  *Farrell v. Bd. Of Elections in NY*, 1985 US Dist LEXIS 16669, at *5, n 1 (SDNY Aug. 20, 1985), No. 85-Civ-6099 (JES).  *See also, Hirschfeld v. Bd. of Elections*, 799 F. Supp. 394, 395 (S.D.N.Y. 1992) ("plaintiff handed his present petitions to the clerk who accepted them. He then asked the clerk whether there were any further formalities expected of him, and was told that there were none. There were no facts known to plaintiff Hirschfeld which could have lead him to suspect that the information which he had received was inaccurate.").  And similarly, courts have long excused errors introduced in the voting process, that technically would render some document as having "a fatal defect," where those errors are created by the Board of Elections.  *Green v DiNapoli*, 96 NY2d 910, 912 (2001).  *Cf. Lichtman v. Office of Personnel Management*, 785 F.2d 299 (Fed. Cir. 1988) ("we think it clear that Congress intended to protect the equitable rights of a federal employee in a case (such as the current one) in which he was inequitably deprived of his benefits by the Government's own error").

Here too, it would be fundamentally unfair for the state to apple the Catch-22 they've created:  that (1) votes require postmarks to be counted but (2) absentee ballots are postage pre-paid, which precludes them from being postmarked.  Similarly, it would be fundamentally unfair for the state to reject an absentee ballot mailed *on the day it was received*, yet it has done just that.  Comp. ¶¶ 55-9.

### III.   The Balance of the Equities Favors Injunctive Relief and Irreparable Harm is Presumed.

In ordinary cases, the grant or denial of an injunction may turn on factors beyond likelihood of victory on the merits.  In constitutional cases, however, a demonstration of the required likelihood of success entitles a party to a presumption that the equities balance in their favor.  "That is, "[t]he typical remedy afforded when a statute is found to be facially unconstitutional is an injunction enjoining its enforcement."  *Schulz v. Williams,* 44 F.3d 48 (2d Cir. 1994) (provision of voters lists only to major parties was denial of equal protection to minority parties).  This rule holds particular weight in the election context:  "[i]n matters involving allegations or claims of First Amendment violations, irreparable harm may be presumed."  *Kermani v. N.Y. State Bd. of Elections,* 487 F. Supp. 2d 101 (NDNY 2006) (injunction granted against enforcement of Election Law section restricting outside expenditures in primary elections).  That is, because of the nature of elections, in this kind of case, "absent injunctive relief, [Plaintiffs'] First Amendment rights likely would be forever extinguished."  *Yang*, 960 F.3d at 136 (2d Cir. 2020) (holding that extinguishing voting rights is "surely a 'significant' hardship that the Board has not adequately justified" and any costs to the State are a "cost that the State of New York chose to bear when it assumed the responsibility of regulating and holding the Democratic Party's primary election.") (alterations adopted).

Thus, injunctions issue in virtually every case to find a constitutional violation under *Anderson-Burdick* (and its predecessors).  *See, e.g., Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411 (2d Cir. 2004) (injunction granted against Election Law section canceling status of previously

enrolled parties which fail to get 50,000 votes in gubernatorial election); *Williams v. Salerno,* 792 F.2d 323 (2d Cir. 1986) (injunction granted against Board of Elections determination that college dorm could not constitute "residence" for voter registration purposes); *Pitts v. Black,* 608 F. Supp. 696 (SDNY 1984) (injunction against refusal to register homeless voters); *Vanasco v. Schwartz,* 401 F. Supp. 87 (SDNY 1975), *aff'd* 1976 U.S. LEXIS 921 (1976) (enjoining BOE rules which censored content of campaign materials); *Credico v. New York State Bd. of Elections,* 751 F. Supp. 2d 417 (EDNY 2010) ("Because violations of First Amendment rights are commonly considered irreparable injuries, I have no trouble concluding that plaintiffs have established that, in the event the injunction is not granted, they will suffer an irreparable injury") (cleaned up).

Even if more balancing were required, as detailed throughout Part II above, the Board has offered no justification – beyond a sort of "well, the law requires it" (*see, e.g.,* "Again, we do not have the ability to accept a ballot that was not postmarked by 6/23," Comp. Ex. 2) – for refusing to count duly cast absentee ballots lacking an appropriate postmark.  Indeed, rather than defending the measure at all, the Board has collectively lamented that their hands are tied.  That kind of shrug-and-dodge is not the weighty justification required by law.  *Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 422 (E.D.N.Y. 2010) (state interest in "seeing state laws enforced, to the letter, as written" without more "carries no weight as a justification.").  Given that the Board has publicly expressed to their constituents that they *wish* they could accept ballots, the balance of the equities decidedly tips towards allowing them to do just that.

## CONCLUSION

For the reasons above, the Plaintiffs respectfully request the Court grant their motion for injunctive relief.

Respectfully submitted,

/s/

J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016
T: (212) 401-6222
F: (888) 370-2397
ali@najmilaw.com