UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/3/2020
```

EMILY GALLAGHER, SURAJ PATEL,
KATHERINE STABILE, JILLIAN SANTELLA,
AARON SEABRIGHT, JAMES C. MCNAMEE,
KRISTIN SAGE ROCKERMAN, MARIA
BARVA, MIRIAM LAZEWATSKY, MYLES
PETERSON, SAMANTHA PINSKY, CHRISTIAN
O'TOOLE, TESS HARKIN, CAITLIN PHUNG,
ANTONIO PONTEX-NUNEZ, *individually and on
behalf of all others similarly situated*,

                                        Plaintiffs,

                -against-

NEW YORK STATE BOARD OF ELECTIONS; PETER
S. KOSINSKI, ANDREW SPANO, AND DOUGLAS
KELLNER, *individually and in their official capacities as
Commissioners of the New York State Board of Elections*;
TODD D. VALENTINE, ROBERT A. BREHM,
*individually and in their official capacities as Co-
Executive Directors of the New York State Board of
Elections*; *and* ANDREW CUOMO *as Governor of the
State of New York*,

                                        Defendants.

MARIA D. KAUFER and ETHAN FELDER,

                                        Plaintiff-Intervenors,

                -against-

NEW YORK STATE BOARD OF ELECTIONS; PETER
S. KOSINSKI, ANDREW SPANO, AND DOUGLAS
KELLNER, *individually and in their official capacities as
Commissioners of the New York State Board of Elections*;
TODD D. VALENTINE, ROBERT A. BREHM,
*individually and in their official capacities as Co-
Executive Directors of the New York State Board of
Elections*; *and* ANDREW CUOMO *as Governor of the
State of New York*; NEW YORK CITY BOARD OF
ELECTIONS; PATRICIA ANNE TAYLOR *individually
and as President of the New York City Board of Elections*;

20 Civ. 5504 (AT)

**OPINION
AND ORDER**

and MICHAEL J. RYAN, *individually and as the Executive Director of the New York City Board of Elections*,

                                                    Defendants.

ANALISA TORRES, District Judge:

In this action, fourteen New York City voters who voted by absentee ballot in New York's June 23, 2020 primary election (the "June 23 Primary"), and four candidates on the ballot allege that their rights under the First and Fourteenth Amendments to the United States Constitution, and corresponding sections of the New York Constitution, were violated when their absentee ballots were deemed invalid because they lacked a United States Postal Service (the "USPS") postmark, or a timely postmark.

Plaintiff Emily Gallagher aspires to be the Democratic Party's candidate for the State Assembly in New York's 50th Assembly District.  Plaintiff Suraj Patel is running to be the Democratic candidate for the House of Representatives in the 12th Congressional District.  Each of the voter Plaintiffs, Katherine Stabile, Jillian Santella, Aaron Seabright, James C. McNamee, Kristin Sage Rockerman, Maria Barva, Miriam Lazewatsky, Myles Peterson, Samantha Pinsky, Christian O'Toole, Tess Harkin, Caitlin Phung, and Antonio Pontex-Nunez, claims that they mailed their absentee ballots on either June 22 or 23, 2020, but the ballots were rejected by the New York City Board of Elections (the "NYCBOE") due to the absence of a timely postmark. Compl., ECF No. 1.

Plaintiff-Intervenors, Maria D. Kaufer and Ethan Felder, are candidates for Democratic District Leader in Part A of New York's 28th Assembly District.  Intervenor Compl. ¶¶ 12–13, ECF No. 40.  Like Plaintiffs, they claim that absentee ballots cast in their races were invalidated for lack of a timely postmark.

Now before the Court are Plaintiffs' and Plaintiff-Intervenors' motions, brought pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction ordering Defendants—the New York State Board of Elections (the "NYSBOE"), Commissioners Peter S. Kosinski, Andrew Spano, and Douglas Kellner, Co-Executive Directors Todd D. Valentine and Robert Brehm, and Governor Andrew M. Cuomo (together, the "State Defendants")—to count all absentee ballots received by boards of elections by June 30, 2020, whether or not such ballots bear a timely postmark.  Pl. Mot., ECF No. 3; Compl. at 21.  Plaintiff-Intervenors join in this request, and also seek emergency relief against the NYCBOE, President Patricia Anne Taylor, and Executive Director Michael J. Ryan (together, the "City Defendants").  Intervenor Mot., ECF No. 11.

Starting on July 29, 2020, the Court held a two-day evidentiary hearing via videoconference.  Following are the Court's findings of fact and conclusions of law.

At the hearing, Plaintiffs called Emily Gallagher; Mikael Haxby, Data Director, New Kings Democratic Club; Douglas Kellner; Allen Tanko, Marketing Manager, USPS New York District (covering Manhattan and the Bronx); Michael Calabrese, Manager, USPS Morgan Processing and Distribution Center; and Sherilyn Simmons, Consumer Affairs Manager, USPS Triboro District (covering Brooklyn, Queens, and Staten Island).  Plaintiff-Intervenors did not call any witnesses.  Robert Brehm testified on behalf of the State Defendants.  City Defendants called the following NYCBOE employees: Georgea Kontzamanis, Operations Manager; Dawn Sandow, Deputy Executive Director; and Raymond J. Riley, Chief Clerk, Kings County.

The Court credits the witnesses' testimony.  However, to the extent that Tanko's testimony about the postmarking and delivery of mail contradicted that of Calabrese, the Court

adopts Calabrese's version of the facts because, as Tanko conceded, Calabrese has superior knowledge and experience with respect to postal service operations and procedures.

For the reasons stated below, the preliminary injunction is GRANTED as follows:  the Commissioners of the NYSBOE are ORDERED to direct all local boards of elections to count all otherwise valid absentee ballots cast in the June 23 Primary which were (1) received by June 24, 2020, without regard to whether such ballots are postmarked by June 23, 2020 and (2) received by June 25, 2020, so long as such ballots are not postmarked later than June 23, 2020.

**FINDINGS OF FACT**

I.      The Role of State and Local Boards of Elections

New York's election system relies on a state board of elections, the NYSBOE, and a number of local boards of elections, including the NYCBOE.  Hearing Tr. 77:20–78:11; Brehm Decl. ¶¶ 3–4, ECF No. 18.  The NYSBOE is responsible for maintaining the state voter registration database with the records that are provided by the county boards of elections, canvassing contests that are statewide or that cross county boundaries, and maintaining the campaign finance disclosure system.  N.Y. Elec. Law § 5-614; *see* Hearing Tr. 78:2–8.  The NYSBOE also has the power to "issue instructions and promulgate rules and regulations relating to the administration of the election process," and "perform such other acts as may be necessary to carry out the purposes of" the Election Law.  N.Y. Elec. Law § 3-102(1), (17); Hearing Tr. 78:14–79:7; Brehm Decl. ¶ 6.

Local boards of elections are responsible for the conduct of elections, including organizing poll sites, printing ballots, mailing absentee ballots, and then canvassing the vote and reporting the results to the NYSBOE.  N.Y. Elec. Law § 9-202; *see* Hearing Tr. 77:20–25; Brehm Decl. ¶ 6.  The local boards are required to complete a canvass of ballots and certify

results within 13 days of a primary election.  N.Y. Elec. Law § 9-200.  Overburdened by the

large volume of absentee ballots cast during the COVID-19 pandemic, the NYCBOE failed to

meet that deadline for the June 23 Primary.  Hearing Tr. 410:22–411:3.  Under Election Law § 4-

112, the NYSBOE must "certify to each county board of elections the name and residence of

each candidate nominated" in a primary election "not later than fifty-five days before a general

election."

II.      The June 23, 2020 Primary Election and Absentee Ballots

During April and May of 2020, in response to the COVID-19 pandemic, Governor

Andrew M. Cuomo issued a series of executive orders modifying state election law as it pertains

to the use of absentee ballots for the June 23 Primary.  *See* N.Y. Exec. Order No. 202.15 (Apr. 9,

2020); N.Y. Exec. Order No. 202.23 (Apr. 24, 2020); N.Y. Exec. Order No. 202.26 (May 1,

2020).

New York Election Law § 8-400 permits a voter, upon application, to receive an absentee

ballot for any primary election if the voter expects to be: (a) absent from the county of his or her

residence; (b) unable to appear in person due to illness or physical disability; (c) a resident or

patient of a veterans health administration hospital; or (d) absent from his or her residence

because he or she is detained in jail.

On April 9, 2020, the Governor issued Executive Order 202.15, which temporarily

suspended and modified § 8-400 to allow a voter to receive an absentee ballot based on a

temporary illness due to the potential for contraction of COVID-19.  N.Y. Exec. Order No.

202.15 (Apr. 9, 2020).  Executive Order 202.15 further modified § 8-400 to allow for electronic

absentee ballot applications, thereby eliminating the requirement of a signature or in-person

appearance.  *Id.*  On April 24, 2020, Governor Cuomo issued Executive Order 202.23, which

again modified § 8-400 by directing the boards of elections to send absentee ballot applications to all eligible voters.  N.Y. Exec. Order No. 202.23 (Apr. 24, 2020).

Finally, Executive Order 202.26, issued on May 1, 2020, modified § 8-406 "to the extent that any ballot sent to a voter for a primary or special election to be held on June 23, 2020 shall be provided with a postage paid return envelope."  N.Y. Exec. Order No. 202.26 (May 1, 2020); *see* Hearing Tr. 111:5–10.  Thus, absentee ballot return envelopes specified that "POSTAGE WILL BE PAID BY ADDRESSEE."  *See, e.g.*, Pl. Ex. 1.  Prior to this Executive Order, boards of elections were only required to send a voter a ballot and an envelope.  *See* N.Y. Election Law § 8-408.  Postage paid return envelopes had not been used in the preceding two decades.  Hearing Tr. 81:4–21, 82:20–83:4.

The New York State Legislature also acted.  The Election Law was amended to allow, among other things, a voter to request an absentee ballot over the Internet.  NY LEGIS 91 (2020), 2020 Sess. Law News of N.Y. Ch. 91 (S. 8130-D) § 1.  Section 8-412 was modified to require that absentee ballots postmarked on or before Election Day be counted.  *Id.* § 2.

III.   <u>USPS and the June 23 Primary</u>

A.  Postmarking Requirement

Election Law § 8-412 provides that:

> the board of elections shall cause all absentee ballots received by it before the close of the polls on election day and all ballots contained in envelopes showing a cancellation mark of the United States postal service or a foreign country's postal service, or showing a dated endorsement of receipt by another agency of the United States government, with a date which is ascertained to be not later than the day of the election and received by such board of elections not later than seven days following the day of election to be cast and counted.

N.Y. Elec. Law § 8-412(1).  For the June 23 Primary, therefore, absentee ballots could be counted if they (1) were received by a board of elections before the close of the polls on

June 23, or (2) bore a postmark dated June 23 or earlier, and were received by a board of elections by June 30.  On July 14, 2020, the NYCBOE tweeted that "ballots had to be postmarked by 6/23 in order to be valid."  @NYCBoardOfElections, Twitter (July 14, 2020, 6:15 PM).  At the hearing, however, Commissioner Kellner conceded that absentee ballots placed in a USPS mailbox on Election Day after the last pick-up time would not be postmarked.  Hearing Tr. 91:14–16.

B.  USPS Policies and Practices

The parties present different accounts of the USPS's written policies and practices with respect to postmarking prepaid postage envelopes.  On the one hand, Plaintiffs point to a postal service handbook, which states that "postmarks are not required for mailings bearing a permit, meter, or precanceled stamp for postage."  USPS, Handbook PO-408: Area Mail Processing Guidelines, 1-1.3 Postmarks, https://about.usps.com/handbooks/po408/ch1_003.htm (last visited Aug. 3, 2020).  On the other hand, Defendants cite USPS postmarking guidelines which provide that in March 2014, "the Postal Service began applying a cancellation mark to all letter pieces processed on USPS Letter Automation Compatible Postage Cancellation Systems."  USPS, Your 2020 Official Election Mail: USPS Postmarking Guidelines (Jan. 2020), https://about.usps.com/kits/kit600.pdf.

At the hearing, testimony from postal service employees established that, contrary to Plaintiffs and Plaintiff-Intervenors' assertions, although the USPS does not generally postmark prepaid mail, Hearing Tr. 232:18–20 ("[O]ur policy is when it is a prepaid postage . . . normally we do not cancel them."), the USPS has a longstanding policy of postmarking election mail, *id*. 339:25–340:5, including absentee ballot return envelopes, *id*. 285:12–14; 339:16-24.

Leading up to the June 23 Primary, senior postal service administrators took steps to establish procedures that would ensure that ballot return envelopes would be postmarked including frequent meetings with headquarters and regional bodies before the election season, *id*. 284:23–285:6, directives from national and regional offices to local postmasters mandating that election mail be postmarked, *id*. 284:10–16, and directives to postmasters and station managers directing that constituents requesting a postmark on their ballot return envelope should receive one, *id*. 270:4–8

In addition, the postal service and the NYCBOE had meetings to discuss measures that would be implemented to make the June 23 Primary run as smoothly as possible. *Id*. 231:5–16. Dawn Sandow, the NYCBOE's Deputy Executive Director, testified that she received assurances from the USPS that ballot return envelopes would be cancelled. *Id.* 182:22–24. Georgea Kontzamanis, the NYCBOE's Operations Manager, testified that the NYCBOE worked with USPS mail design analysts to ensure that "all standards were met" regarding postal service requirements for election mail. *Id.* 179:17–23. And Allen Tanko, USPS Marketing Manager for the New York District, testified that the NYCBOE was "very adamant about making sure that every single piece got a postmark and we agreed to make that happen." *Id.* 238:17–20.

C. USPS Postmarking Process

Michael Calabrese, Manager of the USPS Morgan Processing and Distribution Center (the "Morgan Facility") in Manhattan—the central location where all New York City mail is processed—described the trajectory of a piece of mail.

First, upon pickup from a collection box, a ballot return envelope is transported to the Morgan Facility. *Id*. 315:7–10. There, the envelope will run through an automated cancellation machine, which will stamp the envelope with a postmark. *Id*. 315:21–316:6. The postmarking

process begins at approximately 4:00 p.m. at the Morgan Facility, and ends around midnight.  *Id.* 336:25–337:20.  Even if a ballot envelope is not processed until after midnight it will still receive a postmark with the drop-off date because the automated computer system does not change the date stamp until 6:00 a.m. the following morning.  *Id.*  The following day, the envelope will be transported to the local postal service plant in the borough corresponding to the delivery address. *Id.* 316:3–6; 12–16.  There, the envelope will undergo another sorting process to identify the postal station that ultimately will deliver the envelope to the addressee.  *Id.* 316:7–11.  Two days after pickup, in accordance with the USPS's two-day service standard, the envelope should arrive at its final destination (i.e., the NYCBOE office in the borough of the voter's residence). *Id.* 316:4–5.

Within the five boroughs of New York City the postal service promises a "two-day service standard," which means that over 98 percent of mail placed in a collection box or delivered to a post office will arrive within two days, excluding Sundays.  *Id.* 313:1–20.  In the normal course, a ballot return envelope dropped off at a mailbox before the final pickup time— usually at 5:00 p.m.—will follow the standard mail flow and be delivered to the borough NYCBOE office two days later.

Postal service representatives testified that they took seriously their commitment to postmark absentee ballots for the June 23 Primary.  Tanko indicated that on June 22, the USPS received over 30,000 absentee ballots which needed to be delivered to voters by the next day.  *Id.* 298:4 –8; 33:6–11.  Tanko directed the Morgan Facility to upgrade the ballots to Express Mail, in order to ensure that voters would receive them in time to vote on June 23, Election Day.  *Id.* 271:7–20; 333:6–19.  As an additional safeguard, during the week before Election Day, the Morgan Facility assigned "gatekeepers . . . to filter through [any ballot return envelopes] that

didn't go through the cancellation machines and actually pull [them] out one at a time and hand cancel them." *Id.* 321:11–14; 321:24–25.  The New York District requested that its various locations also count and postmark any return envelopes missing postmarks. *Id*. 239:15–25.  On the night of June 23, staff at the Morgan Facility "forced everything through the cancellation machines" and were "hand-cancelling [thousand of ballots] that [were] bypassed on the cancellation machines to ensure that they had the correct same-day postmark." *Id.* 318: 6–12; 319:12–13.

Yet, despite the postal service's best efforts, there is uncontroverted evidence that thousands of absentee ballots for the June 23 Primary were not postmarked.  This could be due to a number of human or mechanical errors.  For example, some return envelopes may lack postmarks because, contrary to policy, the envelopes were not routed to the Morgan Facility, or were misdirected and did not pass through the automatic cancellation machinery. *Id*. 326:2–7.  It is also possible that the automated process failed to cancel some ballot envelopes because they were folded over, stuck together, or otherwise avoided the stamping process for mechanical reasons. *Id.* 323:2–7.

IV.     Canvassing of Absentee Ballots

Approximately 1.2 million New York voters, including 414,582 in New York City, voted by absentee ballot in the June 23 Primary.  Brehm Decl. ¶ 9.  This was more than ten times the number of absentee ballots cast in the 2016 primary. *Id.*  For the June 23 Primary, the absentee ballot envelope included instructions for voters. *See* Pl. Ex. 1.  It stated that the

> return envelope with ballot enclosed must reach the Board of Elections not later than 9 p.m. on Election [D]ay, if delivered in person, OR be postmarked not later than the day before the election and received at the Board of Elections not later than seven days following the day of a primary, special or general election to be cast and counted.

*Id.* (After those instructions were printed, the New York Legislature changed the postmark date. Instead of having to be postmarked by the day before Election Day, absentee ballot envelopes are now required to be postmarked by Election Day. *See* NY LEGIS 91 (2020), 2020 Sess. Law News of N.Y. Ch. 91 (S. 8130-D) § 1.)

An absentee ballot contains three components: (1) the ballot, (2) an inner "oath envelope," and (3) an outer return envelope for mailing. *See* Vote — June 2020, *Board of Elections in the City of New York* (last visited Aug. 3, 2020), https://vote.nyc/vote-june-2020; Hearing Tr. 39:15–40:3, 118:13–25; Pl. Ex. 1.

The "canvass" of ballots consists of opening and tallying paper ballots, and confirming the validity of machine counts. Hearing Tr. 193:3–4. The NYCBOE began its canvass of Staten Island ballots on July 6, and ballots from the other four boroughs on July 8. *See* Absentee Ballot Totals, *Board of Elections in the City of New York* (last visited Aug. 3, 2020), https://www.vote.nyc/page/absentee-ballot-totals. When absentee ballots are received by the NYCBOE, they are stamped with the date of receipt, categorized by assembly district and election district, and then categorized based on a preliminary determination by a board employee of validity or invalidity. Hearing Tr. 195:3–8. The ballots are then logged in a computerized system. *Id.* 198:5–7. When it is time for the counting to begin, the absentee ballots are transported to a counting facility by a bipartisan team, which remains with the ballots at all times. *Id.* 198:7–13. There, ballots that have been ruled preliminarily valid are brought out in batches to tables where board staff members are seated for counting. *Id.* 200:18–19. A candidate's campaign is permitted to request copies of the absentee ballots, and to have watchers present at the tables where ballots are opened and validity determinations are made. *Id.* 199:6–10.

At the counting facility, the ballots are presented, NYCBOE employees read aloud the voter's name, and a campaign's watchers are permitted to lodge objections to the preliminary determination of a ballot's validity. *Id.* 200:19–24. Once objections are heard, the board clerk will make a ruling, and the ballot will either be opened and counted, or set aside as invalid. *Id.* 200:24–201:5. If a candidate wishes, the campaign may seek judicial review of the clerk's decision of validity, at which point a photocopy of the ballot and the ballot return envelope are set aside for review by the courts. *Id.* 201:11–15; *see King v. Smith*, 765 N.Y.S.2d 51, 52 (App. Div. 2003). Once all of the ballots that were deemed preliminarily valid are canvassed, campaign representatives have an opportunity to present to the board a list of ballots that were ruled preliminarily invalid, but that they believe should be counted. Hearing Tr. 201:24–202:3. NYCBOE staff reviews the contested ballots and decide whether any should be counted. *Id.* 202:5–8, 202:19–23.

Finally, when the counting is completed, the board performs a "reconciliation," where it checks to ensure the number of ballots counted matches the number of envelopes received (minus the number of ballots that were deemed invalid). *Id.* 203:3–7. And the board also undertakes an audit, in which the ballots in three percent of the election districts in each county are recounted manually to ensure the correctness of the earlier count. *Id.* 203:9–15. These procedures, too, are reviewed by poll watchers. *Id.* 203:16–18.

V.     Plaintiffs and Plaintiff-Intervenors

Plaintiffs and Plaintiff-Intervenors are all registered Democratic Party voters. Compl. ¶¶ 11–26; Intervenor Compl. ¶¶ 12–13.

Emily Gallagher is a candidate for State Assembly in the 50th Assembly District, and the declared primary election winner. Hearing Tr. 12:1–3, 13:2–4. At the hearing, she characterized

her campaign as "grassroots" and focused on increasing transparency and participation in government.  *Id.* 12:14–16.  Gallagher's campaign worked to educate voters about using absentee ballots because it considered that to be a safer option for voting during the COVID-19 pandemic.  *Id.* 16:6–12.  She is concerned that voters in her district who voted by absentee ballot will not have their votes counted because of a missing or late postmark. Not counting those votes, she testified, will "dissuade people from participating in our democracy" and render unclear the scope of her mandate as she enters office.  *Id.* 12:20–22, 17:22–23.  Gallagher urged that "during a pandemic when we've created special circumstances for people to stay safe and healthy, I think that people should feel a sense of trust in that form of voting; otherwise, it's going to be people either putting their own physical well-being at risk to go vote in person or people silencing themselves because they don't trust the system."  *Id.* 18:4–10

Suraj Patel is a candidate for the House of Representatives in the 12th Congressional District.  Patel Decl. ¶ 1, ECF No. 22-5.  As the vote count currently stands, Patel is losing his race by a narrow margin.  *Id.*; *see* New York Primary Election Results: 12th Congressional District, *New York Times* (Aug. 3, 2020), https://www.nytimes.com/interactive/ 2020/06/23/us/elections/results-new-york-house-district-12-primary-election.html.  Maria D. Kaufer is a candidate for Female Democratic District Leader in Part A of the 28th Assembly District, and the preliminary results indicate that she has lost her race by 113 votes.  Kaufer Decl. ¶¶ 1, 6, ECF No. 23; Haggerty Decl. ¶ 4, ECF No. 33.  Ethan Felder is a candidate for Male Democratic District Leader in the same Assembly District, and the preliminary results indicate that he has won his race by 611 votes.  *See* Intervenor Compl. ¶ 13; Haggerty Decl. ¶ 4.

Voters Katherine Stabile, Jillian Santella, Aaron Seabright, James C. McNamee, Kristin Sage Rockerman, Maria Barva, Miriam Lazewatsky, Myles Peterson, Samantha Pinsky,

Christian O'Toole, Tess Harkin, Caitlin Phung, and Antonio Pontex-Nunez are residents of New York City.  As instructed by state and local authorities, they mailed their absentee ballots on either June 22 or 23, and allege that their ballots will be deemed invalid by the NYCBOE due to untimely postmarks.  Compl. ¶¶ 13–26.

VI.   <u>Invalidated Ballots in New York City</u>

In New York City, thousands of absentee ballots cast in the June 23 Primary were invalidated because they (1) arrived after the close of polls on June 23 and lacked a postmark, or (2) reflected a postmark with a date later than June 23.  *See* Pls. Exs. 2, 3; Hearing Tr. 42:20–45:5, 49:2-4, 187:1–17; Patel Decl. ¶ 3; Kaufer Decl. ¶ 9.  The evidence shows that many more ballots were invalidated in Brooklyn than in other boroughs.  Hearing Tr. 187:1–17.

Gallagher directed her campaign to obtain from the NYCBOE absentee ballots that were preliminarily invalidated, *id.* 19:5–24, either because the ballots lacked a postmark, or because they were postmarked with a date later than June 23.  *Id.* 41:12–42:3;  *see also* Pls. Ex. 2, 3.  The board gave her campaign a box of photocopies of every ballot return envelope that had been set aside for no postmark, a late postmark, or some other infirmity, such as a missing signature.  Hearing Tr. 20:21–21:6; *see also id.* 37:11–24.  For most voters, the board provided two sheets of paper: a copy of the inner oath envelope and a copy of the outer return envelope.  *Id.* 37:11–15.  The campaign reviewed the inner envelope, which had to be signed and dated by the voter, and the outer envelope, which included instructions to voters and might contain a handwritten reason for the ballot's invalidation.  *Id.* 39:21–40:3, 111:22 –112:19.

After careful review of the envelopes, Gallagher's campaign concluded that a large number marked invalid had arrived on June 24.  *Id.* 19:12–24, 37:11–46:24; *see also* Pls. Ex. 2 (summary of ballots without a postmark in the Assembly District 50 race).

This analysis was performed by a group of volunteers led by Mikael Haxby, Data Director of New Kings Democrats, an independent Democratic club in Brooklyn.  Hearing Tr. 35:25–36:5, 37:25–38:6.  Haxby created a form that was used by volunteers to input information electronically, distributed instructions to volunteers to help them identify the reasons for a ballot's invalidation, showed volunteers how to record the information, and implemented a process for himself and others to check the data that volunteers input, including by performing hand checks.  *Id.* 38:4–39:14.  Haxby's team reviewed the ballot envelopes to track how many had a missing postmark or a late postmark, and also checked whether the envelope suffered from some other basis for invalidity, such as whether it was signed and dated, whether the date of the signature was after June 23, or marked as being received by the NYCBOE after June 30.  *Id.* 39:15–40:11, 44:14–25.  Haxby's group also performed a similar analysis of ballot envelopes deemed preliminarily invalid in Assembly Districts 52 and 57 races, which had been obtained by the Jesse Pierce and Shaquana Boykin campaigns, respectively.  *Id.* 36:17–21.

The Gallagher campaign reviewed 2,944 invalidated ballots in her race.  Hearing Tr. 49:3–16.  Of those 2,944 ballots, 902 were marked invalid for no postmark and had no other identifiable deficiency that could invalidate the ballot, such as a missing signature or missing date.  *Id.* 42:20–45:5, 49:2–4; *see also* Haxby Decl. ¶ 5, ECF No. 62-1.  More than 97 percent of ballots without a postmark were received by June 26.  Gallagher Decl. ¶ 6.  Of the 2,944 invalidated ballots reviewed, 361 were marked as having a late postmark, 112 of those were postmarked June 24, 66 were postmarked June 25, and 18 were postmarked June 26.  Hearing Tr. 45:6–47:15.

In Brooklyn's 52nd Assembly District, Haxby's team reviewed 1,601 invalidated ballots. Of those, 337 were deemed invalid for lack of a postmark, and 220 for a late postmark.  *Id.*

47:21–48:5.  In Brooklyn's Assembly District 57, Haxby's group checked 437 ballots that were invalidated, 104 of which were rejected for no postmark, and 77 marked invalid for a late postmark.  *Id.* 48:6–11

Patel and Kaufer performed similar analyses with respect to their races.  In Patel's race for Congress, in a district that covers parts of Manhattan, Brooklyn, and Queens, the NYCBOE provided a total of 7,193 absentee ballots from Brooklyn's 50th Assembly District.  Patel Decl. ¶ 3.  Of those ballots, 962 were deemed invalid solely because they lacked a postmark.  *Id.*  The board received another 1,902 absentee ballots from Brooklyn's 53rd Assembly District, 173 of which were invalidated because they lacked a postmark.  *Id.*  All but three ballots were received by June 26.  *Id.*  In Kaufer's race for Female District Leader, 259 ballots were marked invalid due to an untimely postmark.  Kaufer Decl. ¶ 9, ECF No. 23.

The evidence demonstrates that Brooklyn absentee ballots were more likely to lack a postmark as compared to the other boroughs.  Dawn Sandow, Deputy Executive Director of the Board of Elections, Hearing Tr. 181:18–21, testified that although most absentee ballots returned by voters were postmarked, there were substantially more Brooklyn ballots without postmarks, *id.* 182:25–183:5.  Although she could not recall the exact numbers, she testified that there were "possibly" 2,000 ballots invalidated in Brooklyn, whereas there were between 20 to 60 absentee ballots that lacked postmarks in the other boroughs.  *Id.* 187:1–17.

VII.   Invalidated Ballots Outside of New York City

Robert Brehm, NYSBOE's Co-Executive Director, testified that at least ten county boards of elections outside of New York City also invalidated absentee ballots for lack of a postmark.  Brehm Supp. Decl. ¶ 5, ECF No. 67.  In Orange County, 131 absentee ballots were deemed invalid for no postmark.  *Id.*  In Oswego County, 48 were rejected for no postmark.  *Id.*

In Niagara County, the local board of elections received 42 ballots without postmarks.  *Id.*  In

Broome County, 35 absentee ballots were not postmarked.  Essex County saw 22 non-

postmarked ballots.  *Id.*  Wyoming County marked invalid eight for no postmark.  *Id.*

Chautauqua County and Cortland County each rejected five absentee ballots without postmarks.

*Id.*  Seneca County invalidated four absentee ballots, Schuyler County three, and Steuben and

Sullivan Counties one a piece.  *Id.*

Brehm admitted that the data presented to the Court was incomplete.  Conspicuously

absent from his testimony was information about several of the state's most populous counties,

such as Nassau, Westchester, Erie, Monroe, Richmond, Onondaga, Rockland, and Albany

Counties.  *See id.*

## DISCUSSION

I.   Standing

"Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and

'Controversies,' which restricts the authority of federal courts to resolving the legal rights of

litigants in actual controversies."  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013)

(internal quotation marks and citation omitted).  The "Constitution requires that anyone seeking

to invoke federal jurisdiction . . . have standing to do so."  *Crist v. Comm'n on Presidential

Debates*, 262 F.3d 193, 194 (2d Cir. 2001); *see Genesis Healthcare Corp.*, 569 U.S. at 71 ("In

order to invoke federal-court jurisdiction, a plaintiff must demonstrate that he possesses a legally

cognizable interest, or personal stake, in the outcome of the action." (internal quotation marks

and citation omitted)).  "To satisfy Article III, a party must demonstrate an 'injury in fact'; a

causal connection between the injury and the conduct of which the party complains; and that it is

'likely' a favorable decision will provide redress."  *Kowalski v. Tesmer*, 543 U.S. 125, 129 n.2

(2004) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

A.  Injury in Fact

The State Defendants argue that the candidate Plaintiffs, Gallagher, Patel, Kaufer, and

Felder, have not alleged a cognizable injury in fact because they assert their rights as candidates,

not as voters.  State Opp. at 20–21, 24, ECF No. 17.  The City Defendants also contend that

Felder lacks standing because he is currently winning his election, and as a result he is not

injured by the enforcement of § 8-142's postmark requirement.  City Opp. at 4, ECF No. 34.

As an initial matter, the Court notes that even if the candidates did lack standing, the

Court's jurisdiction would be unaffected.  "When, as here, there are multiple plaintiffs, only one

plaintiff need possess the requisite standing for a suit to go forward."  *New York v. U. S. Dep't of*

*Agric.*, No. 19 Civ. 2956, 2020 WL 1904009, at *3 (S.D.N.Y. Apr. 16, 2020) (citing *Town of*

*Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017); *Massachusetts v. E.P.A.*, 549

U.S. 397, 518 (2007)).  And it is undisputed that the voter Plaintiffs have suffered an injury as a

result of the possible invalidation of their ballots.  Because they and the candidate Plaintiffs seek

the same relief, therefore, the candidates need not have standing in their own right.

In any event, all four candidates allege cognizable injuries in fact.  "Injury in fact consists

of an invasion of a legally protected interest that is concrete and particularized and actual or

imminent, not conjectural or hypothetical."  *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732,

736 (2d Cir. 2017) (internal quotation marks and citation omitted).  Obviously, Patel has suffered

such an injury.  As the count now stands, he will lose his race, and he avers that "in all

likelihood, my election will turn entirely on whether or not the voters who voted properly by

absentee ballot have their votes counted."  Patel Decl. ¶ 2.[1]  The same goes for Kaufer.  *See*

---

[1] Since this lawsuit was commenced, Patel's opponent, Congresswoman Carolyn B. Maloney, declared victory in the
race, claiming a "decisive winning margin of over 3,700 votes."  David Brand, Maloney Expands NY-12 Lead, But

Kaufer Decl. ¶¶ 8–9.  Although there is no way to be sure what the invalidated ballots will show, the possibility that counting them could affect the election results is more than sufficient to establish injury to the candidate.  *See, e.g.*, *Hunter v. Hamilton Cnty. Bd. Elections*, 850 F. Supp. 2d 795, 803 (S.D.N.Y. 2012) (holding that a candidate "has a concrete, private interest in the outcome of [a] suit" where "treatment of the disputed ballots matters to the outcome of the . . . election").

The injuries suffered by Gallagher, who has won her race, and Felder, who is winning based on the current count, may be more attenuated but are still real.  *See* Hearing Tr. 13:2–8; Gallagher Decl. ¶ 5; Hagerty Decl. ¶ 4, ECF No. 33.  Candidates have an interest not only in winning or losing their elections, but also in ensuring that the final vote tally accurately reflects the votes cast.  Gallagher testified that she believes she will not enter office with a clear mandate unless every valid vote is counted.  Hearing Tr. 12:14–22; Gallagher Decl. ¶ 5.  Candidates also have an informational interest in an accurate count in their races.  Whether counting additional ballots would increase the margin, strengthening the candidate's political hand, or decreases it, communicating to the candidate that she must make a more vigorous effort to win over the electorate, a candidate has a legally protected interest in ensuring that all valid ballots cast in her election are accounted for.

B.  Causation

The State Defendants also argue that they did not cause the injuries alleged by Plaintiffs, because they are neither responsible for any failure by the USPS to postmark ballots, nor for the invalidation of non-postmarked ballots by the NYCBOE and other local boards of elections.

---

Patel Won't Concede Until Lawsuit Resolved, *Queens Daily Eagle* (July 29, 2020), https://queenseagle.com/all/maloney-expands-ny-12-lead-but-patel-wont-concede-until-lawsuit-resolved.  However, the Court was not presented with any evidence of the final count, and Patel's counsel represents that he has not conceded the race.  Hearing Tr. 439:23–440:1.  Regardless, even if this litigation alone were not enough to tip the balance in Patel's favor, a favorable ruling would move him closer to his goal, and accordingly he has standing to pursue this action.

State Opp. at 8.  For a plaintiff to establish causation, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (internal quotation marks, citation, and alterations omitted).  The burden of showing that an injury is linked to a defendant's conduct, however, is "relatively modest," and a plaintiff need not show that "defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169, 171 (1997).  Rather, it is sufficient for a plaintiff to show "injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169.

If the Court were to rule that the enforcement of the postmark requirement in the June 23 Primary was unconstitutional, the State Defendants would have the power to promulgate a directive enforcing that determination.  Hearing Tr. 78:14–79:7; Brehm Decl. ¶ 6; *see* N.Y. Elec. Law § 3-102(1) ("[T]he state board of elections shall have the power and duty to . . . issue instructions and promulgate rules and regulations relating to the administration of the election process, election campaign practices and campaign financing practices consistent with the provisions of law."); *id.* § 3-102(17) ("[T]he state board of elections shall have the power and duty to . . . perform such other acts as may be necessary to carry out the purposes of this chapter.").  For that reason, the alleged violation of Plaintiffs' and Plaintiff-Intervenors' constitutional rights is fairly traceable to the State Defendants' failure to exercise that authority.  That is, but for the State Defendants' inaction, the relevant ballots would be counted.  Nothing more is required to show causation.  *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013), *as amended* (Mar. 21, 2013) (If it were not "for [the Food and Drug Administration's] challenged inaction, triclosan-containing soaps would not be available on the market.  We therefore conclude that [plaintiff] has satisfied the requirement that

its . . . injury be fairly traceable to the challenged action" (internal quotation marks and citation omitted)); *Nat. Res. Def. Council v. U. S. Consumer Prod. Safety Comm'n*, No. 16 Civ. 9401, 2017 WL 3738464, at *5 (S.D.N.Y. Aug. 18, 2017) ("Even if an agency's inaction is a small, incremental source of plaintiff's injury, it is fairly traceable." (internal quotation marks and citations omitted)).

C.  Redressability

Similarly, the State Defendants argue that an order granting relief to Plaintiffs and Plaintiff-Intervenors would be properly directed to the NYCBOE and other local boards of elections, because the State Defendants do not play a role in canvassing absentee ballots.  State Opp. at 9.  They argue, in other words, that a decision against the State Defendants would not cure Plaintiffs' and Plaintiff-Intervenors' injuries.

Plaintiffs contend, and the Court agrees, that the State Defendants do have the power to direct that absentee ballots be counted, if the Court finds that not counting them violates the Constitution.  *See* Pl. Reply at 3–4, 8–9, ECF No. 22.  Indeed, the Second Circuit has recognized that the NYSBOE has "jurisdiction of, and is responsible for, the execution and enforcement of statutes governing campaigns, elections and related procedures," holding consequently that the NYSBOE's commissioners "have the requisite special relation to [contested provisions of state election law] to render them proper defendants" in suits challenging the application of those provisions.  *Schulz v. Williams*, 44 F.3d 48, 61 n.13 (2d Cir. 1994) (internal quotation marks and citation omitted).

Accordingly, the Court concludes that Plaintiffs and Plaintiff-Intervenors have standing to challenge the enforcement of § 8-412's postmark requirement in the June 23 Primary.

II.     Sovereign Immunity

The Eleventh Amendment to the Constitution, incorporating the longstanding doctrine of sovereign immunity, bars federal lawsuits against a state unless (1) the state unambiguously consents to be sued, or (2) Congress has enacted legislation abrogating the state's Eleventh Amendment immunity.  *See, e.g.*, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996). This immunity extends to "arms of the state, such as state agencies."  *Walker v. City of Waterbury*, 253 F. App'x 58, 60 (2d Cir. 2007) (internal quotation marks and citations omitted). Under *Ex Parte Young*, 209 U.S. 123 (1908), however, that bar does not apply to "suits against state officers acting in their official capacities that seek prospective injunctive relief to prevent a continuing violation of federal law."  *Kelly v. N. Y. Civil Serv. Comm'n*, 632 F. App'x 17, 18 (2d Cir. 2016).  But *Ex Parte Young* does not allow a federal court "to issue an injunction for a violation of state law."  *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)).

Plaintiffs' and Plaintiff-Intervenors' claims against the NYSBOE, therefore, are barred by sovereign immunity.  *See Yang v. Kellner*, No. 20 Civ. 3325, 2020 WL 2129597, at *6 (S.D.N.Y. May 5, 2020), *aff'd sub nom. Yang v. Kosinski*, 805 F. App'x 63 (2d Cir. 2020), and *aff'd* 960 F.3d 119 (2d Cir. 2020).  But their federal claims against the NYSBOE's officers and Governor Cuomo, as well as Plaintiff-Intervenors' claims against the NYCBOE and its officers, are not barred.  *See Weiss v. City Univ. of N. Y.*, No. 97 Civ. 5770, 1999 WL 203354, at *3 (S.D.N.Y. Apr. 12, 1999) ("Cities and their agencies, of course, do not enjoy Eleventh Amendment immunity." (citing *Mt. Healthy City Sch. Dist. Bd. Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Of course, the Court may not issue an injunction against those Defendants for violation of state law.  *See Kelly*, 632 F. App'x at 18.

Accordingly, for the purposes of resolving the request for a preliminary injunction, the Court addresses only prospective injunctive relief under the U.S. Constitution against the individual State Defendants in their official capacity, and the City Defendants.

III.    Necessary Parties

"Under Federal Rule of Civil Procedure 19, a court must dismiss an action where a party was not joined only if: (1) an absent party is required, (2) it is not feasible to join the absent party, and (3) it is determined in equity and good conscience that the action should not proceed among the existing parties." *Seibel v. Frederick*, No. 20 Civ. 2603, 2020 WL 1847792, at *2 (S.D.N.Y. Apr. 13, 2020) (internal quotation marks and citations omitted).

A person must be joined as a necessary party, if feasible, if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).  "Under New York law, the [NYSBOE] has jurisdiction of, and is responsible for, the execution and enforcement of . . . statutes governing campaigns, elections and related procedures." *Schulz*, 44 F.3d at 61 n.13 (citing N.Y. Elec. Law § 3–104). Nevertheless, the State Defendants argue that, in order for this action to proceed, every local board of elections, every candidate on the June 23 Primary ballot who might be affected if the Court grants the requested relief, and the USPS must be joined as necessary parties.  State Opp. at 9.  The City Defendants similarly contend that Kaufer and Felder's electoral opponents are necessary parties to this action.  City Opp. at 5.  The Court disagrees.

First, the argument that every local board of elections must be joined when challenging statewide election restrictions has been consistently rejected by courts in this Circuit.  In *Green*

23

*Party of New York v. Weiner*, for example, voters claimed that the NYCBOE's decision to

conduct the Green Party primary on paper ballots rather than on the voting machines used for the

Republican and Democratic primaries violated their constitutional rights.  216 F. Supp. 2d 176,

180 (S.D.N.Y. 2002).  There too, the NYSBOE contended that it was not a proper defendant

because "under New York Election Law, the [NYSBOE] is responsible only for administering

access to the ballot, whereas local election boards have sole responsibility for administering

elections [and therefore] . . . the [NYSBOE] cannot implement the relief which plaintiffs seek."

*Id.* at 185.  The Court rejected this argument, explaining that the law on the issue "suggests

exactly the opposite."  *Id.*  The argument was also squarely disproved of in *Donohue v. Board of*

*Elections of New York*:

> [I]t is argued that the action should be dismissed for plaintiffs' failure to join all
> fifty-seven [c]ounty [b]oards of [e]lection[s], as well as the Democratic
> Presidential electors, as necessary parties to this action . . . Rule 19 of the Federal
> Rules of Civil Procedure vests the court with wide discretion in deciding whether
> to proceed in the absence of necessary parties; application of the joinder rules
> requires a balancing of interests . . . [W]here it is only a matter of days within
> which this court must act, and the interests of the successful electors are
> adequately protected by counsel for the existing defendants, equity demands that
> the court proceed in their absence."

435 F. Supp. 957, 963 (E.D.N.Y. 1976).

Second, the argument that every candidate who might be affected by the Court's granting

of the requested relief must be added as a necessary party likewise fails.  Defendants cite no

authority for the proposition that in a lawsuit where voters or candidates challenge a statewide

voting practice that violates their constitutional rights, every candidate potentially implicated

must be named as a party.  *See* State Opp. at 8–9; City Opp. at 5.  And for good reason:  Rule 19

does not require that a plaintiff bringing an urgent preliminary injunction motion that implicates

the Constitution include every similarly situated person as a party.  Rather, where the claims are

styled as on behalf of all similarly situated persons, voters and candidates alike, "the Court need not formally certify a class in order to issue the requested preliminary relief." *Yang*, 2020 WL 2129597, at *13 n.5.[2]  The candidate Plaintiffs' opponents were, of course, entitled to move to intervene in this action if they believed their presence in the suit was necessary to protect their interests.  And even if it were the case that Gallagher, Patel, Kaufer, and Felder's opponents qualified as necessary parties, "Rule 19 of the Federal Rules of Civil Procedure vests the court with wide discretion in deciding whether to proceed in the absence of necessary parties" and equity would demand that the Court proceed in their absence.  *Donohue*, 435 F. Supp. at 965.

Lastly, the USPS is not a necessary party.  Plaintiffs and Plaintiff-Intervenors are not asking that the postal service apply a postmark to absentee ballots that lack one.  Instead, Plaintiffs and Plaintiff-Intervenors seek an order directing Defendants to count all absentee ballots cast in the June 23 Primary that were received by boards of elections by June 30, whether or not such ballots bear a timely postmark.  ECF No. 3; *see* ECF No. 11.  Defendants are in a position to provide a solution to this systemic problem.  Whereas the USPS is merely "a conduit" and "delivery service," Hearing Tr. 265:8–10, with which the NYSBOE has partnered, *see id.* 85:12–21, Defendants possess the ballots and can count them (or direct that they be counted), and in doing so, cure any violation of Plaintiffs' and Plaintiff-Intervenors' voting rights.  *See, e.g.*, Gallagher Decl. ¶ 3 (declaring that she filed a state challenge to obtain copies of ballots that the NYCBOE intended to reject, which were provided by the NYCBOE); Patel Decl. ¶ 3 (same).  It is the NYCBOE, under the direction of the NYSBOE, that has invalidated the ballots that Plaintiffs and Plaintiff-Intervenors claim should be counted.  *See id.*  Because it is the NYSBOE

---

[2]  *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit.").

that has the power to order the local boards to count the absentee ballots here, *see Schulz*, 44 F.3d at 61 n.13, the postal service is not needed as a party in order for the Court to "accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

Accordingly, there are no necessary parties missing from this action. And even if there were, given the time in which the Court must act, "equity demands that the court proceed in their absence." *Donohue*, 435 F. Supp. at 963.

IV.    Abstention

Under the *Younger* abstention doctrine, "federal courts must abstain where a party seeks to enjoin an ongoing, parallel state criminal proceeding, to preserve the 'longstanding public policy against federal court interference with state court proceedings' based on principles of federalism and comity." *Disability Rights N. Y. v. New York*, 916 F.3d 129, 133 (2d Cir. 2019) (quoting *Younger v. Harris*, 401 U.S. 37, 43–44, (1971)). "The *Younger* abstention doctrine was extended to include particular state civil proceedings akin to criminal prosecutions and cases that implicate a state's interest in enforcing the orders and judgments of its courts." *EH Fusion Party v. Suffolk Cnty. Bd. Elections*, 401 F. Supp. 3d 376, 387 (E.D.N.Y. 2019) (citing *Disability Right N. Y.*, 916 F.3d at 133), *aff'd*, 783 F. App'x 50 (2d Cir. 2019). "In *Sprint [Communications, Inc. v. Jacobs]*, the Supreme Court held that *Younger's* scope is limited to these three 'exceptional' categories—'ongoing state criminal prosecution,' 'certain civil enforcement proceedings,' and 'civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Disability Right N. Y.*, 916 F.3d at 133 (quoting *Sprint*, 571 U.S. 69, 78 (2013)).

Both Gallagher and Patel filed actions in state court challenging the canvass of ballots in their races. *See Gallagher v. N. Y. City Bd. of Elections*, Index No. 700012/2020 (Sup. Ct. Kings

Cty.); *Patel v. Maloney, et al.*, Index No. 154624/2020 (Sup. Ct. N.Y. Cty.).  Defendants argue

that this Court should abstain from entertaining their "overlapping federal claims."  State Opp. at

21.  But *Younger* abstention is not appropriate here.  In *Sprint*, the Supreme Court emphasized

that its "dominant instruction" has always been "that, even in the presence of parallel state

proceedings, abstention from the exercise of federal jurisdiction is the exception, not the rule."

571 U.S. at 81–82 (internal quotation marks and citation omitted).  Moreover, none of the

circumstances outlined in *Sprint* are present here—and Defendants do not argue otherwise.  *See*

State Opp. at 21.  And although New York election law "provides New York state courts with

jurisdiction to hear expedited challenges arising under [New York] election law, it does not

purport to provide exclusive jurisdiction."  *EH Fusion Party*, 401 F. Supp. 3d at 388.  Plaintiffs'

decision to commence lawsuits in both federal and state court "does not command that the state

suit must proceed ahead of this federal court action."  *EH Fusion Party*, 401 F. Supp. 3d at 388.

Having determined that *Younger* abstention does not apply, the Court proceeds to

consider the merits.

V.     Preliminary Injunction

A.  Legal Standard

A preliminary injunction sought against government action taken pursuant to a statute or

regulatory scheme requires that "the moving party . . . demonstrate (1) irreparable harm absent

injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in

favor of granting the injunction."  *Friends of the E. Hampton Airport, Inc. v. Town of E.

Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).  Moreover, the movant must show that "the balance

of equities tips in his [or her] favor."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

(2008).  "A showing of irreparable harm is the single most important prerequisite for the

issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).

Where a moving party seeks a mandatory preliminary injunction, requiring a change to the status quo, as is the case here, the district court "may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Thomas v. N. Y. City Bd. Elections*, 898 F. Supp. 2d 594, 597 (S.D.N.Y. 2012) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (internal quotation marks omitted)). This standard also applies where the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *People ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citation omitted).

    B.   Analysis

        1.   Irreparable Harm

To establish irreparable harm, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley*, 559 F.3d at 118 (internal quotation marks and citation omitted).

Plaintiffs and Plaintiff-Intervenors have shown irreparable injury because they allege a violation of their constitutional rights in connection with election results that will soon be certified as final.

In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm. *See, e.g.*, *Conn. Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir.

2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citations omitted)); *Statharos v. N. Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary). And the Second Circuit has held specifically that voters' allegations that their ballots will be unconstitutionally excluded from certified results gives rise to irreparable harm. *See Hoblock v. Albany Cnty. Bd. Elections*, 422 F.3d 77, 97 (2d Cir. 2005) ("[I]f the election results are certified without counting the plaintiff voters' ballots, the plaintiff voters will suffer an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages. Such an injury meets the standards for irreparable harm." (internal quotation marks and citation omitted)).

The State Defendants argue that Plaintiffs' and Plaintiff-Intervenors' delay in initiating this action demonstrates that their harm is not irreparable. State Opp. at 22. The City Defendants argue the same with respect to Plaintiff-Intervenors' claims against them. City Opp. at 10–12. The Court is not persuaded that Plaintiffs or Plaintiff-Intervenors dallied in commencing this lawsuit. They could not have reasonably identified the problems with postmarking until July 8, when the NYCBOE began counting absentee ballots in Brooklyn, Queens, and the Bronx. And the full scope of the issue likely did not become clear to Plaintiffs until Gallagher and Patel filed state court challenges that allowed them to obtain copies of the invalidated ballots. Hearing Tr. 19:15–20:4; *see also* Gallagher Decl. ¶ 3.

In any event, "where, as here, an alleged wrongful governmental act has resulted in an ongoing deprivation of constitutional rights, delay in seeking relief does not defeat the presumption of irreparable harm—at least when the delay is not so severe as to implicate the equitable doctrine of laches." *Yafai v. Cuccinelli*, No. 20 Civ. 2932, 2020 WL 2836975, at *4 (S.D.N.Y. June 1, 2020). Laches can be asserted as a defense only when plaintiffs are "guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) (internal quotation marks and citation omitted). This action, which was filed within 25 days of Election Day, and nine days after absentee ballot counting began, was timely commenced.

The Court finds, therefore, that Plaintiffs and Plaintiff-Intervenors have established the threat of irreparable harm absent a preliminary injunction.

### 2.   Likelihood of Success on the Merits

Plaintiffs and Plaintiff-Intervenors allege that the failure to count their ballots violates three constitutional guarantees: (1) the First Amendment right to expressive association through voting, Compl. ¶¶ 82–91; (2) the Fourteenth Amendment's Equal Protection Clause, *id.* ¶¶ 92–99; and (3) the Fourteenth Amendment's Due Process Clause, *id.* ¶¶ 100–105.

The Court concludes that Plaintiffs have demonstrated a clear and substantial likelihood of success on the merits of their First Amendment and Equal Protection Clause claims.[3]

---

[3] Second Circuit precedent is not entirely clear on the question of whether voters may assert a freestanding Due Process claim based on alleged unfairness in election procedures, or whether such unfairness is merely a dimension of a claim that restrictions burden voters' rights under the First Amendment—which applies to states under the Due Process Clause. *See Corren v. Condos*, 898 F.3d 209, 217 n.1 (2d Cir. 2018). Because Plaintiffs and Plaintiff-Intervenors have established a likelihood of success on their First Amendment and Equal Protection claims, the Court need not decide whether a separate Due Process claim would be viable.

a.   First Amendment

"States have a broad power to regulate the time, place, and manner of [primary]

elections," but "they have a responsibility to observe the limits established by the First

Amendment rights of the [s]tate's citizens."  *Yang*, 960 F.3d at 130 (internal quotation marks,

citation, and alterations omitted).  "The State's power cannot be used, for example, to create

barriers that unduly burden a person's right to participate in a state-mandated . . . primary."  *Id.*

In assessing an alleged burden on voters' First Amendment rights related to casting a

ballot, a court must "first consider the character and magnitude of the asserted injury to the rights

protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate," then

"identify and evaluate the precise interests put forward by the State as justifications for the

burden imposed by its rule," and then "determine the legitimacy and strength of each of those

interests" and "consider the extent to which those interests make it necessary to burden the

plaintiff's rights."  *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  "[T]he rigorousness of [a

court's] inquiry into the propriety of a state election law depends upon the extent to which a

challenged regulation burdens First and Fourteenth Amendment rights."  *Burdick v. Takushi*, 504

U.S. 428, 434 (1992).  "[W]hen those rights are subjected to 'severe' restrictions, the regulation

must be 'narrowly drawn to advance a state interest of compelling importance'"—in other words,

the restriction must survive the standard commonly referred to as "strict scrutiny."  *Id.* (citation

omitted).  "But when a state election law provision imposes only reasonable, nondiscriminatory

restrictions upon the First and Fourteenth Amendment rights of voters, the State's important

regulatory interests are generally sufficient to justify the restrictions."  *Id.* (internal quotation

marks and citation omitted).

The question before the Court is not whether § 8-412's requirement that ballots be postmarked is constitutional in the abstract, but rather whether it is unconstitutional as applied under the circumstances of this case.  The burden on voting rights that must be analyzed, therefore, is the burden created by enforcing the postmark requirement in an election where thousands of ballots, constituting a significant percentage of the total ballots cast in certain races, were rendered invalid by its application, even though the evidence shows those ballots were mailed on time.

That burden is exceptionally severe.  A large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control.  In Patel's race, 1,135 of 8,285 absentee ballots received by the NYCBOE within a week of Election Day—more than 13%—were not postmarked.  Patel Decl. ¶¶ 3–4.  Of those, 691 were received by the NYCBOE on June 24, and another 144 were received on June 25.  *Id.*  In Gallagher's race, 923 of 9,689 absentee ballots lacked a postmark (nearly 10%).  Gallagher Decl. ¶ 6.  628 of those were received on June 24, and 131 on June 25.

Moreover, in light of the ongoing COVID-19 pandemic, there was an uncommonly compelling reason for many voters to vote by absentee ballot in the June 23 Primary, and the State Defendants encouraged them to do so.  *See, e.g.,* N.Y Exec. Order No. 202.15 (Apr. 9, 2020) (providing that "due to the prevalence and community spread of COVID-19, an absentee ballot can be granted based on temporary illness and shall include the potential for contraction of the COVID-19 virus"); N.Y. Exec. Order No. 202.23 (Apr. 24, 2020) (directing that "every voter that is in active and inactive status and is eligible to vote in a primary or special election to be held on June 23, 2020 shall be sent an absentee ballot application form with a postage paid return option for such application").

Applying § 8-412 to invalidate such a significant number of absentee ballots, when there is strong evidence that those ballots are otherwise valid, where many voters doubtless saw little choice but to use absentee ballots during the COVID-19 pandemic, and after the state took a variety of proactive measures to increase the use of absentee ballots, would strike a serious blow to voters' First Amendment right to associate themselves with candidates who express their values, if not undermine confidence in the democratic process itself.

Because applying the postmark requirement to the June 23 Primary would severely burden voters' rights, the Court must apply strict scrutiny, and consider whether such a measure is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks and citation omitted). The State Defendants argue, and the Court agrees, that the state has a legitimate interest in ensuring that all ballots are cast before the polls close on Election Day. State Opp. at 15–16. But as applied in the June 23 Primary, the postmark requirement was not narrowly fashioned to advance that interest.

State action is not narrowly drawn if it is "overinclusive," meaning that it regulates conduct that does not meaningfully advance the state interest at issue. *Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991). At least as applied to ballots received within two days of Election Day in the June 23 Primary—that is, by June 25— the postmark requirement is grossly overinclusive. An absentee ballot received on June 24 cannot possibly have been put in the mail later than June 23. *See* Hearing Tr. 246:21–24, 252:2– 5, 341:10–18. Moreover, credible USPS testimony established that (1) "the flow of mail does not allow" for one-day delivery, even within a borough, under normal circumstances, and (2) over 98 percent of mail will arrive two days after being placed in a mailbox or delivered to a post office. *Id.* 313:16–20; *see also id.* 313:21–314:12, 341:14–18. Thus, the Court concludes with a

high degree of confidence that ballots received by the NYCBOE on June 25 were mailed on June 23 or earlier.  Enforcing § 8-412 against those ballots would do nothing to advance the state's interest in ensuring ballots are cast by Election Day, and would result in timely cast votes being needlessly rejected.

Moreover, there are less restrictive means of advancing the state's interest in ensuring that ballots are timely submitted. The state could simply rely on the evidence from the USPS demonstrating that absentee ballots received within two days of Election Day were almost certainly placed in the mail on Election Day, or earlier.  And local boards may examine the dated signatures that voters were required to affix to their "oath envelopes."  Hearing Tr. 67:4–10; *see* Brehm Decl. ¶ 11 ("Once a voter receives an absentee ballot, the voter marks the ballot with the voter's vote selection, [and] places the ballot in an 'Affirmation Envelope' which is signed, dated, and sealed."); Patel Decl. ¶ 3(a)(vi) ("Nearly all of the ballots that we could read were signed and dated on or before June 23."); Gallagher Decl. Ex. A, ECF No. 22-2 (showing that the overwhelming majority of ballots invalidated for lack of postmark in Gallagher's race have signatures dated on or before June 23).  Applying the postmark requirement to absentee ballots cast in the June 23 Primary, therefore, cannot survive strict scrutiny.

Even if the Court were to apply the more flexible balancing test applied to reasonable, non-discriminatory restrictions, the state's application of § 8-412 in the June 23 Primary would impose an unacceptable burden on voters' First Amendment rights.  Enforcing the postmark requirement to invalidate ballots received within two days of Election Day would be unlikely to capture ballots that were cast late, given the evidence that mail (or at least mail that must receive a postmark) takes two days to be delivered within a borough.  On the other hand, doing so would cause the invalidation of a large number of ballots that were timely cast.  Such a burden is not an

acceptable price to pay in return for the slim chance of catching some genuinely late votes. Indeed, the New York Legislature has recognized the weakness of the state's interest in applying the postmark requirement to ballots received close to Election Day, by amending § 8-412 so that, in future elections, a postmark will only be required for absentee ballots received two days after Election Day or later.  *See* S8799A/A10808A (July 16, 2020).

The State Defendants argue that even if enforcement of the postmark rule will deprive voters of the opportunity to have their otherwise valid and timely ballots counted, those voters cannot make out a constitutional claim, because burdens on the right to vote created by mere inadvertence or negligence do not violate the Constitution.  State Opp. at 14.  The Second Circuit has held that "[i]n general, garden variety election irregularities do not violate the Due Process Clause" (or the First Amendment rights of expressive association that the Due Process Clause protects from state infringement).  *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005) (internal quotation marks and citation omitted).  "[P]laintiffs must prove an intentional act in order to show a due process violation."  *Id.*  As a result, the Court may find a violation of First Amendment rights only if Plaintiffs and Plaintiff-Intervenors have demonstrated "purposeful state conduct directed at disenfranchising a class or group of citizens."  *Id.*

The State Defendants contend that Plaintiffs and Plaintiff-Intervenors have failed to satisfy this burden.  They claim that the asserted injuries are, at most, a result of the USPS's inadvertent failure to postmark certain ballots.  State Opp. at 14.  As a result, they argue, Plaintiffs and Plaintiff-Intervenors have not demonstrated that the State Defendants purposefully burdened their right to vote.

But the Constitution is not so toothless.  When voters have been provided with absentee ballots and assured that their votes on those ballots will be counted, the state cannot ignore a later

discovered, systemic problem that arbitrarily renders those ballots invalid.  For example, in
*Hoblock v. Albany County Board of Elections*, a county board of elections sent both primary and
general election absentee ballots to voters who had submitted absentee ballot requests for the
primary.  After the ballots had been sent and voters had returned them, the New York state courts
held that the general election ballots had been sent to voters unlawfully, and invalidated them.
422 F.3d at 81–82.  Voters sued the board in federal court, and the Second Circuit affirmed a
preliminary injunction directing the board to count the votes.  *Id.* at 98.  The court held that
"when election officials refuse to tally absentee ballots that they have deliberately (even if
mistakenly) sent to voters, such a refusal may violate the voters' constitutional rights," and
accordingly affirmed the district court's finding that the voters had established a likelihood of
success on their constitutional claims.  *Id.*

The situation before the Court is closely analogous.  In response to the COVID-19
pandemic, Governor Cuomo ordered that absentee ballots be made available to a much larger
number of voters than ever before.  Ultimately, more than 1.2 million absentee ballots were cast
statewide, and approximately 414,582 were cast in New York City.  Brehm Decl. ¶ 9.  For those
who voted by absentee ballot in the Gallagher and Patel races—and in particular, for those voters
living in Brooklyn, *see* Hearing Tr. 187:10–188:15—accepting the state's offer to vote by
absentee ballot and following the state's instructions to vote timely, nonetheless resulted in their
ballots not being postmarked, and, consequently, invalidated under § 8-412.  Under these
circumstances, the policy embodied by the postmark rule, deliberately adopted and intentionally
applied to those ballots, is sufficient to establish a violation of the Due Process Clause and the
First Amendment.  *See Hoblock v. Albany Cnty. Bd. Elections*, 487 F. Supp. 2d 90, 96 (N.D.N.Y.
2006) ("[I]t would make for an empty constitutional right if one's franchise extended only so far

as placing one's ballot in the ballot box.  If that were the case, the situation of a ballot box subsequently 'falling off of a truck' would be of no constitutional moment.  That is an unacceptable result.").

This is not a "garden variety" election irregularity.  If § 8-412 is applied to the June 23 Primary, the votes of thousands of New Yorkers—almost one in ten votes cast in certain races— will be disregarded, because of a systematic failure.  Nor is this a case that involves only state or local races, where "[p]rinciples of federalism limit the power of federal courts to intervene." *Shannon*, 394 F.3d at 94.  Rather, alongside local and state races, the June 23 Primary included congressional races and a presidential primary election, and in those races the federal interest in protecting voting rights is at its height.  *See Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The Court has consistently recognized that all qualified voters have a constitutionally protected right to cast their ballots and have them counted at Congressional elections.  Every voter's vote is entitled to be counted once.  It must be correctly counted and reported. . . . And these rights must be recognized in any preliminary election that in fact determines the true weight a vote will have." (internal quotation marks and citations omitted)); *United States v. Classic*, 313 U.S. 299, 315 (1941) ("Obviously included within the right to choose [Congressional representatives], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections.  This Court has consistently held that this is a right secured by the Constitution.").

Accordingly, Plaintiffs and Plaintiff-Intervenors are likely to succeed on their claim that the purposeful application of § 8-412 to invalidate their absentee ballots violates their rights under the First and Fourteenth Amendments.

b.  Equal Protection

The principle of "one person, one vote" requires that courts seek to "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's." *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970).  "The right to vote is protected in more than the initial allocation of the franchise." *Bush v. Gore*, 531 U.S. 98, 104 (2000).  "Equal protection applies as well to the manner of its exercise." *Id.*; *see also Hoblock*, 487 F. Supp. 2d at 96 ("More than just the act of voting . . . the counting of said vote is also guarded." (internal quotation marks and citation omitted)).  "Having once granted the right to vote on equal terms, the [s]tate may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104–105.

As applied here, §8-412's postmark requirement—in the context of (1) Executive Order 202.26 directing that absentee ballots be mailed to voters with a postage-paid return envelope, (2) the inconsistent application of postmarks to absentee ballots depending on where voters live, and (3) Defendants' refusal to count such ballots—has created a voting process where the State "by later arbitrary and disparate treatment, value[s] one person's vote over that of another." *Id.* The inconsistent treatment of ballots that were timely cast, especially when considering the prevalence of ballots lacking postmarks in Brooklyn as compared to the other boroughs, raises issues indistinguishable from those in *Bush v. Gore*, which involved varying standards for the recount of ballots in Florida counties.

In *Bush v. Gore*, much of the controversy revolved around ballot cards designed to be punched by a stylus but which, either through error or deliberate omission, were not punctured with sufficient precision for a machine to register the vote.  *Id.* at 105.  The Florida Supreme Court ordered that the intent of the voter be discerned from such ballots.  *Id.*  The Supreme Court

found that this command was "unobjectionable as an abstract proposition and a starting principle." *Id.* at 106. The problem, however, was "the absence of specific standards to ensure its equal application." *Id.*

Although the State Defendants argue that all absentee voters were treated in the same way, State Opp. at 17, the evidence belies this, suggesting instead that the June 23 Primary suffered from a lack of "specific standards to ensure . . . equal application" of §8-412's postmark rule, because of the inconsistent application of postmarks to absentee ballots, *Bush*, 531 U.S. at 106. As the NYCBOE Deputy Executive Director testified, although most absentee ballots were postmarked, there was a subset in Brooklyn that lacked postmarks. Hearing Tr. 182:25–183:5. Although she could not recall the numbers exactly, she testified that there were "possibly" 2,000 ballots invalidated in Brooklyn, whereas there were between 20 to 60 absentee ballots that lacked postmarks in the other boroughs. *Id.* 187:2-17. A review of the vote in Patel's race for New York Congressional District 12 further demonstrates that absentee ballots were, in effect, treated differently depending on whether they were cast in Manhattan, Queens, or Brooklyn. Although a significant number of ballots were invalidated in all three boroughs, the proportion of ballots invalidated for lack of a postmark in Brooklyn was 50 percent higher than in Manhattan and Queens. *See* Pl. Reply at 5–6 (noting that of the total absentee ballots, 18.9 percent of Manhattan ballots were marked invalid; 19 percent in Queens; and 27.6 percent in Brooklyn); *see also* ECF Nos. 22-7, 22-8.

This is strong evidence that USPS locations in Brooklyn handled absentee ballots differently from the postal service locations in the other boroughs. Whether they were not delivered to the Morgan Facility, or mishandled once they got there, a significant number of Brooklyn ballots that should have been postmarked were not. Whether an individual's vote will

be counted in this race, therefore, may depend in part on something completely arbitrary—their place of residence and by extension, the mailbox or post office where they dropped off their ballot.  Not only is this "not a process with sufficient guarantees of equal treatment," it is also the type of differential treatment that the Supreme Court has found to violate the "one person, one vote" principle.  *Bush*, 531 U.S. at 107 ("An early case in our one-person, one-vote jurisprudence arose when a [s]tate accorded arbitrary and disparate treatment to voters in different counties." (citing *Gray*, 372 U.S. at 378 –381)).

The procedures for counting absentee ballots also present issues of disparate treatment with respect to votes that were mailed on the days right before the election.  "An absentee ballot envelope returned by mail is valid if it arrives at the local board of election either before the close of polls on [E]lection [D]ay, or else within seven days after [E]lection [D]ay provided it has a postmark of not later than the day of the election."  Brehm Decl. ¶ 11.  Calabrese testified that the USPS has a two-day service standard.  Hearing Tr. 332:14–17.  Consider then, the case of two absentee ballots cast on June 22, at the same time, at different post offices, and assume that both are not postmarked.  Under the rule that an absentee ballot returned by mail is valid if it arrives at the local board before the close of polls on June 23, whether either vote is counted depends entirely on the speed of the post office handling their ballot.  If the first post office delivers the ballot to the local board ahead of schedule, meaning that it arrives by June 23, then that vote would be counted.  *See* Brehm Decl. ¶ 11.  If the second post office delivers the ballot to the local board in two days, meaning by June 24, then that ballot would be invalidated.  A voter's right to vote, therefore, may hinge on random chance.  Hearing Tr. 167:1–11 (The Court: "So then the . . . voter's precious right to vote is just left to chance, random chance, whether he or she ends up with a post office that does its job."  Commissioner Kellner: "That's absolutely

correct, Judge, and I could give you thousands of examples of where random chance disenfranchises voters in our current election system, and, yes, we want to try to address them, but you have to address them in a way that is administratively doable.  And I might add again, the legislature has changed the law so that in November a ballot that's delivered without a postmark on the day after Election Day is going to be counted . . . .").

In other words, whether the votes of these two voters—who cast their votes in precisely the same manner—are counted depends entirely on the speed at which their local post office delivered their votes.  And it demonstrates that Defendants have created a voting process where arbitrary factors lead the state to valuing one person's vote over that of another—the kind of process specifically prohibited by the Supreme Court.  *See Bush*, 531 U.S. at 104–105.

A review of the ballots that the NYCBOE has preliminary invalidated for lack of a postmark in Gallagher's and Patel's races shows that this situation is not hypothetical:  hundreds of ballots mailed before June 23, but received after June 23, will be invalidated due to the time it took the postal service to deliver the ballot.  This is true even considering that the USPS standard for delivery of mail sent from a New York City address to another New York City address is one-to-two business days, a standard that the USPS satisfies 98 percent of the time.  Hearing Tr. 314:10–12.  For example, the NYCBOE has not counted 628 absentee ballots that were cast in Gallagher's race and 691 absentee ballots that were cast in Patel's race that were received by the NYCBOE on June 24.  Gallagher Decl. ¶ 6, Patel Decl. ¶ 3.   But the Court concludes that absentee ballots received by the NYCBOE on June 24 and 25, 2020 were necessarily mailed on or before June 23, 2020, the postmark deadline for absentee ballots reflected in N.Y. Election Law § 8-412.  *See* Brehm Decl. ¶ 11.  Considering that ballots that are postmarked by June 23 and received by June 30 are being counted, *see* Brehm Decl. ¶ 11, the postmark requirement, in

41

conjunction with the absence of postmarks on timely mailed absentee ballots—a factor

completely out of a voter's control—creates an arbitrary voting system with insufficient

"guarantees of equal treatment." *Bush*, 531 U.S. at 107.  This cannot stand.

The State Defendants argue that Plaintiffs have not established a clear likelihood of

success on their equal protection claim because they have failed to show that Defendants'

conduct constituted intentional or purposeful discrimination.[4]  State Opp. at 17.  To the extent

that this is an attempt to question the equal protection principles set forth in *Bush v. Gore*, and

their application here, such an attempt is not persuasive.  The Supreme Court held in that case

that an equal protection violation occurs when a state's vote counting procedures lacked

"minimum procedures necessary to protect the fundamental right of each voter," and made no

mention of the government's intent to disenfranchise voters.  *Bush*, 531 U.S. at 109.  Now that

systemic postmarking issues have been revealed, and the effect is that § 8-412 requires

identically situated ballots to be counted or invalidated based on random chance, the state

violates the Equal Protection Clause when it deliberately continues to apply that policy.  *See*

*Hoblock*, 487 F. Supp. 2d at 97 ("[W]hen a group of voters are handed ballots by election

officials that, unsuspected by all, are invalid, [and then] state law . . . forbids counting the ballots,

the election officials violate the constitutional rights of the voters, and the election process is

flawed." (internal quotation marks and citation omitted)).

Accordingly, given arbitrary postmarking of absentee ballots, and the State's decision to

determine ballot eligibility on the basis of that arbitrary practice, the Court finds § 8-412's

---

[4] Defendants do not cite—much less distinguish—*Bush v. Gore.  See generally* State Opp.; City Opp.  This failure to respond to Plaintiff's substantial argument can be taken as a concession of the case's applicability.  *See In re UBS AG Secs. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept.28, 2012) (recognizing that a party "concedes through silence" to arguments by its opponent that it fails to address); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 392–93 & n.116 (S.D.N.Y.2002) (considering an argument not addressed in opposition brief to be waived).

postmark requirement subjects absentee voters across the state to unjustifiable differences in the way that their ballots are counted.  Plaintiffs and Plaintiff-Intervenors, therefore, have demonstrated a likelihood of success on their equal protection claim.

### 3.   Balance of Equities and Public Interest

The equities tip strongly in Plaintiffs and Plaintiff-Intervenors' favor.  In assessing the balance of equities, "the court must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'"  *Make the Rd. N. Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (quoting *Winter*, 555 U.S. at 24).

Plaintiffs' and Plaintiff-Intervenors' injuries arising from the possible invalidation of timely mailed absentee ballots across New York City are substantial.  The loss of one's vote is a serious burden on constitutional rights.  *See N. Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (holding that denial of First Amendment expressive rights constitutes "significant" hardship).  As already discussed at length, voter Plaintiffs followed the rules mandated by state and local election authorities, yet face disenfranchisement through no fault of their own.  Similarly, Gallagher testified to the cognizable harms that she and her constituents will suffer as a result of ballot invalidation.  Hearing Tr. 12:16–20 ("I am very concerned that voters in my district have been silenced due to no fault of their own . . . ."); *id.* 12:20–22 ("And I feel that if we are leaving out ballots from the count, it's unclear what my mandate is as I enter into the assembly.").

There are also meaningful costs to Defendants from granting the requested relief. Requiring the counting of ballots received without a postmark will surely involve logistical challenges and extensive coordination throughout the state with local boards of elections.

Commission Kellner testified that it would be a "very substantial and burdensome" task for boards of elections to recanvass absentee ballots and require "tens of thousands of person hours" to complete. *Id.* 114:21–115:5. He also stated that boards of elections are already "extraordinarily overburdened in preparing for the November election." *Id.* 115:1–5. The Court does not take these burdens lightly. But Defendants are already in possession of the absentee ballots that must now be deemed valid, and local boards of elections were required to record the date each absentee ballot was received. This should permit Defendants to respond appropriately to an injunction. Moreover, as Defendants testified, there were relatively few ballots marked as invalid on June 24 and 25, with the exception of ballots in Brooklyn. *Id.* 182:25–183:8.

In addition, Congress has taken steps, and may well take further action, to provide states with additional resources to address challenges on election administration brought on by the COVID-19 crisis. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281, 530–31 (2020) (appropriating $400 million dollars in "[e]lection [s]ecurity [g]rants" to help states "prevent, prepare for, and respond to coronavirus, domestically or internationally, for the 2020 [f]ederal election cycle"); *see also, e.g.*, The Heroes Act, H.R. 6800, 116th Cong. at 38 (2020) (proposing an appropriation of $3.6 billion in grants to states "for contingency planning, preparation, and resilience of elections for [f]ederal office"); State Elections Preparedness Act, S. 3778, 116th Cong. § 2(a) (2020) (proposing a waiver of the requirement that states provide matching funds for election security grants). The Court is aware that judicial intervention into state election administration, even when compelled by the Constitution, is a blunt instrument. Congress should exercise its power to equip states with more flexible—and well-funded—tools to prevent the recurrence of problems like those in this case, and to swiftly resolve vote counting issues which may arise.

There is a strong public interest in granting an injunction in this case. "[S]ecuring First Amendment rights is in the public interest." *N. Y. Progress & Prot. PAC,* 733 F.3d at 488. In reliance on *Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205 (2020), the State Defendants argue that an injunction is not in the public interest because "it would upend the rules by which the [June 23 Primary] was conducted." State Opp. at 23. Not so. Unlike in *Republican National Committee*, an injunction in this case would not "alter the election rules on the eve of an election." 140 S. Ct. at 1207. To the contrary, and in line with the expectations of voters and candidates alike, the requested relief would prevent boards of elections from disregarding timely filed absentee ballots. Moreover, there is no concern of "judicially created confusion" in the run-up to Election Day. *Id.* Election Day has come and gone. Requiring Defendants to count valid ballots already cast will provide clarity in the face of unexpected and constitutionally significant chaos, and strengthen voters' faith in the franchise.

Plaintiffs and Plaintiff-Intervenors have made a strong showing of irreparable harm without emergency relief, established a clear and substantial likelihood of success on the merits of their First and Fourteenth Amendment claims, and demonstrated that the balance of equities tips decisively in their favor and that the public interest would be served by such relief. Accordingly, the Court holds that Plaintiffs and Plaintiff-Intervenors have established their entitlement to a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.

VI.    Scope of Relief

Having determined that Plaintiffs have established their entitlement to an injunction to rectify the violation of their constitutional rights resulting from the state's decision to not count non-postmarked absentee ballots cast in the June 23 Primary when those ballots have other

guarantees of being timely mailed, the Court now turns to the scope of the relief that should be granted.

As the Court has stressed, the virtual certainty that absentee ballots received by a board of elections on June 24 or June 25 were cast on or before June 23 means that enforcing § 8-412 against those ballots is pointless.  The state interest in ensuring that all votes are cast by the close of polls on Election Day is not served by requiring a postmark on ballots that, as a factual matter, could not have been cast after the close of polls on Election Day.  The evidence before the Court does not establish to the same level of certainty, however, that absentee ballots received by the NYCBOE or another local board on June 26 or later were mailed on or before June 23—though, to be sure, it is possible that some ballots may have taken three days or longer to get to local boards, given the extraordinary strain on the postal service created by the pandemic and the surge of absentee balloting.[5]  The testimony of USPS officials also indicates that when a ballot does contain a postmark, it is likely that the postmark reflects the date the ballot was mailed by the sender and received by the postal service.  Hearing Tr. 337:9–25.  Accordingly, the Court will limit relief to ballots received by a local board of elections on June 24 or 25, so long as those received on June 25 are not postmarked after June 23.

Plaintiffs seek an order on behalf of themselves and all others similarly situated throughout the state.  *See* Compl. at 1, 21.  Thus, they ask the Court to order statewide relief. The evidence before the Court does not show a widespread problem of absentee ballots being invalidated for lack of a timely postmark outside of New York City.  *See* Brehm Supp. Decl. ¶ 5. Still, it is clear that *some* absentee ballots were invalidated for lack of a postmark in upstate and

---

[5]Although the Court holds that absentee ballots received by June 25 were presumptively timely cast despite the absence of a postmark, the Court does not hold that non-postmarked ballots received from June 26 to June 30 were presumptively *not* timely cast.  To the extent that a candidate can show that a tally of the latter ballots could be outcome dispositive of a race, the Court, upon application of a candidate aggrieved by the count, shall consider what remedy, if any, is available.

western New York.  *Id.*  In the rest of the state, as in New York City, it is virtually impossible

that a ballot return envelope received by a local board on June 24 was mailed later than June 23,

and highly likely that a ballot received on June 25 was mailed on June 23 or earlier.  *See* 39

C.F.R. § 121.1 (2014) (providing that a two-day service standard applies to first-class mail when

the sender and the destination share a sectional center facility—i.e., when their zip codes have

the same first three digits—and that a three day service standard applies to other first-class mail

within the contiguous United States); *see also Am. Postal Workers Union, AFL-CIO v. Postal

Regulatory Comm'n*, 842 F.3d 711, 713 (D.C. Cir. 2016) (holding that the promulgation of

§ 121.1 in its present form "shifted a substantial portion of mail previously subject to the

overnight standard to either the two-, three-, four-, or five-day service standards, and further

transferred a large volume of the two-day mail to the three-, four-, and five-day service

standards").

For the reasons already set forth, applying § 8-412's postmark requirement to those

ballots is not justified by the need to ensure that they were timely cast, so long as they were

received by boards of elections on June 24 or 25, and were not postmarked after June 23.

Enforcing the requirement upstate would impose the same burden on the right to vote and enact

the same unequal treatment as it would in the five boroughs.  Moreover, counting absentee

ballots without timely postmarks in New York City but not counting them in the rest of the state

would risk running afoul of the Constitution's guarantee of equal treatment.  *See Bush*, 531 U.S.

at 109.  The Court concludes, therefore, that it must grant statewide relief.

**CONCLUSION**

For the reasons stated in this opinion, the preliminary injunction is GRANTED as follows:  the Commissioners of the NYSBOE are ORDERED to direct all local boards of elections to count all otherwise valid absentee ballots cast in the June 23 Primary which were (1) received by June 24, 2020, without regard to whether such ballots are postmarked by June 23, 2020 and (2) received by June 25, 2020, so long as such ballots are not postmarked later than June 23, 2020.

The Clerk of Court is directed to terminate the motions at ECF Nos. 3, 21, and 63.

SO ORDERED.

Dated:  August 3, 2020
        New York, New York

_____

ANALISA TORRES
United States District Judge