**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Emily Gallagher, Suraj Patel, Katherin Stabile, Jillian Santella, Aaron Seabright, James C. McNamee, Kristin Sage Rockerman, Maria Barva, Miriam Lazewatsky, Myles Peterson, Samantha Pinsky, Christian O'Toole, Tess Harkin, Caitlin Phung, Antonio Pontón-Núñez, *individually, and on behalf of all others similarly situated,*<br><br>        Plaintiffs,<br><br>    v.<br><br>New York State Board of Elections; Peter S. Kosinski, Andrew Spano, and Douglas Kellner, *individually and in their official capacities as Commissioners of the New York State Board of Elections*; Todd D. Valentine, Robert A. Brehm, *individually and in their official capacities as Co-Executive Directors of the New York State Board of Elections*; and Andrew Cuomo *as Governor of the State of New York,*<br><br>        Defendants. | Docket No. 20-cv-5504-AT<br><br>**FIRST AMENDED COMPLAINT** |

| |
|---|
| Maria D. Kaufer and Ethan Felder,<br><br>        Plaintiff-Intervenors,<br><br>  v.<br><br>New York State Board of Elections; Peter S. Kosinski, Andrew Spano, and Douglas Kellner, *individually and in their official capacities as Commissioners of the New York State Board of Elections*; Todd D. Valentine, Robert A. Brehm, *individually and in their official capacities as Co-Executive Directors of the New York State Board of Elections*; and Andrew Cuomo *as Governor of the State of New York*, New York City Board of Elections, Patricia Anne Taylor, *individually and as President of the New York City Board of Elections,* and Michael J. Ryan, *individually and as the Executive Director of the New York City Board of Elections,*<br><br>        Defendants. |

Plaintiffs, for their first amended complaint, allege as follows:

## INTRODUCTION

1.      This action focuses on – in the words of the New York State Board of Elections (together with the Commissioners and Executive Directors of the State Board, along with the Governor, the "Board") – an "unacceptably high" number of voters disenfranchised by the interactions between New York's Election Law and United States Postal Service ("USPS") services, and the "urgen[t]" question of how to protect those voters.  *See* August 10, 2020 Letter from the Board to USPS (a true copy of this letter, along with a declaration verifying it, is attached as Exhibit 3).

2.      In New York's June Primary Election, thousands of voters, concentrated in Brooklyn, stood to be disenfranchised through no fault of their own – because New York's Election Law's broad sweep would toss out their unquestionably valid vote.  This Court stepped in, however, and protected the rights of many of those voters.  *See generally*, *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219 (S.D.N.Y. Aug. 3, 2020).

3.      The risks faced by voters in November and going forward are dire:  USPS services are less reliable than ever, and – in New York City at least – voters interact with a local board of elections that saw no issue with sending out approximately 35,000 absentee ballots *the day before election day*.  As Commissioner Kellner described it, rather than assure voters received their ballots in a timely manner, the City Board "threw up their hands and said, 'Well, there's nothing more that we can do.'"  Without the Court's intervention, voters have no guarantee of protection against the very same issues that so marred the June Primary.

4.      And yet, the Board believes there is no need to assure that ballots get to voters in a timely way, and further, that the Court went too far in addressing the June Primary.

5.      As the Supreme Court has long recognized, the right to vote is *the* "fundamental political right, because [it is] preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370

(1886).  This jurisprudential and political touch point has become so well accepted that that the qualification that preceded the declaration in *Yick Wo* – that voting is a "privilege merely conceded by society according to its will, under certain conditions" – sounds unfathomably foreign.  *Id*.  *Compare, e.g., Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.").  In short:  "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

6.     Yet, both as to the June Primary and future elections, the Board seems to believe there is no constitutional issue around the profound risk of tossing out thousands of ballots as a cost of doing business.  But, as this Court has explained, "the Constitution is not so toothless. When voters have been provided with absentee ballots and assured that their votes on those ballots will be counted, the state cannot ignore a later discovered, systemic problem that arbitrarily renders those ballots invalid."  *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *53.

## JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

8.     Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as some of the Plaintiffs live in this district and the acts, and many of the transactions that give rise to this action occurred, in substantial part, in this district.

10.    Venue is also proper in this district because Defendants' principal place of business in this District.

## PARTIES

11.     Plaintiff Emily Gallagher is a registered Democrat in Kings County and was a primary candidate on the ballot in the Democratic Primary for Assembly District 50 in Kings County.  Having won her primary race, Ms. Gallagher will be on the ballot in the November Election as the Democratic candidate for AD50.

12.     Plaintiff Suraj Patel is a registered Democrat in New York County and was a primary candidate on the ballot in the Democratic Primary for Congress in the 12th Congressional District encompassing New York, Kings and Queens counties.

13.     Plaintiff Katherine Stabile is a registered voter enrolled in the Democratic Party and a resident of Queens County.  In the June Primary, Ms. Stabile did not receive her ballot until June 23.[1]  Ms. Stabile promptly submitted her completed ballot to a USPS mailbox on the same day on June 23.  Despite mailing on June 23 in the morning, Ms. Stabile's ballot envelope was postmarked by USPS on June 25, was deemed "invalid" by the New York City Board of Elections ("City Board"), and was not counted in the June Primary.  Ms. Stabile intends to vote by absentee ballot in the November Election.

14.     Plaintiff Jillian Santella is a registered voter enrolled in the Democratic Party and a resident of Queens County.  In the June Primary, Ms. Santella voted by absentee ballot on June 22, delivering her ballot to a USPS mailbox.  Ms. Santella's ballot envelope was postmarked later than June 23, and was deemed "invalid" by the City Board.  Ms. Santella has requested a mail-in absentee ballot for November, but is unsure whether she will use it given what happened in the June Primary.

---

[1] The allegations about the voter-plaintiffs in this section primarily regard what has already happened in the June Primary.  However, upon information and belief, without the Court's intervention, these issues will recur and Plaintiffs – and the proposed class – will be harmed in exactly the same way.

15.     Plaintiff Aaron Seawright is a registered voter enrolled in the Democratic Party and a resident of Kings County.  In the June Primary, Mr. Seawright voted by absentee ballot on June 22, delivering his ballot to a USPS mailbox.  Upon information and belief, Mr. Seawright's ballot was not timely postmarked on June 23, and was at least initially invalidated by the City Board.

16.     Plaintiff James McNamee is a registered voter enrolled in the Democratic Party and a resident of Kings County.  In the June Primary, Mr. McNamee voted by absentee ballot on June 22, delivering his ballot to a USPS mailbox.  Upon information and belief, Mr. Seawright's ballot was not timely postmarked on June 23, and was at least initially invalidated by the City Board.  Mr. McNamee intends to vote by absentee ballot in the November Election.

17.     Plaintiff Kristin Sage Rockerman is a registered voter enrolled in the Democratic Party and a resident of Kings County.  In the June Primary, Ms. Rockerman voted by absentee ballot on June 22, delivering her ballot to a USPS mailbox.  Upon information and belief, Ms. Rockerman's ballot was not timely postmarked on June 23, and was at least initially invalidated by the City Board.  Ms. Rockerman intends to vote by absentee ballot in the November Election.

18.     Plaintiff Maria Barva is a registered voter enrolled in the Democratic Party and a resident of Kings County.  In the June Primary Ms. Barva voted by absentee ballot on June 22, delivering her ballot to a USPS mailbox.  Upon information and belief, Ms. Barva's ballot was not timely postmarked on June 23, and was at least initially invalidated by the City Board.

19.     Plaintiff Miriam Lazewatsky is a registered voter enrolled in the Democratic Party and a resident of Kings County. Ms. Lazewatsky voted by absentee ballot on June 22, delivering his ballot to a USPS mailbox.  Upon information and belief, Ms. Lazewatsky's ballot was not timely postmarked on June 23.  Upon further information and belief, Ms. Lazewatsy's ballot was

at least initially invalidated by the City Board.  Despite concerns about COVID-19, Ms. Lazewatsky will be voting in person, risking in person contacts, because she believes her ballot will be at risk of being discarded otherwise.  She views this choice as a burden she has been forced to undertake.

20.     Plaintiff Myles Peterson is a registered voter enrolled in the Democratic Party and a resident of Kings County.  Mr. Peterson voted by absentee ballot on June 22, delivering his ballot to a USPS mailbox. Upon information and belief, Mr. Peterson's ballot was not timely postmarked on June 23, and was at least initially invalidated by the City Board.

21.     Plaintiff Samantha Pinsky is a registered voter enrolled in the Democratic Party and a resident of Kings County.  Ms. Pinsky voted by absentee ballot on June 22, delivering her ballot to a USPS mailbox.  Upon information and belief, Ms. Pinsky's ballot was not timely postmarked on June 23, and was at least initially invalidated by the City Board.  Ms. Pinsky intends to vote by absentee ballot in the November Election.

22.     Plaintiff Christian O'Toole is a registered voter enrolled in the Democratic Party and a resident of Kings County.  In the June Primary, Mr. O'Toole voted by absentee ballot on June 22, delivering his ballot to a USPS mailbox. Upon information and belief, Mr. O'Toole's ballot was not timely postmarked on June 23, and was at least preliminarily invalidated by the City Board.  Mr. O'Toole intends to vote by absentee ballot in the November Election.

23.     Plaintiff Tess Harkin is a registered voter enrolled in the Democratic Party and a resident of Kings County. Ms. Harkin voted by absentee ballot on June 22, delivering her ballot to a United States Postal Service mailbox.  Upon information and belief, Ms. Harkin's ballot was not timely postmarked on June 23, and was at least preliminarily invalidated by the City Board. Ms. Harkin intends to vote by absentee ballot in the November Election.

24.     Plaintiff Caitlin Phung is a registered voter enrolled in the Democratic Party and a resident of Kings County.  Ms. Phung voted by absentee ballot on June 22, delivering her ballot to a USPS mailbox.  Upon information and belief, Ms. Phung's ballot was not timely postmarked on June 23, and was at least preliminarily invalidated by the City Board.

25.     Plaintiff Antoio Pontón-Núñez is a registered voter enrolled in the Democratic Party and a resident of Kings County. Mr. Pontón-Núñez voted by absentee ballot on June 23, delivering his ballot to a United States Postal Service mailbox. Upon information and belief, Mr. Pontón-Núñez's ballot was not timely postmarked on June 23, and will be invalidated by the Board of Elections.

26.     Defendant New York State Board of Elections ("State Board") is the bipartisan agency vested with the responsibility for administration and enforcement of all laws relating to elections in New York State.  The State Board has authority – alone and through its directors and commissioners – to direct the actions of all local boards of elections, including the City Board.

27.     Defendants Peter S. Kosinski, Douglas A. Kellner, and Andrew J. Spano are commissioners and co-chairs of NYS BOE, and are sued in their official capacity under *Ex parte Young*.

28.     Defendants Todd D. Valentine and Robert A. Brehm are co-executive directors of the NYS BOE, and are sued in their official capacity under *Ex parte Young*.

29.     Defendant Andrew Cuomo is the Governor of the State of New York, and is sued in his official capacity under *Ex parte Young*.

30.     All Defendants (collectively, when not just "Defendants", the "Board"), to the extent personally involved with the decisions and policies discussed below, are also sued in their individual capacities.

31.     The NY BOE, and the Board collectively, have created what Defendant Kellner described as "partnership" with the United States Postal Service ("USPS") "for conducting the election."[2]

32.     That "partnership" has involved extensive coordination, and extensive communication, as described in reporting in the Gothamist (*see* note 2).

33.     Upon information and belief, the Defendants collectively possess the authority and power to provide the relief requested by Plaintiffs, and are therefore the correct *Ex parte Young* defendants.

## FACTUAL ALLEGATIONS

**Background and Facts on Absentee Ballots.**

34.     In April and May of 2020, and in light of the ongoing pandemic, Governor Cuomo issued four relevant executive order concerning the use of absentee voting for upcoming elections. See N.Y. Exec. Order No. 202.15 (Apr. 9, 2020); N.Y. Exec. Order No. 202.23 (Apr. 24, 2020); N.Y. Exec. Order No. 202.26 (May 1, 2020); and N.Y. Exec. Order No. 202.28 (May 7, 2020). Of these:

  a.   Executive Order 202.15 permitted voters affected by COVID-19, including those who are at risk of contracting COVID-19, to check the box "Temporary Illness" as the reason for requesting an absentee ballot in connection with the June 23, 2020 primary election. N.Y. Exec. Order No. 202.15, at 3 (Apr. 9, 2020).

  b.   Executive Order 202.23 required County Boards of Elections to send absentee ballot applications to all eligible voters.

  c.   Executive Order 202.28 addressed other issues relating to absentee ballot eligibility.

---

[2] https://gothamist.com/news/heres-what-could-invalidate-your-absentee-ballot-and-its-beyond-your-control ("Gothamist").

d.  And, most relevantly to this case, Executive Order 202.26 "modified [N.Y. Elec. L. §
8-406] to the extent that any absentee ballot sent to a voter for a primary or special
election to be held on June 23, 2020 shall be provided with a postage paid return
envelope."

35.     Prior to N.Y. Exec. Order No. 202.26, however, absentee ballots sent to voters did
not indicate they could be sent without postage, and the Board generally instructed voters to
attach postage to their ballots.[3]

36.     Thus, while national USPS policy is to postmark all election mail, local boards
have historically not needed to separate election mail from other Business Reply mail – that is,
mail that traditionally does *not* receive a postmark.

37.     And ultimately, whether because of this new step or because of other mechanical
or human failures, thousands of voters did not receive the postmark necessary for their votes to
be counted.

38.     Further, because of the way that the boards of election keep information, the
number of ballots identified as missing postmarks in the June Primary is underinclusive:  ballots
that happened to reach a board of elections on or before election day without a postmark would
not have been recorded as missing a postmark.

39.     In the June Primary, because of the new, general availability of absentee ballots,
Board officials became overwhelmed with the record setting applications for absentee ballots. In
New York City alone, more than 750,000 absentee applications were received.[4]

40.     Even more applications are expected for the November Election.

_____

[3] https://www.propublica.org/article/mail-in-ballot-postage-becomes-a-surprising-and-unnecessary-cause-of-voter-anxiety
[4] https://nypost.com/2020/06/23/750k-nyc-democrats-requested-absentee-ballots-for-primary/

41.    And as related to the June Primary, there were widespread complaints of ballots never arriving and many arriving late.[5]

42.    Some of this problem stems from the conduct of the City Board.

43.    The Manhattan borough office of the City Board had "30 or 40,000 pending applications for absentee ballots" 11 days before the election, and "could only process 5,000 per day."  Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction ("Tr.") 146:11-24.

44.    Rather than scaling up to meet that challenge, the City Board, in effect, "threw up their hands and said, 'Well, there's nothing more that we can do.'"  *Id.*

45.    Further 34,359 absentee ballots were delivered by the City Board to USPS, to be sent to voters, on *the day before the June Primary*.

46.    Most troublingly, lining up with the disproportionate number of ballots lacking postmarks, over 50% of ballots sent the day before the election were for Brooklyn voters.  Tr. 336:2-6.

47.    Under ordinary USPS service standards, these tens of thousands of ballots would not have even *reached* voters before they needed to be mailed – let alone reached voters with a reasonable amount of time to fill them out and return them.

48.    While USPS *did* accelerate service in order to make sure a substantial number of these ballots reached voters on election day, that situation made it significantly less likely that any voter could successfully return such a ballot.  *See also,* Tr. 267:13-269:16; 298:2-14.

49.    Thus, upon information and belief, as a direct result of the City Board's delay and late delivery of ballots to voters, thousands of voters were effectively disenfranchised.

---

[5] https://www.cityandstateny.com/articles/politics/campaigns-elections/heres-whos-blame-tuesdays-disenfranchisement.html

50.     Nonetheless, in the June Primary ultimately an unprecedented number of New Yorkers cast their votes by absentee ballot, in the middle of a pandemic, an achievement that should be celebrated.

51.     In terms of the absentee voting process, once a county board approves a voter's request to vote absentee, the board mails the voter the ballot(s) and return envelope.  N.Y. Elec. Law § 8-406.

52.     N.Y. Elec. L. § 8-412, for the purposes of the June Primary, provides:

> The board of elections shall cause all absentee ballots received by it before the close of the polls on election day and all ballots contained in envelopes showing a cancellation mark of the United States postal service or a foreign country's postal service, or showing a dated endorsement of receipt by another agency of the United States government, with a date which is ascertained to be not later than the day of the election and received by such board of elections not later than seven days following the day of election to be cast and counted.

53.     N.Y. Elec. L. § 8-412, for the purposes of the November Election,[6] provides:

The board of elections shall cause all absentee ballots received by it before the close of the polls on election day and all ballots contained in envelopes showing a cancellation mark of the United States postal service or a foreign country's postal service, or showing a dated endorsement of receipt by another agency of the United States government, with a date which is ascertained to be not later than the day of the election and received by such board of elections not later than seven days following the day of election to be cast and counted. For purposes of this section, any absentee ballot received by the board of elections by mail that does not bear or display a dated postmark shall be presumed to have been timely mailed or delivered if such ballot bears a time stamp of the receiving board of elections indicating receipt by such board on the day after the election.

54.     In other words, the law has a belt and suspenders approach to assure timeliness:  it both requires (1) postmarks from election day or earlier *and* (2) receipt of the ballot by the board of elections by seven days after the election.

---

[6] This change in the law would count *some*, but not all of the ballots that the Court has already "stressed" were, with a "virtual certainty," mailed in a timely way.  *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *69 (S.D.N.Y. Aug. 3, 2020).

55.     In both instances, if ballots fail to receive postmarks, there will be ballots that are **without any doubt** cast in the time required, that are invalidated, for reasons completely outside of a voter's control.

56.     Upon information and belief, there is no *additional* assurance of timeliness of a ballot provided by the postmark when the receipt-by-June 30 requirement is in place.

57.     The Board *could* choose to interpret N.Y. Elec. L. § 8-412 to permit local boards to count all ballots that a reasonable person would know were mailed by the deadline.  Tr. 155:4-157:6.

58.     The Board has not done so.

59.     New York could also, rather than using postmarks to evaluate timeliness, use what are called "intelligent mail barcodes."  *See generally*, Ellie Kaufman, Postmarks come under scrutiny as states prepare for mail-in voting, CNN (Aug. 11, 2020).[7]

60.     Use of intelligent mail barcodes would be far better tailored postmarks for many reasons, among them that:

a.     The data collected from intelligent mail barcodes cannot get smudged in processing;

b.     Barcode data comes from a machine earlier in the USPS process than postmarks, and is therefore more likely to reflect the actual day a voter mailed their ballot; and

c.     Intelligent mail barcodes, if implemented correctly, would also allow voters to track their ballots, and if necessary, lodge challenges when USPS incorrectly marked them as being mailed after election day.

61.     New York could also allow – for absentee ballots, just as it does for in person ballots – a cure process for any defect.  In the context of the postmark requirement, this would

---

[7] Available at https://www.cnn.com/2020/08/11/politics/postmarks-mail-in-ballots/index.html.

involve calling a voter in to attest to the date they mailed their ballot if a postmark is missing or appears to reflect a mailing date after election day.

62.     New York could also use, instead of a postmark requirement at all, a sworn declaration on the ballot envelope that requires a voter to state the day they placed the ballot in the mail.

63.     New York could also, like some other states, begin from a presumption that a vote *is* valid, and only invalidate ballots when there is evidence that the ballot was *not* cast in accordance with the law (for example, a ballot with *no* postmark received within 5 days of election day would be valid, but a ballot with a postmark from several days after election day received 5 days after election day would at least have some evidence it was not cast in time).

64.     In short, the postmark is not the least restrictive alternative to accomplishing the purported state end that the postmark rule serves.

**USPS Handling of Ballots and Board Awareness of Problems.**

65.     Historically, there have been significant issues with USPS handling of election mail in New York.  *See generally*, Tr. 94:8-97:21 (Commissioner Kellner stating "I don't have a great deal of confidence in the U.S. Postal Service" and recounting "just [some] example[s] of [his] frustration with the postal service that continues to this day.").

66.     The issues with USPS handling of mail are not minor.  They are, in fact, "an issue with election integrity."  *Id*.

67.     In the process for the June Primary, even in the coordination that the Board *did* engage in with the USPS "there were complaints [that] the postmark problem was never resolved" according to Commissioner Kellner.

68.    For example, as set out in the Gothamist's reporting (*supra* note 2) and contrary to USPS policy, upon information and belief, the USPS location in Rosedale, Queens did not place postmarks on any absentee ballots, instead informing even those voters who asked for postmarks and demanded to speak to supervisors that "[USPS] did not postmark business reply postage paid envelopes, like the ones mailed in this election."

69.    And of course, thousands of voters in Brooklyn would have been disenfranchised if not for the Court's order.

**The June 23, 2020 Primary Election and Counting Ballots.**

70.    Because of the unprecedented volume of absentee ballot requests, some voters, such as Plaintiff Katherine Stabile, did not receive a ballot until June 23 in the mail.

71.    When she received it, Ms. Stabile promptly returned her ballot to the nearest USPS mailbox, despite her being in poor health and recently discharged from the hospital (hence, her need for an absentee ballot).

72.    Notwithstanding it being mailed on June 23, the USPS failed to postmark her ballot until June 25, 2020.

73.    Ultimately, therefore, Ms. Stabile's vote was deemed invalid because it was not postmarked – through no fault of her own – until June 25.  This was also despite Ms. Sabile literally writing "Ballot was received 6/23 in the afternoon" on her ballot.  *See* Ex. 1 at 1, at 2 for "Preliminary Invalid" stamp.

74.    A true copy of Ms. Stabile's invalidated ballot envelope is attached as **Exhibit 1.**

75.    In the June Primary, there was a substantially group of voters similarly situated to Ms. Stabile in that:

    i.   They mailed a ballot on or before June 23;

ii.   The USPS did not postmark it correctly or at all; and

iii.  Because of a lack of postmark from June 23 or earlier, their votes either were not counted (like Ms. Stabile's) or would not have been counted if this Court had not intervened.

76.   In the June Primary, even voters who put ballots in the mail on June 22 and earlier have had their ballots invalidated (and those who received a *late* postmark did not receive a remedy from the Court).  For example, Plaintiff Jillian Santella deposited her ballot on June 22 at a USPS postal facility, only to find out that the Board of Elections in Queens County invalidated her ballot for an untimely postmark.

77.   Upon information and belief, rather than turning on voter conduct, in the June Primary, the November Election, and in future elections, the validity of thousands of votes will continue to turn on the entirely arbitrary question of which USPS location or box a voter used.

**Board Comments and Public Statements.**

78.   Defendant Douglas Kellner, a Democratic commissioner and co-chair of the state BOE has said: "One of the big problems of going to a vote by mail system is that the Boards of Elections are now in partnership with the U.S. Postal Service for conducting the election."

79.   Upon information and belief, and according to Gothamist, in a conference call with local election officials two days after the primary, Defendant Kellner said that there were complaints that the postmark problem was never resolved.  *See,* Gothamist, *supra*, note 2.

80.   Upon information and belief, Defendant Kellner said: "Several commissioners were reporting that they got large batches of envelopes with voted absentee ballots without any postmarks." *Id*.

81.     Gothamist also reported that Dustin Czarny, the Democratic elections commissioner in Onondaga County in Central New York, and an officer in the New York State Elections Commissioners Association has characterized this as "a persistent problem."  *Id*. Specifically, upon information and belief, Czarny said, "they [e.g., the Board] have had an ongoing issue with the postal service not postmarking election mail, even if it had a stamp."  *Id*.

82.     Czarny has been quoted as saying: "The Boards [of Elections] are bound by the law and the law is clear. If a postmark is not on there and we receive them after June 23rd, we cannot count those ballots."  *Id*.

83.     Upon information and belief, Czarny also commented, in sum and substance, "What's worse … is that without those markings election officials have little choice but to toss the ballot."  *Id*.

84.     The Board's "Spokesperson Valerie Vasquez-Diaz said the Board will follow the law until they receive direction otherwise."  *Id* (direct quotation from reporting).

85.     The New York City Board of Elections has publicly tweeted and confirmed their unlawful policy of discarding valid votes as long as the USPS has failed to postmark them.  On July 14, 2020, "Joey De Jesus for NY State Assembly D38" Tweeted at the New York City Board of Elections, alerting them to the fact that the BOE and USPS were disenfranchising voters by way of their policy of refusing to count valid votes which the USPS refused to postmark:



https://twitter.com/BOENYC/status/1283165134614073344?s=20.

86.     In the interest of being specific with allegations: "Joey De Jesus for NY State

Assembly D38" tagged two voters in the Tweet, alerting the BOE that "even though they each

attest to submitting materials in time – they each submitted ballots along with their husbands,'"

"[t]heir husbands['] ballots were date-stamped appropriately [e.g., June 23rd], theirs were marked

25th by @USPS."

87.     The New York City Board of Elections Tweeted their response that "[t]he ballots

had to be postmarked by 6/23 in order to be valid."

88.     "Joey De Jesus for NY State Assembly D38" replied to the New York City Board of Elections with the following Tweet: "What I'm telling you is that they were mailed well in advance but their ballots weren't postmarked in time while their husbands['] were despite being submitted together."

89.     The New York City Board of Elections doubled down, replying: "We can't comment on USPS error. If the ballot is not time stamped by 6/23 it will be deemed invalid."

90.     A longer version of the same Twitter exchange is attached as **Exhibit 2**.

91.     As noted above, while the *City* Board cannot issue guidance on interpreting the Election Law, the State Board could have issued guidance to address these problem and did not.

92.     Instead, the Court stepped in and ordered the Board to count certain votes, finding there was no question those ballots were mailed in time.

**Events After the Court Entered an Injunction.**

93.     Following the June Primary, rather than addressing these issues, the Board has heard only silence from USPS.

94.     In a letter sent on August 10, the Board "asked the U.S. Postal Service how they plan to address past failures in the postmarking, delivery and collection of absentee ballots," specifically referencing this Court's injunction.  Ex. 3, ¶¶ 25-27.

95.     "Despite the urgency of these issues, [the Board has] not received any response from the U.S. Postal Service to date." *Id.*

96.     Upon information and belief, beginning essentially *just* after the June Primary, there have been substantial and transformative changes in USPS service standards and capacity, that have dramatically reduced USPS service.

97.     The USPS changes result in a likelihood that voters will be disenfranchised.

98.     To that end, in affirmative litigation, relying on testimony from Defendant Commissioner Kellner, the State of New York has asserted that the facts laid out here establish a likelihood of irreparable harm and that "[w]aiting to abate these harms until after they have already occurred would be too late."  *See State of New York v. Trump, et al.*, 20-cv-2340-EGS, Memorandum of Law In Support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 12-1 at 26-28 (Aug. 2, 2020).  Specifically, that likelihood comes from the fact that "[i]n Brooklyn, however, the Postal Service failed to postmark some 4,800 absentee ballots, causing those ballots to be initially rejected by election officials. And voters who reportedly requested absentee ballots but did not receive them by Election Day were forced to either forfeit the franchise or venture out into public to vote in person, notwithstanding the risks associated with in-person, indoor gathering" and that "On August 11, 2020, concerned New York State Board of Elections officials sent a letter to the U.S. Postal Service official asking how the agency planned to prevent further failures in the postmarking, delivery, and collection of absentee ballots. To date, they had received no response."  *Id* (citations omitted).

99.     Upon information and belief, the changes in USPS service standards have already resulted in a two-day delay in all mail in some parts of New York, and more in others.  *See, for example,* Michelle Ye Hee Lee et al., Postal Service Backlog Sparks Worries That Ballot Delivery Could Be Delayed in November, WASHINGTON POST (July 30, 2020) (a USPS employee in Lancaster, NY noting a current two-day delay and commenting "[t]he cardinal rule is, 'don't delay the mail,' and we're in a 180-degree switch where we're delaying mail every day.").[8]

---

[8] *Available at* https://www.washingtonpost.com/politics/postal-service-backlog-sparksworries-that-ballot-delivery-could-be-delayed-in-november/2020/07/30/cb19f1f4-d1d0-11ea8d32-1ebf4e9d8e0d_story.html.

100.    Upon information and belief, those changes delay the application of postmarks to First Class mail.

101.    Thus, upon information and belief, the date included in a postmark is now less likely than ever to be an accurate reflection of the date a voter placed their ballot in a mailbox.

102.    And, upon information and belief, the date stamped on a ballot, is was already, with some frequency, not the date the ballot enters the mail system.  For example. Plaintiff Stabile mailed her ballot on June 23, yet her ballot received a postmark of June 25.

103.    Thus, the application of N.Y. Elec. L. § 8-412 in conjunction with the reduced service standards will result in a substantial number of voters, who all voted in accordance with the law, being disenfranchised.

104.    Upon information and belief, "[a]ny U.S. Postal Service delays or inefficiencies will compound the challenges experienced by the State Board during the June 2020 primary, including the failure of the U.S. Postal Service to properly postmark absentee ballots, thereby leading to the invalidation of ballots."  Ex. 3, ¶ 24 (emphasis added).

105.    That is, there were *already* unconstitutional errors in the application of the postmark requirement in the June Primary.  According to Commissioner Kellner, the underlying issues at USPS that lead to these kinds of errors have gotten *worse,* not better, since the Court issued its injunction.

106.    Upon information and belief, Commissioner Kellner tried to present a number of grave concerns about the November Election to the City Board, who declined to allow him to even present them.

107.    Thus, Commissioner Kellner prepared a formal memorandum, a true copy of which is attached as Exhibit 4) ("Memo").

108.    The Memo begins by noting "Elected officials and others warned that we were not deploying sufficient resources to mail out absentee ballots in a timely manner" in the June Primary, and expresses "hope that we can all learn from the problems faced in the primary to solve them for the general election" and proposes some solutions.  Memo at 1.

109.    In Point II, the Memo warns that boards "need to do better processing absentee ballot applications" and makes a clear recommendation:

> "In 2001, the New York City elections commissioners adopted a policy that the clerks should send applications and ballots on the same day as they receive the request, for requests received before 3:00 p.m. or on the next day for requests received after 3:00 p.m. That important guideline was inserted to make it clear that there be no backlog and that staffing overtime would have to be adjusted to keep any backlog from developing."

Memo at 4 (emphasis in original).

110.    However, upon information and belief, the Board – and local boards – has not adopted the "important guideline" recommended by Commissioner Kellner.

111.    Upon information and belief, there is already a backlog of absentee ballot applications, even though applications have only been open for a very short period.

112.    For example, the undersigned counsel's application for an absentee ballot was submitted on August 21, 2020, was only marked as being under review as of August 27, and as of September 6, upon information and belief, that "review" has not even started in earnest.  No further status update exists in the public absentee tracking application.

113.    Upon information and belief, the City Board will once again end up with a backlog of absentee ballots that it cannot make it through in time to mail absentee ballots in a timely manner.

114.    Thus, the Board has long been aware that they are discounting otherwise valid votes for lack of a postmark.

115.     And the Board is aware that these issues are extremely likely to recur in the

November Election and future elections, and yet is doing nothing about it.

## **COUNT I**
### *(42 U.S.C. § 1983:  First Amendment Right to Vote as applied)*

116.     Plaintiffs incorporate by references all of the allegations above.

117.     The right to vote is *the* "fundamental political right, because [it is] preservative of

all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  "Undoubtedly, the right of suffrage

is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561-

62 (1964).

118.     When a case "call[s] upon" the Court "to consider the constitutionality of [an

election restriction] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of

constitutionality.  *Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (cleaned up), *quoting*

*Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983).  Rather, the Court "conduct[s] a two-step

inquiry that applies to election-related restrictions." *Id*.  In the first stage, the Court evaluates the

burden the restriction places on voters and in the second applies the "*Anderson-*

*Burdick* balancing test" if the restriction is reasonable and nondiscriminatory and "the more

familiar test of 'strict scrutiny'" if the restriction is severe. *Id*.

119.     The burden on voters of having their votes simply tossed aside is severe, and

therefore requires strict scrutiny.

120.     Thousands of voters faced a severe burden in the June Primary.

121.     Since the situation with USPS has gotten worse, and only votes received *one* day

after Election Day face any changed scenario, there is a high likelihood the exact same – or at

least, similar – issues will recur in the November Election.

122.    Similarly, unless the law is changed, there is a high likelihood that the same or similar issues will recur in future elections after the November Election.

123.    Defendants – and New York Election Law itself – have unquestionably not used the last restrictive means of achieving whatever government interest they offer, and therefore automatically fail strict scrutiny.

124.    However, under either level of review, the restrictions at issue here (e.g., requiring a postmark on a ballot but distributing ballots that will likely not be postmarked by the USPS) do not sufficiently advance any government interest to past muster.

125.    First, the Board's official statements make clear that – as the Board has stated – in their own view, *no* government interest is advanced by the postmark requirement at all.  At the hearing, Commissioner Kellner affirmed this in his testimony.

126.    Second, any government interest served by the restriction is already well-served by other (non-restrictive) parts of the election law, to the point where the restriction fails to *additionally* further whatever government interest is claimed.  For example, Any state interest in assuring timely voting is already well-served by the June 30 hardstop *also* contained in NY Elec. L. §8-412 (stating boards of election should only count ballots "received by such board of elections not later than seven days following the day of election").  Any *additional* assurance of timeliness is far outweighed by the significant burden on voters.

127.    Finally, as the Board's official statements seem to concede, any balancing of the state interest against its burden decidedly tips in favor of *not* disenfranchising voters.

128.    Thus, as applied, the postmark requirement unduly burden the right to vote.

## COUNT II
*(42 U.S.C. § 1983:  Equal Protection and One Person, One Vote)*

129.    Plaintiffs incorporate by references all of the allegations above.

130.     The principle of "one person, one vote" requires that courts seek to "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's." *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970).

131.     And the Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated [] be treated alike." *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 439 (1985).

132.      Indeed, "[a]n early case in our one person, one vote jurisprudence arose when a State accorded arbitrary and disparate treatment to voters in its different counties [and t]he [Supreme] Court found a constitutional violation." *Bush v. Gore*, 531 U.S. 98, 107 (2000), *describing Gray v. Sanders*, 372 U.S. 368, (1963).

133.     In the absence of statewide – and indeed, nationwide – consistency in how the USPS handles ballots, the NY Elec. L. § 8-412 postmark requirement subjects absentee voters to arbitrary differences in the way their ballots are counted depending on where they reside and, in some circumstances, depending on who happens to be collecting mail.

134.     As detailed above, then, voters' absentee ballots will be counted or not counted with lightning-like randomness:  depending on where the voter lived and what their local USPS office was doing or told, two voters could cast identical ballots, at exactly the same time, on the same day, and yet one ballot would be counted and one would not.

135.     And, even in the presence of full information (something Plaintiffs and those similarly situated did not have), the burden of handling this randomness would fall much more heavily on people with significant health risks or other factors making the risk of voting in person during a pandemic more severe.

136.     Thus, as applied, the postmark requirement violates the Constitution's promise of Equal.

## COUNT III
*(42 U.S.C. § 1983:  Due Process)*

137.     Plaintiffs incorporate by references all of the allegations above.

138.     As alleged above, Defendants have given Plaintiffs numerous assurances that their votes would be counted if they simply dropped absentee ballots in a USPS box by Election Day.

139.     More specifically, Defendants have assured and continue to assure voters that absentee ballots could be placed in a mailbox up through the end of election day.

140.     Indeed, in the primary election, because nearly 35,000 ballots were only sent to voters the day before election day, this promise had particular significance – and without doubt, caused significant numbers of voters to rely on the fact that they had mailed their ballots on Election Day, rather than going (and risking their health) to vote in person.

141.      Just as, "[w]hen a candidate relies on the Board of Elections for procedural guidance, that candidate may have a viable due process claim if he is excluded from the ballot because of errors resulting from his reasonable reliance on the Board," a voter so relying also has their due process rights violated.  *Farrell v. Bd. Of Elections in NY*, 1985 US Dist LEXIS 16669, at *5, n 1 (SDNY Aug. 20, 1985), No. 85 Civ. 6099 (JES).

142.     And similarly, courts have long excused errors introduced in the voting process, that technically would render some document as having "a fatal defect," where those errors are created by the Board of Elections.  *Green v DiNapoli*, 96 NY2d 910, 912 (2001).

143.     As a result, to throw out the ballots of Plaintiffs and other similarly situated would be to violate their due process rights under the Fourteenth Amendment.

## COUNT IV

*(42 U.S.C. § 1983:  First Amendment Right to Vote, facial challenge to N.Y. Elec. L. § 8-412)*

144.    Plaintiffs incorporate by references all of the allegations above.

145.    Plaintiffs also specifically incorporate the recitation of standards from Count I above.

146.    In addition to the as applied issues with N.Y. Elec. L. § 8-412, in light of the increasing unreliability of USPS services, the fact that postmarks often fail to reflect the information the Election Law assumes it does (e.g., the date a ballot was placed in the mail), the ready availability of other, more reliable means of determining the same information, and the measures already existing in the Election Law that already serve the state interest at issue, the portion of N.Y. Elec. L. § 8-412 that invalidates ballots lacking a timely postmark is unconstitutional.

147.    As noted above, a restriction on the right to vote must serve a legitimate state interest and actually advance that interest.

148.    However, even if an identified interest is important in the abstract, Election Law requirements that advance it are unconstitutional to the extent "that interest already is advanced by [another, existing] requirement." *Lerman v. Bd. of Elections*, 232 F.3d 135, 151 (2d Cir. 2000).

149.    Thus, in *Lerman*, the Second Circuit rejected a belt-and-suspenders argument applied to signature requirements and the "well-established … state interest" in "[r]equiring a candidate to have a 'modicum of support' within their district before their name appears on the ballot." *Id*. at 151.  Because that "modicum of support" interest "already is advanced by the requirement that candidates obtain a minimum number of signatures by district residents," the

Second Circuit reasoned that an *additional* requirement that witnesses to nominating petitions also be residents of the relevant district – in context – "bears no relationship whatsoever" to the state interest. *Id*.

150.    So too here.  Any state interest in assuring timely voting is already well-served by the June 30 hardstop also contained in NY Elec. L. §8-412 (stating boards of election should only count ballots "received by such board of elections not later than seven days following the day of election").  And to the extent there is *some* additional benefit to the postmark requirement, it is outweighed by the many, less restrictive means the state could use to advance the same interest.

151.    Those less restrictive measures include, but are not limited to:

a.  Using "intelligent mail barcodes" to track a piece of election mail through the system, including the date it arrives at a USPS facility.

b.  Having absentee voters fill out a form sworn statement included in the ballot envelope that includes the date they mailed their ballot.

c.  Beginning from a presumption that a ballot is valid, and only invalidating ballots for being mailed too late in instances where there is affirmative evidence it was not mailed in time.

d.  Interpreting the postmark requirement,[9] as election officials in Wisconsin have done for a similar requirement, not to require invalidation of ballots that were obviously mailed in the time permitted by law.

---

[9] There is plenty of room in the statutory text for any number of interpretations, and as described above, Commissioner Kellner has testified that the State Board has even considered using such interpretations. Tr. 155:4-157:6.

In terms of the nuts and bolts of such an interpretation, for example, N.Y. Elec. L. § 8-412 only contains an affirmative "shall" command for when local boards of election *shall* count votes, with no corresponding "shall not."  Without a "shall not," the Board might issue guidance that only requires

e.  Contacting voters whose ballots lack a timely postmark or lack a postmark entirely and allowing a cure period, during which the voter can fill out an affidavit as to the day they mailed their ballot.[10]

f.  Simply relying on the already existing 7-day-post-election hardstop for all election mail as the mechanism double-checking whether ballots were mailed on time.

152.    In past elections, postmarks already often reflected a date multiple days after ballots were mailed.

153.    Because of the increasing unreliability of USPS services – including that mail is left unsorted on the mailroom floor – upon information and belief, ballots will increasingly bear postmarks with dates one or more days after mailing, even when voters mail their ballots early in the day.

154.    Given that, a postmark is increasingly a poor proxy for the information the Election Law uses it to determine:  the date a voter placed their absentee ballot in the mail.

155.    Since it often fails to accurately reflect the information it is used to determine, the postmark requirement is poorly tailored to the government interest.

156.    And, as noted above, even without the tailoring problem, there are more reliable ways to determine the same information – including by simply asking the voter when they

---

disqualification of ballots that show evidence they were not mailed in time.  Similarly, the word "ascertained" ("with a date **which is ascertained to be not later** than the day of the election," emphasis added) in the statute could be interpreted to allow local boards to count ballots that obviously were mailed on or before election day, even when they lack a postmark.

[10] The Legislature has just passed – and the Governor has signed – a bill requiring a notice and cure period where a ballot is lacking a signature or has other technical defects, where – upon notice from a board of election – the "voter may cure … defects by filing a duly signed affirmation attesting to the same information required by the affirmation envelope and attesting that the signer of the affirmation is the same person who submitted such absentee ballot envelope."  *See* S8370B, amending N.Y. Elec. L. § 9-209.

mailed their ballot under oath (the exact same way the law now permits voters to cure other deficiencies in absentee ballots).

157.    Thus, N.Y. Elec. L. § 8-412 imposes a severe burden on the right to vote, and because it fails scrutiny, it is unconstitutional.

**WHEREFORE**, Plaintiffs respectfully requests that this Court:

(a) Issue a declaratory judgment that Defendants' actions have violated Plaintiffs' rights under the Federal and New York State Constitutions;

(b) Issue a declaratory judgment that the portion of N.Y. Elec. L. § 8-412 that requires a postmark is unconstitutional in the context of New York's Election Law;

(c) Enter an injunction requiring the Board to count ballots that were mailed in a timely manner but lacked postmarks in the June Primary;[11]

(d) Enter an injunction sufficient to protect Plaintiffs' and the proposed class's rights in future elections, in a form to be determined, that includes, but is not limited to:

　　a. An extension of the remedy in the Court's Opinion and Order (ECF No. 91) to all future elections, including the General Election in November;

　　b. a remedy that addresses the failures by local boards of election that led to, among other things, the City Board's sending nearly 35,000 ballots to voters on the day before the election; and

---

[11] This relief has already been granted.  *See* ECF No. 103 at 2.  However, since an amended complaint ordinarily completely supersedes an original complaint, and not all consequences of Plaintiffs prevailing on this point are ripe for resolution (e.g., Plaintiffs remain entitled to attorneys' fees and declaratory judgment but that issue is only ripe upon resolution of all claims, *see id.*), this relief remains in the prayer here.

    c.   a remedy that addresses the risks posed by the widely reported drops in USPS service standards; and

    d.   an order prohibiting enforcement of the postmark requirement in N.Y. Elec. L. § 8-412.

(e)  Grant Plaintiffs their attorney's fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988; and

(f)  Grant any other and further relief that the Court may determine to be necessary and proper.

Dated:  September 7, 2020.

Respectfully submitted,

/s/

_____

J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
COHEN&GREEN P.L.L.C.
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Ali Najmi
LAW OFFICE OF ALI NAJMI
261 Madison Avenue, 12th Floor
New York, New York 10016
T: (212) 401-6222
F: (888) 370-2397
ali@najmilaw.com
