**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Emily Gallagher, Suraj Patel, Katherine Stabile, Jillian Santella, Aaron Seabright, James C. McNamee, Kristin Sage Rockerman, Maria Barva, Miriam Lazewatsky, Myles Peterson, Samantha Pinsky, Christian O'Toole, Tess Harkin, Caitlin Phung, and Antonio Pontón-Núñez, *individually, and on behalf of all others similarly situated,*<br><br>        Plaintiffs,<br><br>    v.<br><br>New York State Board of Elections; Peter S. Kosinski, Andrew Spano, and Douglas Kellner, *individually and in their official capacities as Commissioners of the New York State Board of Elections*; Todd D. Valentine, Robert A. Brehm, *individually and in their official capacities as Co-Executive Directors of the New York State Board of Elections*; and Andrew Cuomo *as Governor of the State of New York,*<br><br>        Defendants. | Docket No. 20-cv-5504-AT |
| Maria D. Kaufer and Ethan Felder,<br><br>        Plaintiff-Intervenors,<br><br>    v.<br><br>New York State Board of Elections; Peter S. Kosinski, Andrew Spano, and Douglas Kellner, *individually and in their official capacities as Commissioners of the New York State Board of Elections*; Todd D. Valentine, Robert A. Brehm, *individually and in their official capacities as Co-Executive Directors of the New York State Board of Elections*; and Andrew Cuomo *as Governor of the State of New York,* New York City Board of Elections, Patricia Anne Taylor, *individually and as President of the New York City Board of Elections,* and Michael J. Ryan, *individually and as the Executive Director of the New York City Board of Elections,*<br><br>        Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXPAND THE PRELIMINARY INJUNCTION

[APPEARANCES ON NEXT PAGE]

J. Remy Green
Jonathan Wallace, *of counsel*
Alex Petkanas, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016

*Attorneys for Plaintiffs*

September 18, 2020

**TABLE OF CONTENTS**

TABLE OF CONTENTS ....................................................................................................i

TABLE OF AUTHORITIES .............................................................................................iii

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL AND PROCEDURAL SUMMARY..................................................................1

ARGUMENT.....................................................................................................................5

   I.     Plaintiffs Have Standing and the Motion to Amend the Complaint Should Be Granted.........5

       A.     Plaintiffs have suffered an injury-in-fact, and there is a substantial risk that injury will recur. ...................................................................................................................6

           i.     Senator Alessandra Biaggi and Emily Gallagher can show injury-in-fact. ......................6

           ii.     Voter-Plaintiffs have suffered an injury-in-fact and can show likelihood of future injuries.......................................................................................................................7

       B.     The other elements of standing are satisfied........................................................10

       C.     Plaintiffs' motion to amend the complaint should be granted.............................12

   II.    Expanding the Injunction is Appropriate, Because Plaintiffs Are Entitled to a Mandatory Injunction. ...................................................................................................................13

   III.    Plaintiffs' Claims Will Succeed on the Merits. ...................................................15

       A.     The restrictions here require strict scrutiny.........................................................16

           i.     The burden is severe, standing alone. ..................................................................16

           ii.     The burden will fall, differently on different voters, presenting equal protection and one-person, one-vote problems. ..................................................................................17

B.      If not strict scrutiny, the restrictions as applied here require analysis on the high end of *Anderson-Burdick*'s sliding scale. ........................................................................................................18

C.      Under any level of scrutiny, the restrictions are not supported by any cognizable justification.................................................................................................................................19

   i.    There is no justification for refusing to count ballots received without postmarks within two days of the election.................................................................................................................20

   ii.   There is no justification for failing to mail out absentee ballots promptly. ...................22

   iii.  On balance, the postmark requirement serves no state interest, and ultimately undermines the same interests it is meant to serve. ....................................................................22

IV.    The Balance of the Equities Favors Injunctive Relief and Irreparable Harm is Presumed. 24

CONCLUSION....................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Coll. of Obstetricians & Gynecologists v. United States FDA,*
Civil Action No. TDC-20-1320, 2020 U.S. Dist. LEXIS 122017 (D. Md. July 13,
2020) .................................................................................................................................9

*Anderson v. Celebrezze,*
460 U.S. 780, 789 (1983) ........................................................................................ 19, 20

*Black Voters Matter Fund v. Raffensperger,*
No. 1:20-cv-01489-AT, 2020 U.S. Dist. LEXIS 143209 (N.D. Ga. Aug. 11, 2020) ........................ 9

*Brennan v. N.Y.C. Bd. of Educ.,*
260 F.3d 123, 129 (2d Cir. 2001) .....................................................................................13

*Bullock v. Carter,*
405 U.S. 134 (1972) ..........................................................................................................6

*Burdick v. Takushi,*
504 U.S. 428, 434 (1992) ................................................................................................15

*Bush v. Gore,*
531 U.S. 98 (2000) ..........................................................................................................18

*Church of Scientology of Cal. v. United States,*
506 U.S. 9 (1992) ............................................................................................................11

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................................................................10

*Credico v. N.Y. State Bd. of Elections,*
751 F. Supp. 2d 417 (EDNY 2010) ...............................................................19, 22, 23, 25

*Credico v. New York State Bd. Of Elections,*
2013 US Dist. LEXIS 109737 (EDNY 2013), 10-cv-4555-(RJD)-(CLP) .......................19

*Crisci v. Shalala,*
169 F.R.D. 563 (SDNY 1996) .........................................................................................12

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (In re Merrill Lynch & Co. Research
Reports Sec. Litig.),*
375 B.R. 719 (SDNY 2007) ............................................................................................12

*Daunt v. Benson,*
956 F.3d 396 (6th Cir. 2020) (Readler, J., concurring) ....................................................18

*Davis v. FEC,*
   554 U.S. 724 (2008) .................................................................................................5

*Democratic Exec. Comm. of Fla. v. Lee,*
   915 F.3d 1312 (11th Cir. 2019) ...........................................................................17

*DOC v. U.S. House of Representatives,*
   525 U.S. 316 (1999) .................................................................................................9

*Fla. Democratic Party v. Detzner,*
   No. 4:16cv607-MW/CAS, 2016 U.S. Dist. LEXIS 143620 (N.D. Fla. Oct. 16,
   2016) ......................................................................................................................24

*Floyd v. City of N.Y.,*
   283 F.R.D. 153 (SDNY 2012) .....................................................................5, 8, 11

*Floyd v. City of New York,*
   770 F.3d 1051 (2d Cir. 2014) ...............................................................................13

*Frederick v. Lawson,*
   No. 1:19-cv-01959-SEB-MJD, 2020 U.S. Dist. LEXIS 150995 (S.D. Ind. Aug.
   20, 2020) .......................................................................................................8, 11, 24

*Gallagher v. N.Y. State Bd. of Elections,*
   2020 U.S. Dist. LEXIS 138219 (SDNY Aug. 3, 2020) ..................................*passim*

*Glob.-Tech Appliances, Inc. v. SEB S.A.,*
   563 U.S. 754 (2011) ...............................................................................................17

*Green Party v. N.Y. State Bd. of Elections,*
   389 F.3d 411 (2d Cir. 2004) ...........................................................................*passim*

*Hadley v. Junior Coll. Dist. of Metro. Kan. City,*
   397 U.S. 50 (1970) .................................................................................................18

*Hoblock v. Albany Cnty. Bd. Elections,*
   487 F. Supp. 2d 90 (NDNY 2006) .......................................................................22

*Kermani v. N.Y. State Bd. of Elections,*
   487 F. Supp. 2d 101 (NDNY 2006) .....................................................................25

*League of Women Voters of the United States v. Newby,*
   426 U.S. App. D.C. 67 (2016) ................................................................................9

*League of Women Voters v. Kosinski,*
   20-cv-5238-MKV, ECF No. 37 (Sept. 17, 2020) ................................................24

*Lerman v. Bd. Of Elections,*
   232 F3d 135 (2d Cir. 2000) ..................................................................................20

*Lynch v. City of New York*,
    589 F.3d 94 (2d Cir. 2009) ................................................................................... 14

*Martin v. Kemp*,
    341 F. Supp. 3d 1326 (N.D. Ga. 2018) ............................................................... 24

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) ............................................................................................... 6

*Mastrovincenzo v. City of New York*,
    435 F.3d 78 (2d Cir. 2006) ................................................................................... 14

*McCarty v. Bank of N.Y. Mellon*,
    2015 U.S. Dist. LEXIS 136397 (SDNY Sep. 8, 2015) ......................................... 12

*Medina v. City of Osawatomie*,
    992 F Supp 1269 (D Kan 1998) ........................................................................... 16

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ............................................................................................... 9

*Nat. Res. Def. Council v. U.S. Consumer Prod. Safety Comm'n*,
    2017 U.S. Dist. LEXIS 143195 (SDNY Aug. 18, 2017) ............................... 10, 11

*In re Nat'l Austl. Bank Sec. Litig.*,
    2006 U.S. Dist. LEXIS 94163 (SDNY Nov. 8, 2006) .......................................... 12

*New York et al. v. Trump et al.*,
    20-cv-2340, ECF No. 1 ........................................................................................... 3

*New York v. Trump*,
    20-CV-5770, 2020 U.S. Dist. LEXIS 165827 (SDNY Sep. 10, 2020) ........ 5, 10, 11

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020) ................................................................................ 8, 10

*Obama for Am. v. Husted*,
    697 F3d 423 (6th Cir. 2012) ................................................................................. 16

*People First of Ala. v. Merrill*,
    No. 2:20-cv-00619-AKK, 2020 U.S. Dist. LEXIS 104444 (N.D. Ala. June 15,
    2020) ............................................................................................................... 4, 6, 9

*Pitts v. Black*,
    608 F. Supp. 696 (SDNY 1984) ........................................................................... 25

*Price v. N.Y. State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008) ..................................................................... 15, 19, 20

*Richardson v. Tex. Sec'y of State,* No. *SA-19-CV-00963-OLG,*
2020 U.S. Dist. LEXIS 163631 (W.D. Tex. Sep. 8, 2020) ................................................24

*Schulz v. Williams,*
44 F.3d 48 (2d Cir. 1994) ........................................................................................... 15, 24

*State of New York v. Trump, et al.,*
20-cv-2340-EGS, Memorandum of Law In Support of Plaintiffs' Motion for
Preliminary Injunction, ECF No. 12-1 at 26-28 (Aug. 2, 2020) ...........................1, 6, 8, 10

*State of Washington et al. v. Trump et al.,*
20-cv-3127-SAB, ECF No. 81 (E.D.Wa., Sept. 17, 2020) ..............................................2

*Stauber v. City of N.Y.,*
2004 U.S. Dist. LEXIS 13350 (SDNY July 16, 2004) ...................................................5

*Storer v. Brown,*
415 U.S. 724 (1974) .......................................................................................................19

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) .......................................................................................................20

*Vanasco v. Schwartz,*
401 F. Supp. 87 (SDNY 1975), *aff'd,* 1976 U.S. LEXIS 921 (1976).............................25

*Williams v. Salerno,*
792 F.2d 323 (2d Cir. 1986) ...................................................................................... 15, 25

*Yang v. Kellner,*
__ F. Supp. 3d __, 2020 US Dist. LEXIS 79331 (SDNY May 5, 2020) .........................14

*Yang v. Kellner,*
2020 U.S. Dist. LEXIS 79331 (SDNY May 5, 2020)..............................................6, 7, 19

*Yang v. Kosinski,*
960 F3d 119 (2d Cir. 2020) .......................................................................................*passim*

## Statutes

N.Y. Elec. L. § 8-412..................................................................................................1, 21

N.Y. Elec. L. § 9- 209 ....................................................................................................24

## Other Authorities

Fed. R. Civ. P. 24(a)......................................................................................................13

Michelle Ye Hee Lee et al., Postal Service Backlog Sparks Worries That Ballot
Delivery Could Be Delayed in November, WASHINGTON POST (July 30, 2020) ..........21

U.S. Const., amend. I............................................................................................................15, 16, 19, 25

## PRELIMINARY STATEMENT

This Court has already addressed essentially the questions presented in this motion. *See generally, Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219 (SDNY Aug. 3, 2020) ("*Gallagher*"). As the Court found then, when looking back on an election, "the state cannot ignore a later discovered, systemic problem that arbitrarily renders [large numbers of absentee] ballots invalid." *Id.* at *53. When disenfranchisement is "inadvertent," the State Defendants argued, no constitutional issue exists because inadvertence is not "purposefully burdened the[] right to vote." *Id.* As the Court aptly concluded, "the Constitution is not so toothless." *Id.*

Now, the question is whether – looking forward – the Constitution allows the Court to prevent the very same harms from happening *before* they occur. There is no question the harms are likely to recur. Commissioner Kellner and New York State have explained that they *will* recur in other litigation. *See State of New York v. Trump, et al.*, 20-cv-2340-EGS, Memorandum of Law In Support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 12-1 at 26-28 (Aug. 2, 2020) ("[w]aiting to abate these harms until after they have already occurred would be too late.").

So all that remains is this: where systemic problems caused large amounts of disenfranchisement in an election, and would have caused far more if not for the Court's intervention, can the Court step in again *before* the harm comes to pass? The answer is "yes."

## FACTUAL AND PROCEDURAL SUMMARY

Given the recency of the hearing, and in the interest of brevity, Plaintiffs only briefly recount the facts the Court found at the evidentiary hearing in August. *See generally, Gallagher* at *6-28 (the Court's findings of fact). In the June 23 Primary Election ("June Primary"), "thousands of absentee ballots for the June 23 Primary were not postmarked." *Id.* at *15; *22-26. Because of the operation of N.Y. Elec. L. § 8-412, those ballots would have been thrown out despite "no fault of [the voter]." *Id.* at *65.

At that time, USPS service standards "promise[d] a 'two-day service standard,' which means that over 98 percent of mail placed in a collection box or delivered to a post office [would] arrive within two days, excluding Sundays." *Id.* at *14. Moreover, under that service standard, theoretically a ballot should receive a same-day (or, if submitted after final collection, *next* day) postmark virtually all of the time. *Id; see also* Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction ("Tr.") at 310:12-25 ("the commitment would be that a hundred percent of the mail collected during the proper time would get a postmark of the same day … [in practice, i]t would be over 98 percent").

Since that time, massive delays at USPS have made national news – and at least one Court has found that "[i]t is easy to conclude that the recent Postal Services[] changes [are] an intentional effort on the part the current Administration to disrupt and challenge the legitimacy of upcoming local, state, and federal elections." *State of Washington et al. v. Trump et al.*, 20-cv-3127-SAB, ECF No. 81 (E.D.Wa., Sept. 17, 2020). On August 10, Commissioner Kellner and the State Board wrote to USPS with concerns about the recurrence of the postmark issues from the June Primary. *See* Kellner Ex. 1.[1] In that letter, the State Board expresses that "we expect the number of absentee ballot applications and ballots for the November election to be at increased levels" and that "[g]iven this, several issues **must** be addressed for the November 2020 election." *Id.* at 1. After discussing this case and noting that the June Election involved "4889 ballot envelopes [that] did not have a postmark" – an "unacceptably high number" – the State Board asked a question: "what steps is USPS going to take to ensure this failure does not happen again?" Unlike the extensive coordination that preceded the June Primary,[2] and "[d]espite the urgency of these issues, [the State

---

[1] Exhibit 3 to the First Amended Complaint ("FAC") is Commissioner Kellner's declaration ("Kellner Dec."). Page references are to the exhibit to that declaration, as the exhibit is paginated.

[2] *See Gallagher* at *12-13 (discussing how the City Board was "very adamant about making sure that every single piece got a postmark and we agreed to make that happen").

Board] have not received any response from the U.S. Postal Service to date."  Kellner Dec. ¶ 26.

A closer look at the postmarking process – at least as it happened in ADs 50, 53, and 57 – shows that the situation on the ground in June was not quite as rosy as suggested.  While, without access to ballot envelopes, it would be very difficult to conduct a proper examination (*cf.* ECF No. 108), the apparent error rate is significant.  *See* Green Dec. ¶¶ 6-17.  Just as troublingly, voters revealed that delays of not one, but two and three days between mailing and postmarking emerged.[3]  In sum, of 43 identifiable voters whose ballots in AD50, 53, and 57 had June 25 postmarks, outreach got initial responses from 14 voters, 8 of whom provided affidavits that they mailed their ballots in time.  Green Dec. ¶¶ 11-13.  Only one voter (who was unwilling to sign a declaration one way or another) said they thought they mailed their ballot late.  *Id.* ¶ 13(b).  Thus, the error rate (e.g., when a "late" postmark reflects a ballot mailed on time) may be as high as 91%.  *Id.* ¶ 15.

More broadly, New York itself – represented by the same office representing Defendants and with testimony from Commissioner Kellner – is (correctly) alleging in other litigation that with the changes since June, USPS's services are no longer "prompt, reliable" or "efficient," and that the change in service quality impairs New York's very ability to conduct elections. See Complaint, *New York et al. v. Trump et al.*, 20-cv-2340, ECF No. 1 ¶ 103 (SDNY Aug. 25, 2020) ("New York") ("the U.S. Postal Service has failed to provide prompt, reliable and efficient services to customers in Plaintiffs' jurisdictions").

In the June Primary, faced with the fact that the "Manhattan borough office had something like 30 or 40,000 pending applications for absentee ballots, and … they could only process 5,000 per day," when Commissioner Kellner told the City Board, "you can't conceivably process all of these applications given your current setup," the City Board "basically … threw up their hands and said,

---

[3] *Compare, also, e.g.*, Tr. 246:6-10 ("it should receive a postmark because it is a First Class Mail piece within one to three business days") *with* Tr. 314:2-5 ("for something mailed on the 22nd, that it is going to be postmarked the 22nd and then delivered on the 24th.").

'Well, there's nothing more that we can do.'" Tr. 146:10-24. This "attitude of resignation" (Tr. 147:4-8) led to the City Board *first* delivering 34,359 absentee ballots to the postal service on the day before the election, making successful return of those ballots by the voters extremely unlikely – and reliant on extraordinary and flawless USPS performance. Tr. 267:13-269:16; 298:2-14. Ultimately lining up with the disproportionate number of ballots lacking postmarks in Brooklyn,[4] over 50% of ballots sent the day before the election were for Brooklyn voters. Tr. 336:2-6.

Looking forward, Commissioner Kellner aimed to address these issues, but was rebuffed by the City Board. Thus, Commissioner Kellner sent a six-page memo explaining, among other things, that the City Board "need[s] to do better processing absentee ballot applications," recommending exactly the relief Plaintiffs seek (and noting that this relief *used* to be the policy):

> "In 2001, the New York City elections commissioners adopted a policy that the clerks should send applications and ballots *on the same day as they receive the request*, for requests received before 3:00 p.m. or on the next day for requests received after 3:00 p.m. That important guideline was inserted to make it clear that there be no backlog and that staffing overtime would have to be adjusted to keep any backlog from developing."

FAC Ex. 4 at 4 (emphasis in original).[5] As Commissioner Kellner explains, "[t]he lesson from the primary should be obvious." *Id.* Yet, the City Board apparently did not even meet with Commissioner Kellner to discuss his proposals.

So while the legislature has now partially addressed the problem as it occurred in June (allowing counting of ballots with no postmark for one day after Election Day), there remains a virtual certainty that many valid ballots will not be counted in November and going forward, through no fault of the voter. Indeed, the only real change between the June Primary and the November Election is that USPS's service standards have gotten worse. And unlike the primary,

---

[4] While it is unlikely the entire causal chain behind the postmarking failures in Brooklyn during the primary *can* be fully unraveled, the fact that the Brooklyn postal system was already taxed with delivering more than 18,000 ballots in a day, the day before an election (not to mention the *return* of those ballots) seems likely to have contributed to the postmarking errors arising.

[5] Given the difficult circumstances that exist, Plaintiffs even request a somewhat weakened version of this rule. *See* Notice of Motion 2(a), 2(b).

where there were promises from USPS that postmarking issues would not crop up, now there is only

silence from USPS.

The Court has already cautioned that the Constitution is "not so toothless" as to permit the

State Board to sit idle and ignore predictable, known issues. *Gallagher* at 53. As the Court aptly

asked at the hearing, given what we know, "[i]sn't there an argument to be made that both the State

and the City were willfully blind to the shortcomings of the postal service?" Tr. 400:19-401:8.

## ARGUMENT

### I.   Plaintiffs Have Standing and the Motion to Amend the Complaint Should Be Granted.

Plaintiffs have standing, and no other standing-adjacent defect – mootness, for example –

exists. *Cf. Stauber v. City of N.Y.*, 2004 U.S. Dist. LEXIS 13350, at *52 (SDNY July 16, 2004)

("abandonment of [a] policy presents an issue of mootness rather than standing."), *citing Dodge v.

County of Orange*, 208 F.R.D. 79, 85 (SDNY 2002). While an injury must be impending for standing,

"[a] future injury can suffice [for standing], so long as it is certainly impending, or there is a

**substantial risk that the harm will occur**." *New York v. Trump* ("*Trump*")*,* 20-CV-5770 (RCW)

(PWH) (JMF), 2020 U.S. Dist. LEXIS 165827, at *39 (SDNY Sep. 10, 2020) (collecting cases)

(citations omitted, emphasis added). *See also*, *Floyd v. City of N.Y.*, 283 F.R.D. 153, 169-170 (SDNY

2012) (finding standing, and observing that even "single stop [and frisk], in light of the tens of

thousands of facially unlawful stops, would likely confer standing" to seek an injunction for future

harm).

In the first instance, "standing inquiry remains focused on whether the party invoking

jurisdiction had the requisite stake in the outcome **when the suit was filed**." *Davis v. FEC*, 554

U.S. 724, 734 (2008) (emphasis added). Since the Court already addressed standing – and the

remaining claims focus on whether the *same* injuries will recur without the Court's intervention –

standing continues. *See Gallagher* at *28-33. That is, the relief requested now focuses on exactly the

same injuries the Court already held created standing, but – because the posture is now forward

looking – it includes prophylactic measures designed to prevent harm from coming to pass.

Whether those measures are constitutionally appropriate is a merits question.

> A.    Plaintiffs have suffered an injury-in-fact, and there is a substantial risk that injury will recur.

As a background rule, "the rights of voters and the rights of candidates do not lend

themselves to neat separation; laws that affect candidates always have at least some theoretical,

correlative effect on voters," and visa-versa. *Bullock v. Carter*, 405 U.S. 134, 143 (1972). A "voter

always has standing to challenge a statute that places a requirement on the exercise of his or her right

to vote," which the postmark requirement – as well as the general resigned attitude and approach to

absentee ballots at the City Board (FAC ¶¶ 42-44[6]) – challenged here does. *People First of Ala. v.*

*Merrill*, No. 2:20-cv-00619-AKK, 2020 U.S. Dist. LEXIS 104444, at *21 (N.D. Ala. June 15, 2020).

"When, as here, there are multiple plaintiffs, only one plaintiff need possess the requisite standing

for a suit to go forward." *Gallagher* at *28, *citing Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct.

1645, 1651 (2017); *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007).

> i.   *Senator Alessandra Biaggi and Emily Gallagher can show injury-in-fact.*

"Injury in fact is the first and foremost of standing's three elements." *Trump* at *38

(alterations adopted, quotation marks omitted), *citing Spokeo, Inc. v. Robins*, 578 U.S. ___, 136 S. Ct.

1540, 1547 (2016). For the candidate-Plaintiffs, injury-in-fact is satisfied. Even when victory (or for

that matter, defeat) is assured, where votes are thrown out arbitrarily, candidates suffer "real" – if

"attenuated" – injuries. *Gallagher* at *29. *See also*, *Yang v. Kellner*, 2020 U.S. Dist. LEXIS 79331, at

*12 (SDNY May 5, 2020) (where Board "denied [candidates] the chance to run, and denied voters

---

[6] Because it is the currently operative document, paragraph references are to the First Amended Complaint ("FAC") (ECF No. 109). To convert paragraph numbers from the FAC to the Second Amended Complaint ("SAC"), any paragraph after paragraph 11 with number N from the FAC will be number N+1 in the SAC.

the right to cast ballots for their candidate and their political beliefs," there were "'actual,' 'concrete, and particularized' injuries," even when the outcome of the race was determined).

Here, both Senator Biaggi[7] and Ms. Gallagher will be on the November ballot, and have – at the minimum – "an interest not only in winning or losing their elections, but also in ensuring that the final vote tally accurately reflects the votes cast." *Gallagher* at *29 (finding standing for Ms. Gallagher); *see also* Biaggi Dec. ¶¶ 5-6, 10, 14.  They have "a legally protected interest in ensuring that all valid ballots cast in [their] election[s] are accounted for," and suffer injury-in-fact when "all valid ballots cast in her election" are *not* accounted for.  *Id.* at 30.  Since Senator Biaggi and Ms. Gallagher are on the ballot, will collect votes, and *will* be injured when the same issues that appeared in June recur (as Defendants predict they will), they have standing to assert that interest.

Since standing only requires one plaintiff to have standing, the Court's analysis can stop here.  That said, as explained below, the voter-Plaintiffs have standing too.

> *ii.  Voter-Plaintiffs have suffered an injury-in-fact and can show likelihood of future injuries.*

There is no question some subset of the voter-Plaintiffs have already suffered injuries.  First, those Plaintiffs whose votes did not count in the June Primary – like Ms. Stabile and Ms. Santella – have suffered an injury-in-fact.  *See* Santallea Dec. ¶¶ 4-6 (ballot mailed on June 22 did not receive a postmark until June 25 and was not counted).  And according to Commissioner Kellner and the State Board, those injuries are very likely to recur in future elections, and current delays at USPS "**will** compound the challenges experienced by the State Board during the June 2020 primary, including the failure of the U.S. Postal Service to properly postmark absentee ballots, **thereby leading to the invalidation of ballots**."  Kellner Dec. ¶¶ 24-27 (emphasis added).  That is, the State Defendants view future injuries as a certainty.  On this point, then, "it [would be] disingenuous for [the State Board] to claim that the injur[ies are] not sufficiently imminent" because "the [Board]

---

[7] The addition of Senator Biaggi is addressed below in Point I.C.  *See* ECF No. 111.

itself forecasts the injuries." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, __, 2020 U.S. App. LEXIS 24492, *25 (2d Cir. 2020). And while the State Defendants may claim that these injuries are ultimately the fault of USPS (and the City Board), as the Court has explained, "the state cannot ignore a… systemic problem that arbitrarily renders those ballots invalid." *Gallagher* at *53. When it comes to voting in New York, the buck stops with the State Board.

Further, "[a] future injury can suffice [for standing], so long as it is certainly impending, or there is a **substantial risk that the harm will occur**." *Trump*, at *39 (collecting cases) (citations omitted, emphasis added). Here, as the Court has already observed, in June "it [was] undisputed that the voter Plaintiffs have suffered an injury as a result of the **possible invalidation** of their ballots." *Gallagher* at *28 (emphasis added). And just as they did in June, the State Defendants are once again "ignor[ing] a… systemic problem that [will] arbitrarily render[] … ballots invalid." *Gallagher* at *53.

This case neatly parallels the observation in *Floyd v. City of N.Y.*, that even a "single stop [and frisk], in light of the tens of thousands of facially unlawful stops, would likely confer standing." 283 F.R.D. 153, 170 (SDNY 2012), *citing Roe v. City of New York*, 151 F. Supp. 2d 495, 503 (SDNY 2001) ("[T]here is no per se rule requiring more than one past act, or any prior act, for that matter, as a basis for finding a likelihood of future injury."). Just so here: where there have already been thousands of disenfranchised voters throughout the state, because of a "systemic problem," a disenfranchised voter has standing to seek to protect others from the same harm. *See* Santella Dec. ¶ 9. *See also, Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJD, 2020 U.S. Dist. LEXIS 150995, at *24 (S.D. Ind. Aug. 20, 2020) (finding standing to seek future relief where "Plaintiffs … had their mail-in absentee ballots rejected for [a] signature mismatch in the 2018 general election" and sought relief to address the signature requirement in state law). And for injunctive purposes in election cases, then, it is important that (in terms of the injunctive relief requested) "Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction." *League of Women Voters of the*

*United States v. Newby*, 426 U.S. App. D.C. 67, 75 (2016). Just as "voters have standing to challenge" – for example – "an apportionment statute because they are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes," they have standing to challenge a rule that the State has conceded is likely to operate to disenfranchise thousands of voters once again. *DOC v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999).

In sum, the likelihood this issue will repeat remains looming in November and in future elections. As Commissioner Kellner explained at the hearing when he recounted "just [some] example[s] of [his] frustration with the postal service that continues to this day," he "[doesn't] have a great deal of confidence in the U.S. Postal Service." Tr. 94:8-97:21 (detailing past failures that have led to disenfranchised voters). So long as either (1) the postmark rule remains in place or (2) the City Board (and others) continue to dally in sending absentee ballots to voters, the postmark rule will operate to disenfranchise voters through no fault of their own. That injury suffices for standing, and since the relief requested is targeted only at those issues, Plaintiffs have standing as to all the relief they request.

Finally, Plaintiff Miriam Lazewatsky has settled on voting in person, and will put herself at risk of COVID-19 to avoid the risk of her vote not counting. *See* Lazewatsky Dec. ¶¶ 6-7. Such steps to avoid COVID-19 risks, along with the risks themselves, are injuries that confer standing – as courts have found throughout this pandemic. *Black Voters Matter Fund v. Raffensperger*, No. 1:20-cv-01489-AT, 2020 U.S. Dist. LEXIS 143209, at *55-61 (N.D. Ga. Aug. 11, 2020) (finding injury and standing where state law forced a plaintiff to choose between paying postage or risking COVID-19 by voting in-person); *People First of Ala. v. Merrill*, No. 2:20-cv-00619-AKK, 2020 U.S. Dist. LEXIS 104444, at *22 (N.D. Ala. June 15, 2020); *Am. Coll. of Obstetricians & Gynecologists v. United States FDA*, Civil Action No. TDC-20-1320, 2020 U.S. Dist. LEXIS 122017, at *40 (D. Md. July 13, 2020). *Cf. also*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154 (2010) (where a regulatory action

"g[ave] rise to a significant risk of gene flow to non-genetically-engineered varieties of alfalfa" through random cross-pollination, finding that farmers taking "measures to minimize the likelihood of potential contamination" of their crops constituted an injury).

>        B.        The other elements of standing are satisfied.

Standing also requires that the injury be "fairly traceable to the challenged action[] and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). These issues are well-addressed in the Court's first preliminary injunction decision.

For traceability, "[i]mportantly, proximate causation is *not* a requirement of Article III standing, which requires only that the plaintiff's injury be *fairly traceable* to the defendant's conduct." *Trump*, 2020 U.S. Dist. LEXIS 165827, at *39-40 (alterations adopted, emphasis in *Trump*), *quoting Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). "Accordingly, Article III requires no more than *de facto* causality." *Id.*, at *40 (quotation marks omitted). Thus, "[w]hen a theory of standing relies on the predictable effect of Government action on the decisions of third parties, traceability is satisfied … even when the decisions are illogical or unnecessary." *Id*, *quoting Dep't of Commerce v. New York*, 139 S. Ct. at 2566*; and New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020). And "[e]ven if an agency's inaction is a small, incremental source of plaintiff's injury, it is fairly traceable." *Nat. Res. Def. Council v. U.S. Consumer Prod. Safety Comm'n*, 2017 U.S. Dist. LEXIS 143195 at *14-15 (SDNY Aug. 18, 2017).

Here, because the State Board has already agreed that the actions of USPS – "illogical" or "unnecessary" though they may be – will "lead[] to the invalidation of ballots," traceability is satisfied. *See* FAC Ex. 3 ("Kellner Dec."), ¶¶ 24-27. As this Court put it for the June Primary, "but for the State Defendants' inaction, the relevant ballots would be counted. Nothing more is required to show causation." *Gallagher* at *32, *citing Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013), as amended (Mar. 21, 2013) *and Nat. Res. Def. Council*, 2017 U.S. Dist.

LEXIS 143195, at *14-15.  *See also*, *Trump,* 2020 U.S. Dist. LEXIS 165827 at *80-81 (finding an injury traceable where a Presidential Memorandum had a "chilling effect on immigrant census participation [that was likely to be] at least partially responsible for a degradation in the quality of census data").

Redressability is a similarly light burden.  The State Board has the power to implement any relief the Court grants, including "to direct that [certain categories of] absentee ballots be counted, if the Court finds that not counting them violates the Constitution."  *Gallagher* at *32-33, *citing Schulz v. Williams*, 44 F.3d 48, 61 n.13 (2d Cir. 1994).  Looking forward, there is no "need [that] the plaintiff prove that judicial relief will remedy an injury entirely" or that the remedy will "relieve his *every* injury."  *Trump*, 2020 U.S. Dist. LEXIS 165827, at *41.  Instead, it "is enough that the risk of the alleged harm would be reduced to some extent if the plaintiffs received the relief they seek."  *Id.* at *41-42 (alterations adopted, quotation marks omitted), *citing Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007); *and Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992) ("Even though it is now too late to prevent, or to provide a fully satisfactory remedy for, the [injury], a court does have power to effectuate a partial remedy.").

Here, some Plaintiffs (and class members) did not receive their ballots until *June 23*, the day of the election in the Primary.  As to that issue, Commissioner Kellner has already suggested that the Board adopt one part of the relief sought, calling it an "important guideline" that would "keep any backlog from developing."  Similarly, if the postmark requirement were struck down (or a cure process implemented), Plaintiff Stabile's ballot would have counted in the Primary.[8]  And for those

---

[8] It is important to note, perhaps, that if Plaintiff Stabile lacks standing to challenge application of the postmark rule going forward, no voter-Plaintiff ever would.  She *did* suffer an injury:  her vote did not count in June.  The only question is not one of standing so much as whether she may seek remedies that do more than look backward to an election that already occurred.  That answer is well settled.  *See, e.g.,* *Floyd v. City of N.Y.*, 283 F.R.D. 153, 169-170 (SDNY 2012) (repetition of unconstitutional stop and frisk can be addressed by injunction, perhaps "[e]ven [by a plaintiff who suffered only a] single stop"); *Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJD, 2020 U.S. Dist. LEXIS 150995, at *24 (S.D. Ind. Aug. 20, 2020) (voters whose ballots were thrown out for signature mismatches have standing to challenge future application of the signature rule).

Plaintiffs who *did* receive a remedy from the Court in June, there is no question that similar relief would continue to redress similar problems.

C.         Plaintiffs' motion to amend the complaint should be granted.

Plaintiffs seek to amend the complaint to add Senator Alessandra Biaggi.  Her presence – as a candidate with an opponent on the ballot – helps ensure that all relevant interests are represented here, and places any standing or mootness questions beyond reasonable dispute.  Leave to amend "shall be freely given in the absence of countervailing factors, such as undue delay, bad faith or dilatory motive, undue prejudice to the opposing party, or futility of the amendment." *McCarty v. Bank of N.Y. Mellon*, 2015 U.S. Dist. LEXIS 136397, at *28 (SDNY Sep. 8, 2015) (quotation marks omitted).  Since this case is still fairly new, Senator Biaggi has standing to seek relief, and there is no cognizable prejudice to Defendants, no exception that general rule applies.

Additionally, in class actions like this one, "courts not only may, but **should**, 'respond to the pre-certification mooting of a class representative's claims by permitting substitution of a new class representative.'" *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (In re Merrill Lynch & Co. Research Reports Sec. Litig.)*, 375 B.R. 719, 729 (SDNY 2007) (emphasis in original).  When a Plaintiff's claims have become moot only individually, but not to all members of the class, "intervention by absentee members is freely allowed." *In re Nat'l Austl. Bank Sec. Litig.*, 2006 U.S. Dist. LEXIS 94163, at *12 (SDNY Nov. 8, 2006), *quoting* 1 Newberg on Class Actions § 2: 26 (4th ed. 2006).[9]  While Plaintiffs disagree, State Defendants have proposed a motion to dismiss arguing all Plaintiffs' claims are moot.  Assuming (without conceding) the merit of that argument, Senator Biaggi should *for just that reason* be permitted to substitute for other Plaintiffs as a new class representative.  Thus, the most efficient way for the Court to handle this is to grant leave to Plaintiffs to file an amended complaint.

---

[9] Such intervention also ordinarily relates back to the original complaint.  *See Crisci v. Shalala*, 169 F.R.D. 563, 568 (SDNY 1996).

Even if the Court does not grant Plaintiff's request to file a second amended complaint,

Senator Biaggi may still be added as a Plaintiff under Rule 24 (and Plaintiffs ask the Court to

construe the request in this manner, if necessary).  Fed. R. Civ. P. 24(a).  In order to intervene as of

right under Rule 24, "applicant must (1) timely file an application, (2) show an interest in the action,

(3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that

the interest is not protected adequately by the parties to the action."  *Floyd v. City of New York*, 770

F.3d 1051, 1057 (2d Cir. 2014), *quoting "R" Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d

238, 240 (2d Cir. 2006).  Given that this lawsuit is still in the pre-certification stage and that only two

and a half months have passed since the Primary Election in New York State, Senator Biaggi is well

within the period that should be considered timely.

With regard to the other three factors of intervention as of right under Rule 24, Senator

Biaggi would demonstrate that she has an interest in the action that is "direct, substantial, and legally

protected," and – if the State Defendants arguments as to mootness are credited – that her interest is

not "adequately represent[ed]" by the existing Plaintiffs.  *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123,

129 (2d Cir. 2001), *quoting Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97

(2d Cir. 1990); Fed. R. Civ. P. 24(a)(2).  Senator Biaggi has a well-established interest in ensuring that

all votes cast in her district are counted.  Further, Senator Biaggi's interest is distinct from Ms.

Gallagher's as Senator Biaggi has opponents on the ballot while Ms. Gallagher only faces write-in

opponents.  Thus, regardless of how, the Court should permit Senator Biaggi to join this suit.

## II.   **Expanding the Injunction is Appropriate, Because Plaintiffs Are Entitled to a Mandatory Injunction.**

"In general, the district court may grant a preliminary injunction if the moving party

establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b)

sufficiently serious questions going to the merits of its claims to make them fair ground for

litigation, plus [(3)] a balance of the hardships tipping decidedly in favor of the moving party."  *Lynch*

*v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted).  Where, as here, the injunction sought would essentially "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the movant must show a "'clear' or 'substantial' likelihood of success on the merits." *Yang v. Kellner*, __ F. Supp. 3d __, 2020 US Dist. LEXIS 79331, at *18 (SDNY May 5, 2020), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020), *quoting People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  Thus, a "district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006), *citing No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001).

The specific, forward looking relief proposed meets those exacting criteria.  As explained in more detail below, the substantive legal theories here are meritorious and the challenged actions and laws are unconstitutional as applied and facially.  Nor are there any substantive factual disputes. Many fact issues have already been handled by the Court, and the evidence ultimately was largely consistent.  *See Gallagher* at *5-6 ("The Court credits the witnesses' testimony").  The sole additional facts come from (1) voters who have identified the dates they mailed their ballot, suggesting a particular problem is much larger than previously suggested and (2) later developments related to the USPS, which the State itself has identified, analyzed, and described in other litigation – and thus can't contest here.

Finally, as discussed in more depth in Point 0 below, in cases about the right to vote, the injunction test largely collapses into a single question of whether the alleged act is unconstitutional (at least where, as here, there are few real factual disputes).  *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).  Since Plaintiffs' constitutional claims should prevail on the merits, the "[t]he typical

remedy" of an injunction follows.  *Schulz v. Williams*, 44 F.3d 48, 60 (2d Cir. 1994).

### III.    Plaintiffs' Claims Will Succeed on the Merits.

When a case "call[s] upon" the Court "to consider the constitutionality of [an election

restriction] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of

constitutionality.  *Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (cleaned up), *quoting Anderson v.*

*Celebrezze*, 460 U.S. 780, 789, (1983).  Rather, the Court "conduct[s] a two-step inquiry that applies to

election-related restrictions."  *Id.*

"First, [the Court] ascertain[s] the extent to which the challenged restriction burdens the

exercise of the speech and associational rights at stake[:]  The restriction could qualify as 'reasonable

[and] nondiscriminatory' or as 'severe.'"  *Id*, *quoting Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Second, the Court applies scrutiny:  a restriction is subject to the "*Anderson-Burdick* balancing test"[10]

if the restriction is reasonable and nondiscriminatory and to "the more familiar test of 'strict

scrutiny'" if the restriction is severe.  *Id.*  See *also*, *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109

(2d Cir. 2008) ("[t]he standards for review are clear[:]  If the plaintiffs' rights are severely burdened,

the statute is subject to strict scrutiny.  If the burden is minor, but non-trivial, *Burdick's* balancing test

is applied."); *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004).[11]

Under either level of review, the inevitable effects of the postmark rule – as well as the

backlog and delay in distributing absentee ballots to voters – are unconstitutional.

---

[10] The *Anderson-Burdick* test, discussed below, provides that the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate, and then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment under this more flexible standard, [the Court] must determine both the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights."  *Yang*, 960 F.3d at 129 (alterations adopted).

[11] Some courts (outside this Circuit) have theorized that neither strict scrutiny nor rational basis exists in *Anderson-Burdick* jurisprudence, but that the flexible *Anderson-Burdick* balancing test may bend to "approximat[e]" both standards.  *See, e.g.*, *Medina v. City of Osawatomie*, 992 F Supp 1269, 1275 (D Kan 1998).  *See also*, *Obama for Am. v. Husted*, 697 F.3d 423, 440 (6th Cir. 2012) (White, J., concurring in part, dissenting in part) ("*Anderson-Burdick* balancing test … is flexible enough to *approximate* the rational-basis test when appropriate, i.e., where the burden is slight, the required showing by the state is correspondingly light.") (emphasis added).  This Second Circuit, however, seems to have foreclosed this alternative approach with some finality in *Yang*.

      A.          <u>The restrictions here require strict scrutiny.</u>

The burden stage of *Anderson-Burdick* asks whether restrictions are reasonable and

nondiscriminatory on one hand, or severe on the other.  The burden here is both problematically

discriminatory and severe.

             *i.  The burden is severe, standing alone.*

When "[a] large number of ballots will be invalidated, and consequently, not counted based

on circumstances entirely out of the voters' control," the "burden is exceptionally severe."  *Gallagher*

at *47.  This burden is all the greater here because, as the "COVID-19 pandemic [continues], there

[is] an uncommonly compelling reason for many voters to vote by absentee ballot."  *Gallagher* at *48.

That is, "where many voters doubtless saw little choice but to use absentee ballots during the

COVID-19 pandemic, and after the state took a variety of proactive measures to increase the use of

absentee ballots, [it] would strike a serious blow to voters' First Amendment right to associate

themselves with candidates who express their values, if not undermine confidence in the democratic

process itself."  *Id.* at *49.

While the posture is slightly different now than when the Court issued the first injunction,

the State Defendants themselves have made clear that USPS has done nothing to address the issues

in the June Primary, "[d]espite the urgency of th[o]se issues" and specific requests from the State

Board.  Kellner Dec. ¶¶ 25-27.  Similarly, given that "Election officials fear that U.S. Postal Service

delays may lead to voters not receiving their absentee ballots on time," the fact that they have not

implemented the "important guideline" (or any similar guideline) recommended by Commissioner

Kellner is urgent, pressing, and a severe burden for voters.  Kellner Dec. ¶ 27; FAC Ex. 4 at 4.  And

as explained in the accompanying voter declarations, late postmarks do not reflect the date a voter

mailed their ballot with any real reliability.  *See* Green Dec. ¶¶ 6-17.[12]

If the Court does not intervene, there is every reason to believe exactly the same situation that marred the June Primary will play out:  delays and lack of capacity will lead to local boards "thr[owing] up their hands and sa[ying], 'Well, there's nothing more that we can do.'"  Tr. 146:10-24. *See also*, Tr. 147:4-11 ("THE COURT:  Commissioner, are you saying that you felt an attitude of resignation?  THE WITNESS:  Yes, Judge.").  In short, when the state knows[13] it will end up throwing out ballots that voters cast with no misstep by those voters, it imposes a severe burden on the right to vote.  To toss out such votes, then, the government must satisfy strict scrutiny.

> ii.  *The burden will fall, differently on different voters, presenting equal protection and one-person, one-vote problems.*

As the Court already held, the varying treatment of ballots without Post Office date stamps in different New York counties "raises issues indistinguishable from those in *Bush v. Gore*."  *Gallagher* at *57 (SDNY Aug. 3, 2020), *citing Bush*, 531 U.S. 98 (2000).  In sum, where "[w]hether an individual's vote will be counted … depend[s] in part on something completely arbitrary—their place of residence and by extension, the mailbox or post office where they dropped off their ballot[,] [n]ot only is this 'not a process with sufficient guarantees of equal treatment,' it is also the type of differential treatment that the Supreme Court has found to violate the 'one person, one vote' principle."  *Gallagher* at *59, *quoting* 531 U.S. at 107*, in turn citing Gray v. Sanders*, 372 U.S. 368, 378-381

---

[12] *See* Kennedy Dec. ¶ 9 ("I did not receive a USPS postmark until 2 days later, on June 25"); Todd Dec. ¶ 8 (same); Stephens Dec. ¶ 12 (same); Macagba Dec. ¶ 9 (same); Nielson (Irene) Dec. ¶ 9 ("Though I mailed my ballot in a timely fashion, I did not receive a USPS postmark until 3 days later, on June 25"); Nielson (Stephen) Dec. ¶ 8 (same); Kabakoff Dec. ¶ 10 (same); *and* Lapeyrolerie Dec ¶ 9 (same).

[13] As the Court explored at the hearing, at a minimum, refusal to acknowledge that voters will be disenfranchised by the postmark rule in this circumstance is willful blindness.  *See* Tr. 400:19-401:8 ("Isn't there an argument to be made that both the State and the City were willfully blind to the shortcomings of the postal service?"); Tr. 167:1-11.  *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 767 (2011) (willful blindness can satisfy knowledge or affirmative intent requirements).  Not only has nothing changed since the hearing, but the State Board has expressed deep concerns to the USPS that the issues will recur and has not received a response.  Not acting, under those circumstances, is classic willful blindness.

This is not to say intent is a required element in right to vote claims – it is not (*see Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019)) – but only that intent exists here and is a factor the Court should consider in crafting the appropriate remedy.

(1961).  The central principle, of course, being that one-person, one-vote jurisprudence always seeks to "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's."  *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970).

As Commissioner Kellner has explained, the postmarking issue that the Court already found unconstitutional is likely to recur.  Indeed, recently revealed USPS "delays and inefficiencies **will** compound the challenges experienced by the State Board during the June 2020 primary, including the failure of the U.S. Postal Service to properly postmark absentee ballots, thereby leading to the invalidation of ballots."  Kellner Dec. ¶ 24 (emphasis added).  And just as they did in the primary, those issues will – by their very nature – "subject[] absentee voters across the state to unjustifiable differences in the way that their ballots are counted."  *Gallagher* at *64.  Similarly, even if Defendants assert that issues with late postmarks are confined to one location or another (rather than extrapolatable across the state, risking thousands of votes), the same concerns arise.

In sum, the burden that lightning-like arbitrary treatment poses is severe, and requires strict scrutiny.[14]

> **B.**    **If not strict scrutiny, the restrictions as applied here require analysis on the high end of *Anderson-Burdick*'s sliding scale.**

When it comes to burdens on the right to vote, the Second Circuit and the Supreme Court alike have cautioned that there "is no litmus-paper test for separating those restrictions that are valid

---

[14] There is an open, academic question of how best to conceive of the relationship between *Anderson-Burdick* jurisprudence and equal protection jurisprudence – and at least one Circuit Judge has concluded that "in the Equal Protection setting, we would be wise to forego *Anderson-Burdick*."  *See, for example, Daunt v. Benson*, 956 F.3d 396, 423 (6th Cir. 2020) ("The temptation to overindulge in the *Anderson-Burdick* test has not gone unnoticed" and "we recently questioned 'whether the Supreme Court ever intended *Anderson-Burdick* to apply to Equal Protection claims,' as the Supreme Court has 'only applied the framework in the context of generally applicable laws.'") (Readler, J., concurring), *quoting Mays v. LaRose*, 951 F.3d 775, 783 n.4 (6th Cir. 2020).

That said, Second Circuit cases treat such issues as intertwined – that is, if there is disparate treatment, it makes the unequally treated party's "situation even more difficult" and thereby makes the "burden" a "severe" one – and there is no reason to depart from that approach in this case.  *See, e.g., Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419-22 (2d Cir. 2004).  *See also Gallagher* at *45 n.3 ("Second Circuit precedent is not entirely clear on the question of whether voters may assert a freestanding Due Process claim based on alleged unfairness in election procedures, or whether such unfairness is merely a dimension of a claim that restrictions burden voters' rights under the First Amendment—which applies to states under the Due Process Clause.").

from those that are invidious" and the "rule is not self-executing and [it] is no substitute for the hard judgments that must be made." *Storer v. Brown*, 415 U.S. 724, 730 (1974). *See also, Yang*, 960 F.3d at 129, *quoting Anderson*, 460 U.S. at 789. And, of course, the "results of this evaluation [cannot] be automatic." *Anderson*, 460 U.S. at 789.

If a burden is not necessarily "severe," but still is a "weighty imposition on Plaintiffs' … right[s]," *Anderson-Burdick*'s sliding scale requires much more than rational basis review. *Yang*, 2020 U.S. Dist. LEXIS 79331, at *32. As Chief Judge Dearie explained in *Credico*:

> "That the plaintiffs' associational rights will not be severely burdened, however, does not end my inquiry. As the Second Circuit recently instructed in *Price*, while 'review in such circumstances will be quite deferential,' I must actually 'weigh the burdens imposed on the plaintiff against the *precise* interests put forward by the State' and 'take into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights,' *Price* directs me to conduct more than just a rational basis review, and I am not to give much weight to 'flimsy' or 'extraordinarily weak' justifications proffered by the State."

*Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 422 (EDNY 2010) (citations omitted, emphasis added in *Credico*), *citing Price*, 540 F.3d at 108-11. For the same reasons outlined above, even assuming the as applied burden looking forward is not severe (it is), throwing out a voter's ballot with no chance to correct it and because of expected USPS errors is – at a minimum – a "weighty imposition." Continued application of a postmark rule despite a high error rate is similarly weighty (if not severe). *Anderson-Burdick* requires such an imposition to be balanced by real and precise justifications. As explained below, the Board cannot present such justifications here.

> C.        Under any level of scrutiny, the restrictions are not supported by any cognizable justification.

Once a plaintiff shows a burden on the right of access to the ballot – even if that "burden … is not large" – it becomes the State's responsibility to justify that burden. *Price*, 540 F.3d at 112. The Court should weigh "the precise interests *put forward by the State as justifications* for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (emphasis added). *See also, Green Party v. NY State Bd. of Elections*, 389 F.3d 411, 421 (2d Cir. 2004), *Lerman v. Bd. of Elections*, 232 F3d 135, 149

(2d Cir. 2000); *and Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).  Moreover, the mere "fact that the defendants' asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests.'"  *Green Party* at 421, *quoting Lerman* at 149-50 ("we cannot uphold a statutory provision that substantially burdens political speech and association … without insisting that the defendants do more than simply posit the existence of the disease sought to be cured.") (cleaned up).

In analyzing the justification, the Court should "examine each justification in turn and consider whether they make it necessary to burden the constitutional rights of Plaintiffs."  *Yang*, 960 F.3d at 134 (cleaned up), *citing Anderson*, 460 U.S. at 789.  The measure chosen by the State here, under any level of scrutiny, fails spectacularly to "in fact advance [its proffered] interests."  *Id.*  When the restrictions enacted fail to balance against the burden they pose, the restriction is unconstitutional.

>    i.  *There is no justification for refusing to count ballots received without postmarks within two days of the election.*

Based on USPS service standards articulated from the best of times, "the Court [has already] conclude[d] with a high degree of confidence that ballots received by the NYCBOE on June 25 were mailed on June 23 or earlier."  *Gallagher* at *50.  Since that time, if anything, USPS service standards[15] have gotten *worse*, not better (but most importantly, remain far below baseline): Green Ex. 1 at 2 (showing a steep dip in national delivery standards *right* after the June Primary); *see also,* Green Ex. 2 at 2 (New York's most recent local on time score is 85.88%, compared to 82.57% the week of the primary, with a dip as low as 78.04% in between); *and id.* at 25 (showing Albany's current on time score as 91.23% now and 93.14% the week of the primary).  *See contra,* Tr. 314:6-12 (asserting USPS hits the NYC two-day delivery standard 98% of the time "[a]t minimum").  Given the similar service

---

[15] All ballots are transmitted by USPS as First Class Mail.

standard today to what the data showed for the June Primary, there is nothing that should disturb the Court's "high degree of confidence" that ballots received within two days of the election were mailed on time.  To that end, the Court's confidence came from an assertion that USPS achieved on-time delivery 98% of the time.  That confidence that should be *higher* given the actual data: delivery in June was slower than the USPS witnesses knew when they testified.

While *fewer* voters may be disenfranchised by the current version of the postmark rule,[16] there remains nothing on the State side of the scale.  That is, the rule is still "grossly overinclusive," even having been narrowed slightly:  "[e]nforcing § 8-412 against [] ballots [received on the second day after Election Day] **would do nothing to advance the state's interest** in ensuring ballots are cast by Election Day, and would result in timely cast votes being needlessly rejected."  *Gallagher* at *49-50 (emphasis added), *citing Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991).

Finally, as compared to the June Primary, where it may have been a "burdensome task for boards of elections to recanvass absentee ballots," there is no burden at all to applying the same relief looking forward.  *Gallagher* at *66 (quotation marks omitted).  That is, local boards are already going to be tallying votes and reviewing the ballots at issue, and will not have to conduct *any* additional efforts.  In that case, even where the impact on the right to vote is "not … likely to be significant," because there is "no legitimate justification for causing or increasing" such burdens, even small burdens on the right to vote are unconstitutional.  *Credico*, 751 F. Supp. 2d at 422-23. And as the Court already held, declining to count ballots received within two days "would do nothing" to advance any state interest.

---

[16] That said, if, for example, USPS delays add an additional day to the mail, everything may just essentially shift one day to the right and the additional day provided by the new law simply places us at parity with June.  *See, for example,* Michelle Ye Hee Lee et al., Postal Service Backlog Sparks Worries That Ballot Delivery Could Be Delayed in November, WASHINGTON POST (July 30, 2020) (noting that a Lancaster, New York plant has fallen two days behind normal processing speed).

*ii.   There is no justification for failing to mail out absentee ballots promptly.*

Looking forward to future elections, there is a high likelihood that the same failure to mail

ballots with enough time to return them will recur.  As Commissioner Kellner explained in

recommending the City Board voluntarily adopt the same relief sought here, "[t]he lesson from the

primary should be obvious."  FAC Ex. 4 at 4.  Yet, the City Board did not even meet with

Commissioner Kellner to discuss his proposals.  When the lesson is "obvious," the continued

"attitude of resignation" (Tr. 147:4-7) falls squarely within the reasoning of the Court's earlier

decision:  "the state cannot ignore a … systemic problem" – like an oncoming failure to process

absentee ballots on time – where that problem will "arbitrarily render … ballots invalid."  *Gallagher*

at *53, *discussing Hoblock v. Albany Cnty. Bd. Elections*, 487 F. Supp. 2d 90, 81-82; 96-98 (NDNY 2006).

Permitted to stay their course, local boards (and the City Board in particular) will do just that.  If, as

posited in *Hoblock*, "it … make[s] for an empty constitutional right if one's franchise extend[s] only

so far as placing one's ballot in the ballot box," it makes for a far emptier right when the right

extends only as far as filing a *request* for a ballot.  487 F. Supp. at 98.  For many voters, in the

pandemic, the choice is between absentee voting and not voting at all.  The Court can and should

require the State Defendants to ensure local boards learn the "obvious" lesson and "not wait for a

backlog from which [they] can never recover."  FAC Ex. 4 at 4.

*iii.   On balance, the postmark requirement serves no state interest, and ultimately undermines the same interests it is meant to serve.*

Defendants have argued that the postmark requirement is necessary to set a clear deadline

beyond which voters cannot vote.  *See, e.g.*, Tr. 399:13-15 ("this is just to the important state purpose

that it's a universal rule of elections that votes must be cast on or before election day.  There has to

be a deadline."); *Gallagher* at *49.  Yet, from a voter's perspective, the postmark requirement makes

the deadline to vote *less* clear.  Consider Heather Kabakoff and her husband.  The Kabakoffs took

their ballots and "placed [their ballots] at the same time" in the "same [USPS] bluebox on Huron

and Franklin in Greenpoint, Brooklyn." Kabakoff Dec. ¶ 5.  However, while Ms. Kabakoff's ballot

received a late postmark, Mr. Kabakoff's did not – and was counted.  Kabakoff Dec. ¶¶ 5-6; Green

Dec. ¶ 18.  That is, Heather and Stuart Kabakoff "mailed [their] ballots at the same location at the

same time, and his vote was counted but [hers] was not."  Kabakoff Dec. ¶ 7.  *Cf. Gallagher*, 2020 US

Dist LEXIS 138219, at *60 ("Consider then, the case of two absentee ballots…").

  If the state interest here is to have a bright line rule a voter can rely on to determine *when* to

cast their ballots, the requirement of a postmark from a particular date ends up only muddying that

water.  Instead, votes cast on Election Tuesday, the Monday before, and the Sunday before that all

stand a reasonable chance of being counted – and a reasonable chance of being tossed.  This

arbitrary treatment may even itself be an equal protection and due process issue – but more

importantly, it fails to serve the state end of giving voters actual notice of when to cast their ballots.

Put otherwise, the only entity the postmark requirement provides *any* clarity is the board of elections

itself.

  Beyond that, a restriction on the right to vote must "in fact" advance a state interest. *Green

Party* at 389 F3d at 421.  And the Court should "take into consideration the extent to which th[e

proffered state] interests make it necessary to burden the plaintiffs' rights." *Credico,* 751 F. Supp. 2d

at 422 (EDNY 2010) *citing Price*, 540 F.3d at 108-11.  Many alternatives exist that would do a *better*

job of achieving the same end as the postmark requirement, while disenfranchising less voters,

meaning it is not "necessary" to use the postmark rule as it exists.  While several measures are

identified in the complaint, most importantly, New York could allow a cure process for late or

missing postmarks.  As of the November Election, New York Election Law allows – upon a

required notice from a board of election – a "voter [to] cure … defects [in an absentee ballot

envelope] by filing a duly signed affirmation attesting to the same information required by the

affirmation envelope and attesting that the signer of the affirmation is the same person who

submitted such absentee ballot envelope." *See* S8370B, *amending* N.Y. Elec. L. § 9- 209.  If New York continues to use a postmark requirement, there is no justification to refusing voters a similar cure process for postmark issues.  *See also*, Green Dec. ¶¶ 6-17.  Thus, in the alternative, Plaintiffs ask that the Court simply order a cure process and *make* the postmark requirement constitutional.[17]

### IV.   The Balance of the Equities Favors Injunctive Relief and Irreparable Harm is Presumed.

In ordinary cases, the grant or denial of an injunction may turn on factors beyond likelihood of victory on the merits.  In constitutional cases, however, a demonstration of the required likelihood of success entitles a party to a presumption that the equities balance in their favor.  "That is, "[t]he typical remedy afforded when a statute is found to be facially unconstitutional is an injunction enjoining its enforcement."  *Schulz v. Williams,* 44 F.3d 48 (2d Cir. 1994) (provision of voters lists only to major parties was denial of equal protection to non-major parties).  This rule holds particular weight in the election context:  "[i]n matters involving allegations or claims of First Amendment violations, irreparable harm may be presumed."  *Kermani v. N.Y. State Bd. of Elections,* 487 F. Supp. 2d 101 (NDNY 2006) (injunction granted against enforcement of Election Law section restricting outside expenditures in primary elections).  That is, because of the nature of elections, in this kind of case, "absent injunctive relief, [Plaintiffs'] First Amendment rights likely would be forever extinguished."  *Yang,* 960 F.3d at 136 (2d Cir. 2020) (holding that extinguishing voting rights is "surely a 'significant' hardship that the Board has not adequately justified" and any costs to the

---

[17] *See Richardson v. Tex. Sec'y of State, No. SA-19-CV-00963-OLG*, 2020 U.S. Dist. LEXIS 163631, at *146 (W.D. Tex. Sep. 8, 2020) (ordering implementation of a notice-and-cure process for signature mismatches, finding "rejection of a voter['s] ballot on the basis of a perceived signature mismatch is unconstitutional if the voter is not provided with (a) pre-rejection notice of a perceived mismatched signature and (b) a meaningful opportunity to cure his or her ballot's rejection"); *Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJD, 2020 U.S. Dist. LEXIS 150995, at *56 (S.D. Ind. Aug. 20, 2020) (same); *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 U.S. Dist. LEXIS 143620, at *28 (N.D. Fla. Oct. 16, 2016) (same); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018) (same).

The State Defendants have also agreed to a similar consent order.  *See* Stipulated Consent Order, *League of Women Voters v. Kosinski*, 20-cv-5238-MKV, ECF No. 37 (Sept. 17, 2020) (setting out a cure process for other absentee ballot defects and agreeing that the State Board will direct local boards to implement that process).

State are a "cost that the State of New York chose to bear when it assumed the responsibility of regulating and holding the Democratic Party's primary election.") (alterations adopted).

Thus, injunctions issue in virtually every case to find a constitutional violation under *Anderson-Burdick* (and its predecessors). *See, e.g.*, *Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411 (2d Cir. 2004) (injunction granted against Election Law section canceling status of previously enrolled parties which fail to get 50,000 votes in gubernatorial election); *Williams v. Salerno,* 792 F.2d 323 (2d Cir. 1986) (injunction granted against Board of Elections determination that college dorm could not constitute "residence" for voter registration purposes); *Pitts v. Black,* 608 F. Supp. 696 (SDNY 1984) (injunction against refusal to register homeless voters); *Vanasco v. Schwartz,* 401 F. Supp. 87 (SDNY 1975), *aff'd,* 1976 U.S. LEXIS 921 (1976) (enjoining BOE rules which censored content of campaign materials); *Credico v. New York State Bd. of Elections,* 751 F. Supp. 2d 417 (EDNY 2010) ("Because violations of First Amendment rights are commonly considered irreparable injuries, I have no trouble concluding that plaintiffs have established that, in the event the injunction is not granted, they will suffer an irreparable injury") (cleaned up).

## **CONCLUSION**

For the reasons above, Plaintiffs respectfully request the Court grant their motion for injunctive relief.

Respectfully submitted,

/s/

_____

J. Remy Green
Jonathan Wallace, *of counsel*
Alex Petkanas, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016
T: (212) 401-6222
F: (888) 370-2397
ali@najmilaw.com