UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Emily Gallagher, et al.,

*Plaintiffs*,

- against -

New York State Board of Elections, et al.,

*Defendants*.

Case No.
1:20-CV-05504 (AT)

Maria D. Kaufer and Ethan Felder,

*Plaintiff-Intervenors*,

- against -

New York State Board of Elections, et al.,

*Defendants*.

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A SECOND PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, New York 10005
Tel: (212) 416-6382

*Attorney for the State Defendants*

OWEN T. CONROY
Assistant Attorney General
*Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 3

STANDARD OF REVIEW ...................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

   I.    PLAINTIFFS' NEW CLAIMS DO NOT RAISE AN ARTICLE III CASE OR CONTROVERSY ................................................................................................................. 9

      A.   Plaintiffs Lack Standing to Pursue Their New Claims. ................................................. 9

      B.   Plaintiffs' Alleged Injuries are not Traceable to the State Defendants......................... 16

      C.   Plaintiffs' Claims Are Not Ripe for Review............................................................... 16

      D.   Plaintiffs' Predictions of a NYCBOE Backlog Do Not Create Standing and Are Unrelated to the Actual Claims in this Case. ...................................................................... 16

      E.   The Proposed Second Amended Complaint is Futile. .................................................. 17

   II.    PLAINTIFFS HAVE NOT ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS BECAUSE THE CLAIMS IN THE AMENDED COMPLAINT FAIL TO STATE A CLAIM ............................................................................................................................. 18

      A.   The Postmark Rule Does Not on Its Face Violate the First Amendment. ................... 18

      B.   The Postmark Rule Does Not Violate the First Amendment as Applied to the General Election. ............................................................................................................................ 26

      C.   The Postmark Rule Does Not Violate the Equal Protection Clause as Applied. .......... 26

      D.   The Postmark Rule Does Not Violate the Due Process Clause as Applied.................. 28

   III.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ............................................................................................ 29

   IV.    THE PUBLIC INTEREST WEIGHS AGAINST ALTERING THE ELECTION RULES ON THE EVE OF THE ELECTION ........................................................................ 30

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   No. 08-cv-5689 PKC, 2012 WL 868691 (S.D.N.Y. Mar. 13, 2012) ......................................29

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) .................................................................................................................18

*Ashcroft v. Am. Civil Liberties Union*,
   542 U.S. 656 (2004) .................................................................................................................23

*Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.*,
   437 Fed. App'x 57 (2d Cir. 2011) ............................................................................................29

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ...................................................................................................18-19, 22-23

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ...................................................................................................................15

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...................................................................................................... 9-11, 16

*Cohen v. Facebook, Inc.*,
   252 F. Supp. 3d 140 (E.D.N.Y. 2017) .....................................................................................15

*Crawford v. Marion Cty. Election Bd.*,
   553 U.S. 181 (2008) .................................................................................................................19

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) .................................................................................................................14

*Deshawn E. by Charlotte E. v. Safir*,
   156 F.3d 340 (2d Cir. 1998) .....................................................................................................14

*Dhinsa v. Krueger*,
   917 F.3d 70 (2d Cir. 2019) .........................................................................................................9

*Field Day, LLC v. Cty. of Suffolk*,
   463 F.3d 167 (2d Cir. 2006) .....................................................................................................26

*Floyd v. City of New York*,
   283 F.R.D. 153 (S.D.N.Y. 2012) ........................................................................................ 14-15

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
 841 F.3d 133 (2d Cir. 2016)................................................................................................8

*Gallagher v. New York State Bd. of Elections*,
 No. 20-cv-5504 (AT), 2020 WL 4496849 (S.D.N.Y. Aug. 3, 2020)............................... passim

*Green Party of New York State v. New York State Bd. of Elections*,
 389 F.3d 411 (2d Cir. 2004)...............................................................................................22

*Heindel v. Andino*,
 359 F. Supp. 3d 341 (D.S.C. 2019)....................................................................................10

*Jones, et al. v. United States Postal Service, et al.*,
 No. 20-cv-6516 (VM), 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020) ..................5, 16, 25, 27

*Joseph v. Decker*,
 No. 18-cv-2640(RA), 2018 WL 6075067 (S.D.N.Y. Nov. 21, 2018) ....................................23

*Krull v. Oey*,
 No. 19-cv-0142-TJM-CFH, 2019 WL 1207963 (N.D.N.Y. Mar. 14, 2019) ..........................29

*Landes v. Tartaglione*,
 No. 04-cv-3163, 2004 WL 2415074 (E.D. Pa. Oct. 28, 2004), *aff'd*, 153 F.
 App'x 131 (3d Cir. 2005)............................................................................................. 10-11

*Liu v. Ryan*,
 No. 16-cv-9651, 2017 WL 4350590 (S.D.N.Y. July 10, 2017), *aff'd*, 724 F.
 App'x 92 (2d Cir. 2018)...................................................................................................10

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)........................................................................................................9, 16

*Lusk v. Village of Cold Spring*,
 475 F.3d 480 (2d Cir. 2007).............................................................................................23

*Merrill v. People First of Alabama*,
 No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020) ........................................................11

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010).........................................................................................................16

*Murray v. Cuomo*,
 No. 1:20-cv-03571-MKV, 2020 WL 2521449 (S.D.N.Y. May 18, 2020) ..............................8

*Nat'l Org. for Marriage, Inc. v. Walsh*,
 714 F.3d 682 (2d Cir. 2013).............................................................................................16

*New Georgia Project v. Raffensperger*,
    No. 1:20-cv-01986-ELR, 2020 WL 5200930 (N.D. Ga. Aug. 31, 2020) *appeal
    pending*, No. 20-13360-D (11th Cir.) ........................................................................22

*New York, et al. v. Trump, et al.*,
    20-cv-2340-EGS, 2020 WL 5763775 (D.D.C. Sept. 27, 2020)..................................5

*Pennsylvania v. DeJoy*,
    No. 20-cv-4096-GAM, 2020 WL 5763553 (E.D.Pa. Sept. 28, 2020) .......................5

*People First of Alabama v. Merrill*,
    No. 2:20-cv-00619-AKK, 2020 WL 3207824 (N.D. Ala. June 15, 2020) .......................10, 16

*People First of Alabama v. Merrill*,
    No. 20-cv-619-AKK, 2020 WL 5814455 (N.D. Ala. Sept. 30, 2020)...................................11

*Price v. New York State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008)..................................................................................19

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006).................................................................................................30

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020) (per curiam) ...............................................................22, 30

*Schulz v. Kellner*,
    No. 1:07-cv-0943 (LEK) (DRH), 2011 WL 2669456 (N.D.N.Y. July 7, 2011) ....................10

*Stemple v. RingCentral, Inc.*,
    No. 18-cv-04909-LB, 2019 WL 3842091 (N.D. Cal. Aug. 15, 2019)...................................21

*Taylor v. NYC Health + Hosps.*, No. 19-cv-7086, 2020 WL 4932798 (S.D.N.Y.
    Aug. 24, 2020) .....................................................................................................21

*Terry v. Inc. Vill. of Patchogue*,
    826 F.3d 631 (2d Cir. 2016)..................................................................................18

*Vote Forward v. DeJoy*,
    No. 20-cv-2405-EGS, 2020 WL 5763869 (D.D.C. Sept. 28, 2020).........................5

*Washington v. Trump*,
    No. 1:20-cv-03127-SAB, 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020)..............5

*Wood v. Meadows*,
    207 F.3d 708 (4th Cir. 2000) .................................................................................22

## CONSTITUTIONAL AMENDMENTS

First Amendment ...................................................................................4, 18, 23, 26

Fourteenth Amendment ............................................................................................ 18-19

**FEDERAL STATUTES**

26 U.S.C.A.
    § 7502..................................................................................................................21

**STATE STATUTES**

Chapter 138 of the Laws of 2020...............................................................................7

Chapter 139 of the Laws of 2020...............................................................................6

Chapter 140 of the Laws of 2020...............................................................................6

Chapter 141 of the Laws of 2020...............................................................................7

New York Election Law
    § 8-412...............................................................................................................2, 7

**STATE EXECUTIVE ORDERS**

Executive Order 202.26 ...........................................................................................3, 8

Executive Order 202.58 ...................................................................................7, 13, 17

Executive Order 202.61 ......................................................................................8, 13

**MISCELLANEOUS AUTHORITIES**

Isaac Chotiner, "How to Counter Trump's Attempt to Manipulate the Election and
    the Census: Q&A with Vanita Gupta," The New Yorker, Aug. 9, 2020...............................21

Jake Prinsen, "Were absentee ballots without postmarks counted in the April
    election? The answer depends on where you live", Appleton Post-Crescent,
    June 4, 2020,
    https://www.postcrescent.com/story/news/2020/06/04/wisconsin-election-
    some-absentee-ballots-no-postmark-got-counted/5214150002/............................................25

National Conference of State Legislatures, Voting Outside the Polling Place
    Report: Table 11, Receipt and Postmark Deadlines for Absentee Ballots,
    *available at* https://www.ncsl.org/research/elections-and-campaigns/vopp-
    table-11-receipt-and-postmark-deadlines-for-absentee-ballots.aspx .......................................20

New York State Board of Elections Website, Absentee Voting, *available at*
    https://www.elections.ny.gov/VotingAbsentee.html ................................................................28

Defendants New York State Board of Elections ("State Board"); State Board Commissioners Peter S. Kosinski, Andrew Spano, and Douglas Kellner; State Board Co-Executive Directors Todd D. Valentine and Robert A. Brehm (collectively, "State Board Defendants"); and Governor Andrew M. Cuomo—collectively, "State Defendants"—respectfully submit this memorandum of law, together with the Second Supplemental Declaration of Robert A. Brehm, dated October 2, 2020 ("Brehm Decl."), and Declaration of Owen T. Conroy, dated October 2, 2020 ("Conroy Decl."), in opposition to Plaintiffs' second motion for a preliminary injunction (ECF No. 112) ("Pls.' Mot." or "PI Motion") and motion to file a Second Amended Complaint ("SAC") (ECF No. 110).

## PRELIMINARY STATEMENT

Plaintiffs filed this action based on the allegation that their absentee ballots in New York's June 23, 2020 Primary Election ("June 2020 Primary") were invalidated after the United States Postal Service ("USPS") failed to apply accurate postmarks to their return envelopes. Plaintiffs alleged that this error was caused by a COVID-19 related Executive Order that required local boards of election to provide voters with postage prepaid return envelopes for the June 2020 Primary. Following an evidentiary hearing, the Court found that while the evidence did not support Plaintiffs' prepaid postage theory, possible "human or mechanical error" at certain local USPS facilities caused a postmarking failure in Brooklyn. *Gallagher v. New York State Bd. of Elections*, No. 20-cv-5504 (AT), 2020 WL 4496849, at *5 (S.D.N.Y. Aug. 3, 2020) ("*Gallagher*" or "PI Decision"). Plaintiffs' claims regarding their invalidated ballots were fully resolved when the Court issued a preliminary injunction ordering the State Board to direct local boards to count certain ballots in the June 2020 Primary that were subject to the USPS postmarking error.

Now, with the November 3, 2020 General Election ("General Election") quickly

approaching, Plaintiffs have adopted an entirely new legal theory. The second motion for a preliminary injunction and the Amended Complaint, (ECF No. 109) ("Am. Compl."), allege that because of certain recent USPS policy changes, systemic USPS postmark errors will affect the General Election, as well as every other election in the future. Plaintiffs allege that their ballots will "likely not be postmarked by the USPS," Am. Compl. ¶ 124, and that the postmark requirement of New York Election Law § 8-412 ("Postmark Rule"), is therefore invalid on its face and as applied to the General Election. Plaintiffs' new theory, however, has been overtaken by recent developments: specifically, after the Amended Complaint was filed, the USPS policy changes that formed the basis of Plaintiffs' prediction of future postmarking errors have been enjoined by *five* different nationwide preliminary injunctions.

Further, in the months since the June 2020 Primary, Governor Cuomo and the New York Legislature have enacted multiple election reform measures that address the absentee ballot process. These reforms include amending the scope of the Postmark Rule, expanding access to absentee voting, expanding the timeline for absentee ballot applications, and providing voters with multiple options for returning absentee ballots. These significant changes preclude Plaintiffs' attempt to apply any findings of fact or conclusions of law in the PI Decision to the General Election, or any future election.

Plaintiffs' argument that they are substantially likely to be injured by future USPS postmarking errors is based on unsupported speculation. And the Postmark Rule is a reasonable, non-discriminatory election regulation that is commonly used by all states that permit absentee ballots to arrive after election day. The Court should deny Plaintiffs' motion for a second preliminary injunction because (1) their new claims fail to raise an Article III case or controversy; (2) Plaintiffs have not established a clear likelihood of success on the merits because the Amended

Complaint fails to state any claim for relief; (3) Plaintiffs have not demonstrated irreparable harm absent a preliminary injunction; and (4) the public interest weighs against altering the election rules on the eve of an election that is now 32 days away and counting. The Court should also deny Plaintiffs' motion to file the SAC, which would be futile because it does not remedy the deficiencies of their Amended Complaint.

## BACKGROUND

### A.  The Original Complaint and PI Decision

In the first Complaint filed in this action, Plaintiffs alleged that they participated in the June 2020 Primary as both voters and candidates, and that they timely placed absentee ballots in the mail on or before election day (or, as to the candidate-plaintiffs, that their supporters did so). Complaint ¶¶ 11-26 (ECF No. 1) ("Compl."). Plaintiffs alleged that USPS failed to apply accurate postmarks to these absentee ballot envelopes, allegedly as a consequence of Executive Order 202.26, which provided voters with prepaid postage return envelopes for the June 2020 Primary. *Id*. ¶¶ 1-5. Plaintiffs alleged that their ballots were deemed invalid pursuant to the Postmark Rule because they arrived at the New York City Board of Elections ("NYCBOE") after election day without an accurate postmark. *Id*. ¶ 45.

Following an evidentiary hearing, the Court granted a preliminary injunction. The Court found that, contrary to Plaintiffs' assertions, USPS policy is to apply postmarks to *all* election mail, including absentee ballots in postage prepaid envelopes. *Gallagher*, 2020 WL 4496849, at *4. The Court also found that the evidence showed that "when a ballot does contain a postmark, it is likely that the postmark reflects the date the ballot was mailed by the sender and received by the postal service." *Id.* at *22. The Court found that the evidence did "not show a widespread problem of absentee ballots being invalidated for lack of a timely postmark outside of New York City." *Id*.

at *22. However, the Court found that possible "human or mechanical error" at certain local USPS facilities in Brooklyn caused a significant number of ballots within that borough to arrive at NYCBOE without postmarks. *Id*. at *5, *8. The Court found that because the affected ballots accounted for a "significant percentage" of total ballots cast in certain races in Brooklyn, this constituted a "systemic" error. *Id*. at *16-17. The Court declined to rule on the issue of whether the Postmark Rule is constitutional on its face, *id*. at *16, but found that the Rule, as applied in the particular circumstance of the June 2020 Primary, violated the First Amendment and Equal Protection Clause. *Id*. at *15-21. The Court ordered the State Board to instruct local boards of election to count certain ballots received after election day that were subject to the postmark error. *Id*. at *23.

### B.  The Amended Complaint and Second PI Motion

On September 11, 2020, Plaintiffs filed the Amended Complaint. The Amended Complaint alleges that "there is a high likelihood the exact same—or at least, similar—issues" affecting USPS postmarking and mail handling "will recur" in the General Election and in all future elections. Am. Compl. ¶¶ 121-22. In support of this assertion, Plaintiffs point to "substantial and transformative changes in USPS service standards and capacity, that have dramatically reduced USPS service." *Id*. ¶ 96. On September 18, 2020, Plaintiffs filed a motion for a second preliminary injunction seeking relief as to future elections. Plaintiffs' theory is that their votes might be declared invalid pursuant to the Postmark Rule if USPS fails to accurately postmark their absentee ballot return envelopes, and their ballots subsequently arrive at the NYCBOE between two and seven days after election day. Pls.' Mot. at 1. Based on their supposition about possible future USPS errors, Plaintiffs allege that the Postmark Rule itself violates the First Amendment facially and as applied to the General Election, and that it violates the Equal Protection Clause and Due Process Clause

as applied to the General Election. Am. Compl. ¶¶ 116-57.

### C.  Nationwide Injunctions of USPS Service Changes

As Plaintiffs have noted, beginning in June 2020, USPS issued a number of policy changes that slowed mail delivery times and raised concerns that election mail would not be timely delivered for the General Election. *See* Complaint, *New York, et al. v. Trump, et al.*, 20-cv-2340 (ECF No. 1) (D.D.C. Aug. 25, 2020) (Conroy Decl. Ex. 1). These USPS policy changes have been the subject of multiple federal lawsuits, including actions brought by the State of New York and by Plaintiffs' counsel. *See id.*; *Jones, et al. v. United States Postal Service, et al.*, 20-cv-6516-VM (S.D.N.Y.).

Following the filing of the Amended Complaint, the courts in both *New York* and *Jones*—plus federal district courts in *three* additional similar cases—granted nationwide preliminary injunctions enjoining USPS from implementing the disputed service changes and providing other relief related to clarifying and ensuring the reliability of USPS services for the General Election. *See Jones, et al. v. United States Postal Service, et al.*, No. 20-cv-6516 (VM), 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020); *Vote Forward v. DeJoy*, No. 20-cv-2405-EGS, 2020 WL 5763869 (D.D.C. Sept. 28, 2020); *Pennsylvania v. DeJoy*, No. 20-cv-4096-GAM, 2020 WL 5763553 (E.D.Pa. Sept. 28, 2020); *New York, et al. v. Trump, et al.*, 20-cv-2340-EGS, 2020 WL 5763775 (D.D.C. Sept. 27, 2020); *Washington v. Trump*, No. 1:20-cv-03127-SAB, 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020).

Following these orders, USPS issued revised guidance documents to employees largely reflecting the injunctions. *See Jones* Defendants' Sept. 25, 2020 Letter to Court, (Conroy Decl. Ex. 2). In *Jones*, the defendants filed a letter to the court that specifically addressed USPS postmarking practices for the General Election, which they stated will include "ballot monitors in

each mail processing facility who are familiar with processing operations and the procedures that should be followed for cancelling, or postmarking, ballots, in order to facilitate the policy that as many ballots being returned by voters as possible are cancelled," as well as a "Postmark Team to identify and correct potential process deficiencies . . . ." *Id*. at 4. The letter also confirmed that it is "USPS policy to 'cancel' or 'postmark' all identifiable ballots returned by voters, regardless of the method of payment of postage used," and stated that "USPS shall conduct early cancellations the week before Election Day to ensure all collected ballots are processed timely." *Id*. at 5-6.

### D. New York's 2020 Election Reforms

Following the June 2020 Primary, Governor Cuomo and the New York legislature enacted a series of wide-ranging election reform laws and Executive Orders regarding the absentee ballot process. *See* Brehm Decl. ¶¶ 4-18. The election reform laws include the following:

- Chapter 139 of the Laws of 2020 (S.8015D / A10833), which permits any qualified voter with a risk of contracting COVID-19 to vote by absentee ballot. Brehm Decl. Ex. 1.

- Chapter 140 of the Laws of 2020 (S.8799A / A.10808-A), which amended the Postmark Rule to permit absentee ballots received by local boards of election the day after election day to be counted, even if missing a postmark. Brehm Decl. Ex. 2.[1]

---

[1] Pursuant to this amendment, the Postmark Rule in effect for the General Election provides in pertinent part as follows:

The board of elections shall cause all absentee ballots received by it before the close of the polls on election day and all ballots contained in envelopes showing a cancellation mark of the United States postal service or a foreign country's postal service, or showing a dated endorsement of receipt by another agency of the United States government, with a date which is ascertained to be not later than the day of the election and received by such board of elections not later than seven days following the day of election to be cast and counted. For purposes of this section, any absentee ballot received by the board of elections by mail that does not bear or display a dated postmark shall be presumed to have been timely mailed

- Chapter 138 of the Laws of 2020 (S.8783A / A.10807), which expanded the absentee ballot application time period for applications received other than by the official paper application form. This was one of a series of changes to the absentee ballot application process during 2020. Just before the June 2020 Primary, prior legislation created the option for voters to apply for an absentee ballot by electronic means, not more than 30 days before election day. After the June 2020 Primary, Chapter 138 eliminated the 30-day restriction and permitted voters to immediately begin sending absentee ballot applications or requests by electronic means as of August 20, 2020, the date the legislation was enacted. Brehm Decl. Ex. 4. In addition, on September 1, 2020, the State Board launched a web portal that voters may use to apply online for an absentee ballot. *Id*. ¶ 9.

- Chapter 141 of the Laws of 2020 (S.8370B / A.10830), which requires local boards of election to inform absentee voters if their ballot contains certain curable technical defects and provides an opportunity for the voter to cure the defect. Brehm Decl. Ex. 5.

In addition to these legislative reforms, Governor Cuomo issued two Executive Orders that provide further protections to absentee voters for the General Election. Specifically, Executive Order 202.58 (August 24, 2020) ("EO 202.58") provides that voters can request a General Election absentee ballot by phone or online; requires local boards to send a mailing to every registered voter by September 8, 2020 that provides information about absentee ballot deadlines, early voting

---

or delivered if such ballot bears a time stamp of the receiving board of elections indicating receipt by such board on the day after the election.

N.Y. Elec. Law § 8-412.

options, voting hours and location, and expected mail times; requires local boards to submit a staffing plan to the State Board by September 20, 2020 to enable the State Board to assist as feasible; and directs the State Board to develop a uniform envelope for absentee ballots. Brehm Decl. Ex. 6. Further, Executive Order 202.61 (Sept. 9, 2020) ("EO 202.61") requires local boards of election to establish a dedicated absentee ballot drop off process for the General Election. Voters will be able to drop off their absentee ballot at a board of election, an early voting location, or an election day voting location, without needing to wait in line. Brehm Decl. Ex. 10. Absentee ballot return envelopes for the General Election will not have prepaid postage, as Executive Order 202.26 applied only to the June 2020 Primary.

## STANDARD OF REVIEW

As this Court is aware, "[p]reliminary injunctive relief . . . is an 'extraordinary and drastic remedy' that is 'unavailable except in extraordinary circumstances.'" *Murray v. Cuomo*, No. 1:20-cv-03571-MKV, 2020 WL 2521449, at *8 (S.D.N.Y. May 18, 2020) (quoting *Moore v. Consol. Edison Co.*, 409 F.3d 506, 511 (2d Cir. 2005)). Where "a preliminary injunction 'will affect government action taken in the public interest pursuant to a statute or regulatory scheme,' the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (quoting *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)). Where a plaintiff "seeks a mandatory injunction against the government that would change the status quo existing when the case was filed," a heightened standard applies in which the plaintiff "must show "a 'clear' or 'substantial' likelihood of success on the merits." *Murray*, 2020 WL 2521449, at *8 (quoting *Thomas v. New York City Bd. Of Elections*, 898 F. Supp. 2d 594, 597 (S.D.N.Y. 2012)).

## ARGUMENT

### I.   PLAINTIFFS' NEW CLAIMS DO NOT RAISE AN ARTICLE III CASE OR CONTROVERSY

#### A.  Plaintiffs Lack Standing to Pursue Their New Claims.

Article III of the Constitution "limits the federal courts' power to the resolution of 'Cases' and 'Controversies.'" *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (citing U.S. Const. art. III, § 2). A litigant who invokes federal jurisdiction therefore "must demonstrate standing to sue," consisting of three elements: "the individual initiating the suit 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Standing "evaluates a litigant's personal stake as of the outset of litigation." *Id.* (internal quotation omitted).

The injury in fact requirement may only be satisfied by an injury that is "concrete, particularized, and actual or imminent . . . ." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal citation omitted). Where "there is no actual harm, . . . its imminence (though not its precise extent) must be established." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992). The "threatened injury must be *certainly impending* to constitute injury in fact," and, thus, "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks and citations alterations omitted) (emphasis in original).

Plaintiffs rely heavily on cases that state that the injury in fact requirement may be established by showing a "substantial risk" of future injury. Pls.' Mot. at 5 (quoting *New York v. Trump*, No. 20-CV-5770 (RCW) (PWH) (JMF), 2020 WL 5422959, at *10 (S.D.N.Y. Sept. 10, 2020). The Supreme Court has held, however, that "to the extent that the 'substantial risk' standard is relevant and is distinct from the 'clearly impending' requirement," neither standard is met by

allegations that rely on an "attenuated chain of inferences necessary to find harm . . . ." *Clapper*, 568 U.S., at 414. Under either terminology, the plaintiff "bear[s] the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm," and may not "rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Id*. (quoting *Lujan*, 504 U.S., at 562).

In the context of election lawsuits, courts routinely dismiss complaints based on predictions that possible error might cause the plaintiff's vote to not be counted. *See, e.g.*, *Schulz v. Kellner*, No. 1:07-cv-0943 (LEK) (DRH), 2011 WL 2669456, at *7 (N.D.N.Y. July 7, 2011) (allegations that "machine error and human fraud resulting from Defendants' voting procedures" would cause votes to not be counted accurately were "merely conjectural and hypothetical and do not demonstrate a concrete or particularized injury to Plaintiffs").[2]

Further, "a voter fails to present an injury-in-fact when the alleged harm is abstract and widely shared" by all voters. *Schulz*, 2011 WL 2669456, at *6 (quoting *Crist v. Comm'n on Presidential Debates*, 262 F.3d 193, 195 (2d Cir.2001)). *See also Liu v. Ryan*, No. 16-cv-9651, 2017 WL 4350590, at *1 (S.D.N.Y. July 10, 2017), *aff'd*, 724 F. App'x 92 (2d Cir. 2018) (voter plaintiff alleged only an "abstract, widely shared 'injury,'" which "courts routinely dismiss on standing grounds, as every voter suffers the same alleged harm").[3]

---

[2] *See also Heindel v. Andino*, 359 F. Supp. 3d 341, 357 (D.S.C. 2019), *judgment vacated, appeal dismissed*, No. 19-1204, 2019 WL 7781470 (4th Cir. Nov. 5, 2019) ("Plaintiffs 'merely speculate and make assumptions about whether their' votes will be inaccurately counted as the result of a potential hack" of voting machines) (quoting *Clapper*, 568 U.S., 411); *Landes v. Tartaglione*, No. 04-cv-3163, 2004 WL 2415074, at *3 (E.D. Pa. Oct. 28, 2004), *aff'd*, 153 F. App'x 131 (3d Cir. 2005) (allegation that voting machines were vulnerable to "manipulation or technical failure" insufficient for standing because "[i]f plaintiff's vote and the votes of all other voters in the upcoming election are correctly recorded, plaintiff will suffer no injury").

[3] Plaintiffs cite *People First of Alabama v. Merrill*, No. 2:20-cv-00619-AKK, 2020 WL 3207824, at *6 (N.D. Ala. June 15, 2020), for the proposition that "a voter always has standing to

i.    *Plaintiffs Do Not Allege Certainly Impending Injuries.*

The allegations in the Amended Complaint and PI Motion are based on mere speculation about possible future errors by USPS. Plaintiffs allege that they (or as to the candidate-plaintiffs, their supporters) plan to vote by absentee ballot, and *might* suffer an injury *if* the following conditional events were to occur: (1) they choose to return their absentee ballot by USPS mail, as opposed to the other available methods to return an absentee ballot; (2) a new systemic postmarking error occurs at USPS; (3) that error affects Plaintiffs' return envelopes; and (4) their ballots arrive at the local board of elections between two and seven days after election day. While that precise series of events could result in Plaintiffs' ballots being invalidated pursuant to the Postmark Rule, it is hardly a certain or substantially likely outcome.[4] It also "rel[ies] on speculation about 'the unfettered choices made by'" USPS, an "'independent actor[] not before the court.'" *Clapper*, 568 U.S. at 414 (quoting *Lujan*, 504 U.S., at 562).

Plaintiffs' speculation that their future ballots "will *likely* not be postmarked by the USPS," Am. Compl. ¶ 124 (emphasis added), is too uncertain to establish standing, even if it were an accurate forecast. But this prediction is not supported by any specific allegations or evidence. To

---

challenge a statute that places a requirement on the exercise of his or her right to vote." Pls.' Mot. at 6. But that case did not involve a claim based on speculation about the possibility of error causing vote invalidation; rather, the plaintiffs in *Merrill* alleged that they would not be able to vote at all unless they complied with onerous witness and photo identification requirements during the COVID-19 pandemic. Moreover, the United States Supreme Court stayed the district court's preliminary injunction order on which the plaintiffs relied. *Merrill v. People First of Alabama*, No. 19A1063, 2020 WL 3604049, at *1 (U.S. July 2, 2020). Subsequently, the district court held a bench trial and granted relief to the plaintiffs. *People First of Alabama v. Merrill*, No. 20-cv-619-AKK, 2020 WL 5814455 (N.D. Ala. Sept. 30, 2020).

[4] *Compare Landes*, 2004 WL 2415074, at *3 ("Plaintiff's reliance on the terms 'if' and 'may' to couch her allegations of harm is a clear indication that the harm she alleges is merely speculative"), *with* Am. Compl. ¶ 55 ("*if* ballots fail to receive postmarks," Plaintiffs will be injured) (emphasis added).

the extent isolated USPS postmark errors have been reported in recent elections, the error rate is less than 0.15%. *See* Supplemental Declaration of Robert Brehm ¶ 6 (ECF No. 67). The risk of a systemic postmarking error occurring in any given election, and the risk of Plaintiffs' ballots in particular being affected by such an error, is extremely small.

Plaintiffs' prediction of a heightened risk of postmark error in the General Election is largely based on recent USPS policy changes. Am. Compl. ¶ 96. But those policy changes will not affect the General Election because they have been enjoined by five different nationwide preliminary injunctions. *See supra* at 5-6. Further, USPS has submitted filings describing the postmarking policies it intends to follow for the General Election. *Id.*

The fact that the USPS policy changes have been enjoined also resolves Plaintiffs' misleading argument about the State of New York's submissions in *New York, et al. v. Trump, et al.*, 20-cv-2340 (D.D.C.). Plaintiffs allege that New York has conceded in that case that systemic postmark errors "*will* recur" in the General Election. Pls.' Mot. at 1 (emphasis in original). Plaintiffs are wrong: New York's lawsuit sought judicial relief halting the recent USPS service changes on the basis of the State's allegation that the new policies are "interfering with the administration of myriad state and local government functions, and, *unless vacated or enjoined*, will endanger state and local plans for the November election as well." *New York,* Complaint ¶ 1, Conroy Decl. Ex. 1 (emphasis added).[5] Because New York has succeeded in obtaining a preliminary injunction, the USPS service changes will not interfere with the General Election.[6]

---

[5] In contrast to Plaintiffs' speculative standing arguments here, the plaintiffs in *New York v. Trump* have standing because they alleged multiple specific, immediate, and ongoing injuries that were caused by the USPS service changes. *See New York* Complaint ¶¶ 106-188. Moreover, USPS was the defendant in that case, not an independent third party. *See Clapper*, 568 U.S. at 414.

[6] Plaintiffs' claim about the State of New York's position in its USPS lawsuit is largely based on a misleading partial quotation of a sentence from Commissioner Kellner's declaration in

Plaintiffs have also submitted declarations from eight Brooklyn voters who state that they mailed their absentee ballots for the June 2020 Primary on or before election day, but received a postmark dated after election day. ECF Nos. 118-125. This is of no significance to Plaintiffs' new claims because the Court already found that a systemic postmarking error occurred in Brooklyn during the June 2020 Primary. *Gallagher*, 2020 WL 4496849, at *20. Further submissions about postmarking errors in Brooklyn in that same election, even assuming their accuracy, do not support the contention that postmarking errors will injure Plaintiffs in future elections.

ii.    *The 2020 Election Reforms Further Decreased the Likelihood of Potential Injury.*

New York has taken action to further decrease the already small chance that a systemic postmark error will invalidate Plaintiffs' ballots in the General Election. The 2020 election reform laws and the relevant Executive Orders provide voters with multiple options to further reduce or eliminate the already low risk of encountering a USPS postmark error. *See* Brehm Decl. ¶¶ 4-18, For example, under EO 202.61, any absentee voter can avoid USPS altogether by returning their ballot to the dedicated deposit location at their local board of election, early voting location, or election day voting location. *Id.* ¶¶ 15-17.

Indeed, outside of their litigation filings, several Plaintiffs have applauded these measures. Plaintiff Patel released a statement calling EO 202.58 "a victory for New York voters" that

---

that case, which they relate as follows: "[A]ccording to Commissioner Kellner and the State Board, [Plaintiffs' postmark-related] injuries are very likely to recur in future elections, and current delays at USPS '**will** compound the challenges experienced by the State Board during the June 2020 primary, including the failure of the U.S. Postal Service to properly postmark absentee ballots, **thereby leading to the invalidation of ballots**.'" Pls.' Mot. at 7 (quoting Kellner Decl. ¶ 24 (ECF No. 112-5)) (bold and underlined emphasis added by Plaintiffs); *see also id.* at 18. Each time they quote from this declaration, Plaintiffs omit the first words of the sentence, which when quoted accurately make clear that Commissioner Kellner's statement was conditional: "*Any* U.S. Postal Service delays or inefficiencies will compound the challenges . . . ." Kellner Decl. ¶ 24 (emphasis added).

"corrects the[] issues" raised in Plaintiffs' first Complaint. Conroy Decl. Ex. 3. And prospective plaintiff Alessandra Biaggi, a State Senator, is a co-sponsor of S.8015D, S.8799A, S.8783A, and S.8370B. *Id.* Ex. 4. Plaintiffs cannot avoid the fact that any claim of injury is belied by the recent series of election reforms made by both the Legislature and the Governor.

### iii.   *Plaintiffs' Prior Injuries Do Not Establish Standing for Prospective Claims.*

Plaintiffs next argue that the standing analysis is focused on the moment "when the suit was filed," and because they had standing to pursue their original claims regarding invalidated ballots in the June 2020 Primary, "standing continues" as applied to their new claims for prospective relief. Pls.' Mot. at 5. Plaintiffs are simply wrong. Standing "is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358, n. 6 (1996)). "Rather, 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief'" that is sought." *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Further, a plaintiff "seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

Because Plaintiffs have not demonstrated that future injury is likely, they may not pursue new claims for prospective relief. As to this point, Plaintiffs' reliance on a stop and frisk case, *Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012), is misplaced. The court there found that the plaintiffs' allegation of future injury was "not based on a string of unlikely contingencies . . . ." *Id.* at 170. Rather, at least one of the plaintiffs in that case submitted a sworn affidavit testifying that being stopped and frisked by the defendants was a nearly routine part of "his daily life—walking down the sidewalk, sitting on a bench, getting into a car." *Id.* A remote

14

risk of injury caused by a third party, as exists in this case, is not comparable.[7]

    *iv.*       *Plaintiffs' Subjective Fears Do Not Create Standing.*

Plaintiff Miriam Lazewatsky submitted a declaration stating that she is "worried [her] vote won't be counted if [she] use[s] an absentee ballot for the November election, and because of this [she] will be voting in-person," which may be less safe given the risk of COVID-19. *Id.* ¶ 7.

It is clear that a plaintiff "cannot evade the required showing of an 'actual or imminent' injury by alleging present harms incurred as a result of their 'fear[ ] of a hypothetical future harm that is not certainly impending,' as doing so would allow parties to 'repackage' their conjectural injury to 'manufacture standing.'" *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 150 (E.D.N.Y. 2017) (quoting *Clapper*, 568 U.S. at 416). Where a plaintiff alleges that she incurred some injury as a result of a threatened alternative, "the focus of the standing inquiry remains whether 'the threat creating the fear is sufficiently imminent.'" *Id.* (quoting *Hedges v. Obama*, 724 F.3d 170, 195 (2d Cir. 2013)). *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 107 (1983) ("It is the *reality* of the threat . . . that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.") (emphasis in original).

While her concerns are undoubtedly genuinely held, Ms. Lazewatsky's declaration does not raise an Article III case or controversy. Even assuming that her apprehension to vote absentee is specifically related to a fear that her ballot will be subject to a USPS postmarking error (which she does not contend), the standing inquiry focuses on whether that alleged threat is sufficiently

---

[7] The court in *Floyd* also found that objective evidence supported the plaintiffs' testimony regarding the ongoing nature of the injury: the New York Police Department had conducted "over 2.8 million stops over six years" and was continuing to conduct 1200 stops every day. 283 F.R.D. at 170.

imminent. For all the reasons discussed above, it is not.[8]

### B. Plaintiffs' Alleged Injuries are not Traceable to the State Defendants.

As noted above, Plaintiffs cannot establish an injury in fact based on "speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S., at 414 (quoting *Lujan*, 504 U.S., at 562). Likewise, a plaintiff must show "a causal connection between the injury and the conduct complained of—the injury has to be fairly trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citation omitted). Here, Plaintiffs' alleged injury is the result of purported future independent actions of USPS, and is not traceable to any existing act or omission by the State Defendants.

### C. Plaintiffs' Claims Are Not Ripe for Review.

For similar reasons to those regarding standing, the claims in the Amended Complaint are not ripe for adjudication. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical'") (quoting *Lujan,* 504 U.S., 560). *See also Gallagher*, 2020 WL 4496849, at *22 (relief granted after election).

### D. Plaintiffs' Predictions of a NYCBOE Backlog Do Not Create Standing and Are Unrelated to the Actual Claims in this Case.

Entirely apart from their allegations about future USPS postmarking errors and the

---

[8] By contrast, in other recent cases in which the plaintiffs had standing based in part on COVID-19 risks, those plaintiffs faced an objectively imminent threat of injury that led them to risk contracting COVID-19. *See, e.g.*, *Jones*, 2020 WL 5627002, at *24 (where the now-enjoined USPS service changes had caused widespread mail delays, voters faced choice between "a substantial likelihood that their ballots will not be counted because of delays in Election Mail service" and the risk of voting in person); *People First of Alabama v. Merrill*, 2020 WL 3207824, at *6 (discussed at n.3, *supra*). *See also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010) (farmers had standing where they incurred costs in response to a "significant risk" of harm that was "readily attributable" to the defendant's action).

Postmark Rule, a substantial portion of the Amended Complaint and PI Motion discusses a second prediction by Plaintiffs: that NYCBOE, against which Plaintiffs assert no claims, will "end up with a backlog of absentee ballots that it cannot make it through in time to mail absentee ballots [to voters] in a timely manner." Am. Compl. ¶ 113; *see also id*. ¶¶ 41-49. Plaintiffs ask the Court to order the State Board to direct local boards to adopt certain policies regarding processing and mailing of absentee ballots to voters. ECF No. 112 at 2. This separate allegation and demand for relief underscores Plaintiffs' departure from fundamental Article III principles, as they ask the Court to issue an omnibus order regarding diverse aspects of election administration, untethered from any injury to Plaintiffs or the actual legal claims asserted. The Amended Complaint does not assert any causes of action related to NYCBOE's processing and mailing of absentee ballots. Rather, their claims are that the State Defendants have violated their rights by failing to instruct local boards to count ballots with missing or inaccurate postmarks. Am. Compl. ¶¶ 116-157. Thus, the Court should not address the allegations and argument on this issue.[9]

### E.  The Proposed Second Amended Complaint is Futile.

Plaintiffs seek permission to file the SAC, which would add State Senator Alessandra Biaggi as a new plaintiff. The Court should deny Plaintiffs' request to file the SAC because it is

---

[9] As with their other allegations, Plaintiffs' predictions ignore election reforms implemented by New York State that directly address their concern. During the June 2020 Primary, voters were required to wait until 30 days before the election to begin submitting absentee ballot requests by means other than the formal hard copy application, and electronic requests were not authorized by legislation until June 7, which was 16 days before the primary. Brehm Decl. ¶¶ 6-7. On August 20, 2020, Chapter 138 of the Laws of 2020 (8783A / A.10807) expanded the application time period by permitting voters to immediately begin sending electronic applications for the General Election. *Id*. ¶ 8. Plaintiffs also ignore EO 202.58, which required local boards to send a mailing to every registered voter that provides information about absentee ballot deadlines. *Id*. ¶¶ 12-13. By significantly moving up the application timeline and encouraging early applications, the risk of a backlog close to election day has been reduced.

futile. *See Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016). The addition of Sen. Biaggi as a party does not resolve the standing deficiencies described above. Like all of the Plaintiffs, Sen. Biaggi lacks standing because she has not alleged a certainly impending or substantially likely injury. There is no evidence that any voters in Sen. Biaggi's district are substantially likely to have their ballot invalidated by a systemic USPS postmarking error. For that reason, adding her as a plaintiff would be futile.[10]

## II.   PLAINTIFFS HAVE NOT ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS BECAUSE THE CLAIMS IN THE AMENDED COMPLAINT FAIL TO STATE A CLAIM

Plaintiffs have not established a clear or substantial likelihood that they will succeed in demonstrating that the Postmark Rule is unconstitutional, either facially or as applied to the General Election.

### A.  The Postmark Rule Does Not on Its Face Violate the First Amendment.

When considering whether a state election law imposes an unconstitutional burden on voting rights, courts apply an analysis derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under this test, the court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id*. at 434 (quoting *Anderson*, 460 U.S. at 789). Where a state election law subjects voters' First and Fourteenth

---

[10] Plaintiffs filed the PI Motion and supporting materials on September 18, 2020. ECF No. 112. On September 29, 2020, following a deficient docket entry notice, Plaintiffs purported to re-file the same motion and supporting materials, but in fact added a new, previously undisclosed declaration from Sen. Biaggi. ECF No. 126. While Sen. Biaggi's new declaration does not remedy the standing deficiencies identified here, it was not filed by the deadline set in the Court's Scheduling Order, (ECF No. 105), and the Court should disregard its contents.

Amendment rights to "'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id*. (quoting *Norman v. Reed,* 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)). But when an election law provision "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify the restrictions.'" *Id*. (quoting *Anderson*, 460 U.S. at 788). Judicial review of reasonable, nondiscriminatory restrictions is "quite deferential, and [courts] will not require 'elaborate, empirical verification of the weightiness of the State's asserted justifications.'" *Price v. New York State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997)). The "general rule" is that "evenhanded restrictions that protect the integrity and reliability of the electoral process itself are not invidious . . . ." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (internal citation and quotation omitted).

   i.   *The Postmark Rule is a Reasonable, Non-Discriminatory Regulation.*

Plaintiffs argue in conclusory fashion that the Postmark Rule is unreasonable and discriminatory because "[t]he burden on voters of having their votes simply tossed aside [for lacking a timely postmark] is severe, and therefore requires strict scrutiny." Am. Compl. ¶ 119. That argument rests on the "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny." *Burdick*, 504 U.S. at 432. The Supreme Court's opinions "do not so hold." *Id*. Rather, because "[e]lection laws will invariably impose some burden upon individual voters," courts do not "subject every voting regulation to strict scrutiny and [] require that the regulation be narrowly tailored to advance a compelling state interest . . . ." *Id*. at 433. Doing so "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id*.

The Postmark Rule is reasonable and non-discriminatory. It merely requires that absentee ballots arriving by mail two or more days after election day bear verified, objective evidence that the ballot was cast on time. A USPS postmark conveys this information because, as the Court found, "when a ballot does contain a postmark, it is likely that the postmark reflects the date the ballot was mailed by the sender and received by the postal service." *Gallagher*, 2020 WL 4496849, at *22.

Critically, the Postmark Rule did not arise as a *restriction* on the vote at all—just the opposite, it is a component part of an *expansion* of absentee voting. The majority of states around the country require absentee ballots to arrive on or before election day; in those states, every ballot received after the cut-off time on election day is invalid.[11] New York was one of the first states to permit ballots to arrive by mail after election day. Hrg. Tr. 93:18-23 (Conroy Decl. Ex. 5). But to determine the validity of ballots that arrive by mail after election day, election officials must have some means to determine whether the ballot was cast on time. A postmark is a verified, objective means of determining this information. For that reason, every state that has followed New York's lead and expanded absentee voting to permit late-arriving ballots has implemented some form of a postmark rule.[12] Indeed, many voting rights advocates encourage states that still have an election day deadline to follow New York's lead and adopt a postmark rule as part of an expansion of

---

[11] *See* National Conference of State Legislatures, Voting Outside the Polling Place Report: Table 11: Receipt and Postmark Deadlines for Absentee Ballots, *available at* https://www.ncsl.org/research/elections-and-campaigns/vopp-table-11-receipt-and-postmark-deadlines-for-absentee-ballots.aspx.

[12] *See* National Conference of State Legislatures report, *supra* n.11. Among other states that accept late-arriving ballots, most have postmark rules that are more restrictive than New York's. For example: Iowa, North Dakota, Ohio, and Utah require that absentee ballots be postmarked by the day before election day. *Id.*

absentee voting.[13]

Further, it is not unreasonable or discriminatory for New York to rely on the accuracy of USPS postmarks as a means of verifying a ballot's mailing date because postmarks are commonly used for that purpose in a wide variety of legal and judicial contexts. For example, the federal Internal Revenue Code provides that for tax returns received by the Internal Revenue Service after the tax filing deadline, "the date of the United States postmark stamped on the cover . . . shall be deemed to be the date of delivery or the date of payment." 26 U.S.C.A. § 7502. Courts also frequently rely on postmarks to provide verified information about a mailing date; for example, in the context of enforcing class action deadlines. *See, e.g.*, *Taylor v. NYC Health + Hosps.*, No. 19-cv-7086, 2020 WL 4932798, at *1 (S.D.N.Y. Aug. 24, 2020) (relying on postmark date to enforce opt-in deadline); *Stemple v. RingCentral, Inc.*, No. 18-cv-04909-LB, 2019 WL 3842091, at *7 (N.D. Cal. Aug. 15, 2019) ("The date of the postmark . . . on the Exclusion Letter Envelope will be the exclusive means used to determine whether Class Members timely returned an Exclusion Letter by mail on or before the Response Deadline.").

Despite the ubiquitous use of postmarks in a wide variety of election law and other contexts, Plaintiffs have failed to identify *any* cases supporting their claim that it is facially unreasonable or discriminatory to rely on USPS postmarks.[14] That failure is a powerful indication

---

[13] *See* Isaac Chotiner, "How to Counter Trump's Attempt to Manipulate the Election and the Census: Q&A with Vanita Gupta," The New Yorker, Aug. 9, 2020, https://www.newyorker.com/news/q-and-a/how-to-counter-trumps-attempt-to-manipulate-the-election-and-the-census ("[Q:] What are the crucial things that states should be doing to prepare for holding an election amid a pandemic? [A:] Several things. . . . States that don't already have this have to provide a reasonable window to accept ballots postmarked on Election Day that may arrive after.").

[14] As the Court knows, its Order granting a preliminary injunction in this case was based on specific evidence of a systemic postmarking error in the June 2020 Primary.

that the Postmark Rule is indeed constitutional. *See Wood v. Meadows*, 207 F.3d 708, 713 (4th Cir. 2000) ("In sum, [plaintiff] does not cite a single case, and we have not found one, in which any court has held unreasonably burdensome a statutory scheme like" the one being challenged.). On the contrary, recent decisions, including from the Supreme Court, have endorsed the use of similar postmark rules. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (per curiam) (staying an injunction that required the State of Wisconsin to count absentee ballots received within one week following the election, regardless of postmark); *New Georgia Project v. Raffensperger*, No. 1:20-cv-01986-ELR, 2020 WL 5200930, at *27 (N.D. Ga. Aug. 31, 2020) *appeal pending*, No. 20-13360-D (11th Cir.) (invalidating Georgia's election day deadline for receipt of absentee ballots and mandating a postmark rule as part of the relief granted).

Finally, Plaintiffs' argument that the Postmark Rule is unreasonable and discriminatory also fails given the recent election reforms that provided absentee voters with alternative methods to return their ballots and other protections. *See Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004) ("Courts are required to consider the restrictions within the totality of the state's overall plan of regulation.").

  ii.  *The Postmark Rule Serves the Important State Interest of Ensuring Ballots are Cast By Election Day.*

As a reasonable, non-discriminatory provision, the Postmark Rule is valid so long as it is justified by important regulatory interests. *Burdick*, 504 U.S. at 428. The Court addressed this issue in the PI Decision, when it found that "the state has a legitimate interest in ensuring that all ballots are cast before the polls close on Election Day." *Gallagher*, 2020 WL 4496849, at *16. Indeed, a universal, fundamental feature of elections is that the results of the balloting must remain unknown until voting is complete for everyone. *See* Declaration of Robert A. Brehm ¶ 13 (July 22, 2020) (ECF No. 18). This principle ensures that all votes are given equal weight and deters fraud and

disorder. *Id*. Like every other state, New York requires voters to submit their ballots on or before the close of polls on election day. Given that the Postmark Rule is reasonable, non-discriminatory, and serves this important interest, it does not violate the First Amendment. *Burdick*, 504 U.S. at 433.

### iii. _On a Facial Challenge, Allegations About Likely USPS Errors Cannot Prevail._

Plaintiffs' argument that the Postmark Rule is facially invalid rests on a series of factual claims about the alleged "increasing unreliability" of USPS postmarks. *See* Am. Compl. ¶¶ 152-55 (predicting that "ballots will increasingly bear postmarks with dates one or more days after mailing"). A facial challenge cannot prevail on the basis of these fact-sensitive claims. To succeed on a facial challenge, a plaintiff must establish that "no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. For that reason, a facial challenge "consider[s] only the text of the statute, not the application of the statute to a particular set of facts." *Lusk* v. *Village of Cold Spring*, 475 F.3d 480, 493 n.15 (2d Cir. 2007). Plaintiffs' facial challenge cannot succeed because it relies on allegations about the application of the Postmark Rule to a particular factual scenario: i.e., elections in which USPS services are allegedly unreliable. But even if it is possible or even likely that postmark errors will occur in some elections, that does not establish that *no* set of circumstances exist under which the Postmark Rule could be valid. On the contrary, so long as "some set of circumstances exist" under which the statute could be valid— for example, an election in which USPS performs reliably—Plaintiffs' facial challenge must fail. *Joseph v. Decker*, No. 18-cv-2640(RA), 2018 WL 6075067, at \*8 (S.D.N.Y. Nov. 21, 2018).

### iv. _Even if Strict Scrutiny Applied, the Postmark Rule Would be Valid._

Even if the Court were to apply strict scrutiny—which it should not do—the Postmark Rule would be valid because Plaintiffs' proposed alternatives do not provide an equally effective means of ensuring that ballots are cast on time. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656,

666 (2004) ("the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives"). The Postmark Rule provides objective, verified information about the date ballot was cast. All of Plaintiffs' proposed alternatives, Am. Compl. ¶ 151, either fail to provide comparably verified information, are not less restrictive, or else create different problems.

- Intelligent mail barcodes (*id*. ¶ 151.a) are, like postmarks, a USPS service. Given that Plaintiffs allege that USPS services are fundamentally unreliable, *id*. ¶ 153, it is not clear how this solves the alleged problem.

- Voter affidavits, either included with the ballot (*id*. ¶ 151.b) or via a cure process (*id*. ¶ 151.e), do not provide verified confirmation of timeliness and are vulnerable to fraud and mistake. *See* Hrg. Tr. 120:11-121:15 (Conroy Decl. Ex. 5). Further, the creation of a new requirement that voters must swear out an affidavit with their ballot would very likely create new problems with respect to voters who fail to complete the form.[15]

- Accepting all ballots received within seven days of election day, regardless of postmark, (Am. Compl. ¶ 151.f), or simply presuming that all ballots are timely (*id*. ¶ 151.c), would each fail to screen out ballots cast after election day. *See Gallagher*, 2020 WL 4496849, at *22 (evidence "does not establish to the same level of certainty, however, that absentee ballots received by the NYCBOE or another local

---

[15] The cure provision implemented by S.8370B / A.10830 is not comparable. That provision enables voters to fix certain technical defects that are curable even after the ballot is submitted, including unsigned ballots, mismatched signatures, lack of a required witness, and failure to return the affirmation envelope. *See* Brehm Decl. Ex. 5. By contrast, if a ballot arrives two or more days after election day without a postmark, an *ex post* affidavit would not provide verifiable confirmation that the ballot was mailed on time. The Legislature endorsed this distinction by creating a cure process for the former issues, but not the latter.

board on June 26 or later were mailed on or before June 23"). Nor would a rule accepting all ballots received within two days of election day, regardless of postmark, effectively satisfy the State's interest in ensuring that all ballots are cast on time. The Court found that based on typical USPS services standards, same day delivery of ballots is "virtually impossible," but next-day delivery is possible although unusual. *Gallagher*, 2020 WL 4496849, at *22. *See also* Hrg. Tr. 342:17-25 (Conroy Decl. Ex. 5) (up to ten percent of First Class Mail delivered next day).[16] Ballots received two days after election day therefore could have been cast after the deadline.[17]

- The "Wisconsin rule" (Am. Compl. ¶ 151.d) lacks clear guidelines, which in Wisconsin has led to different standards being applied in different localities throughout the state, a potential *Bush v. Gore* problem.[18]

---

[16] Election mail may well be delivered faster than these typical service standards, making it even more likely that a ballot could be delivered overnight. According to testimony in the *Jones* matter, USPS regularly delivers election mail faster than its normal service standards. USPS officials testified that USPS "undertake[s] extraordinary efforts to accelerate the delivery of ballots," and USPS employees "in some cases have delivered ballots on a same-day basis." *Jones v. United States Postal Serv.*, No. 20 CIV. 6516 (VM), 2020 WL 5627002, at *8 (S.D.N.Y. Sept. 21, 2020). *See also* Conroy Decl. Ex. 2 at 5 (USPS letter).

[17] Following the June 2020 Primary, New York amended the Postmark Rule to count non-postmarked ballots received one day after election day. Brehm Decl. ¶ 5. The Court's preliminary injunction order does not require the State to adopt a two-day rule because its holding was based on specific evidence of systemic postmarking error in the June 2020 Primary. Under that circumstance, the Court found that enforcing the Postmark Rule as to ballots received within two days of election day "would cause the invalidation of a large number of ballots that were timely cast," which was "not an acceptable price to pay in return for the slim chance of catching some genuinely late votes." *Gallagher*, 2020 WL 4496849, at *17. The same analysis does not apply where systemic postmark errors have *not* caused the invalidation of a large number of timely ballots.

[18] *See* Jake Prinsen, "Were absentee ballots without postmarks counted in the April election? The answer depends on where you live", Appleton Post-Crescent, June 4, 2020,

Because none of Plaintiffs' proposed alternatives would provide an equally effective means of ensuring that ballots are cast on time, the Postmark Rule would survive even strict scrutiny.

**B.  The Postmark Rule Does Not Violate the First Amendment as Applied to the General Election.**

Plaintiffs further allege that even if the Postmark Rule is constitutional on its face, it violates the First Amendment as applied to the General Election. Am. Compl. ¶¶ 116-28. An as-applied challenge requires "analysis of the facts of a particular case to determine whether" its application "deprived the individual to whom it was applied of a protected right." *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006). As to the June 2020 Primary, the Court found that the Postmark Rule was invalid as applied because systemic postmarking errors caused a scenario in which "thousands of ballots, constituting a significant percentage of the total ballots cast in certain races, were rendered invalid by its application, even though the evidence shows those ballots were mailed on time." *Gallagher*, 2020 WL 4496849, at *16. By contrast, Plaintiffs have not provided any evidence that could support a similar finding as to the General Election. As to that election, there are no ballots that have been rendered invalid by postmark errors, and no facts supporting Plaintiffs' conclusory prediction that systemic postmarking errors will occur. *See supra* 11-14.

**C.  The Postmark Rule Does Not Violate the Equal Protection Clause as Applied.**

Likewise, there is no basis for a finding that the Postmark Rule violates the Equal Protection Clause as applied to the General Election. In the PI Decision, the Court's equal protection holding was based on its finding that in the June 2020 Primary a significant number of ballots in Brooklyn failed to receive postmarks, whereas a similar problem did not occur elsewhere

---

https://www.postcrescent.com/story/news/2020/06/04/wisconsin-election-some-absentee-ballots-no-postmark-got-counted/5214150002/

in the State. The Court found that this was "strong evidence that USPS locations in Brooklyn handled absentee ballots differently from the postal service locations in the other boroughs." *Gallagher*, 2020 WL 4496849, at *19. Given this finding, the Court concluded that "[w]hether an individual's vote will be counted in this race, therefore, may depend in part on something completely arbitrary—their place of residence and by extension, the mailbox or post office where they dropped off their ballot." *Id*. Because the evidence showed an "inconsistent application of postmarks to absentee ballots," the Court found that the June 2020 Primary "suffered from a lack of 'specific standards to ensure . . . equal application' of § 8-412's postmark rule . . . ." *Id*. (quoting *Bush v. Gore*, 531 U.S. 98, 106 (2000)).

Similarly, in *Jones*, the court found that the plaintiffs had presented specific allegations and evidence of a "lack of standards and uniformity with regard to USPS's handling of Election Mail." 2020 WL 5627002, at *22. The evidence in that case included contradictory internal USPS guidance regarding handling of Election Mail and a "stunning lack of uniformity and a high level of confusion at various points in the USPS hierarchy regarding the standards to be followed by USPS employees on the ground." *Id*. The court concluded that this "lack of uniformity in the Postal Service's treatment of Election Mail among local post offices will result in intrastate and interstate disparities in citizens' voting power," which will "constitute a dilution of votes, an impairment of the right to fair and effective representation, and a violation of the equal dignity owed to each voter." *Id*. at *23.

By contrast here, there are no facts supporting Plaintiffs' prediction that the Postmark Rule will be applied inconsistently in the General Election. The Postmark Rule itself is unambiguous. And unlike the policies at issue in *Jones*, USPS's national postmarking policy is simple and clear: "the USPS has a longstanding policy of postmarking election mail, including absentee ballot return

envelopes." *Gallagher*, 2020 WL 4496849, at *4; *see also* Conroy Decl. Ex. 2 at 5 (USPS policies). Plaintiffs offer nothing beyond speculation that USPS will fail to apply its own clear policies in the future or that a systemic postmarking problem will recur. There is therefore no support for the assertion that voters will be subject to differential treatment in the General Election, and the *Bush v. Gore* analysis does not apply.

**D. The Postmark Rule Does Not Violate the Due Process Clause as Applied.**

As the Court previously noted, Second Circuit precedent is "not entirely clear on the question of whether voters may assert a freestanding Due Process claim based on alleged unfairness in election procedures . . . ." *Gallagher*, 2020 WL 4496849, at *15 n.3. To the extent a separate Due Process claim is even possible, Plaintiffs assert that it is based on their allegation that the State Defendants allegedly "assured and continue to assure voters that absentee ballots could be placed in a mailbox up through the end of election day." Am. Compl. ¶ 139.

This claim is false. The State Board has repeatedly informed the public that voters who return their absentee ballots by mail on election day must obtain a postmark and must be aware of USPS final collection times. For example, the "Absentee Voting" portion of the State Board's website contains the following guidance: "Voters who mail in their ballots on Election Day *must be aware of the posted collection times on collection boxes* and at the Postal Service's retail facilities, and that *ballots entered after the last posted collection time will not be postmarked until the following business day*."[19] Further, the State Board has encouraged voters not to wait until election day to send their absentee ballot by mail, much less the very end of the day. *See* Brehm Decl. Ex. 7. The new statewide uniform absentee ballot envelope expressly informs voters that

_____

[19] State Board of Elections Website, Absentee Voting, *available at* https://www.elections.ny.gov/VotingAbsentee.html (emphasis added). This document is also attached as Exhibit 8 to the Brehm Declaration.

ballots may be dropped off at any Early Voting or Election Day poll site or the voter's local board

of elections by 9:00 PM on Election Day, or if returned by mail must be "postmarked by Election

Day and returned not later than 7 days following the election." *Id*. Ex. 9. And Commissioner

Kellner testified that the State Board has previously cautioned voters about the USPS pickup

deadline.[20] Plaintiffs' due process claim is not supported by any facts and it will not succeed.

### III.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Plaintiffs will not suffer irreparable harm absent a preliminary injunction. While

"[g]enerally an alleged violation of a constitutional right creates a presumption of irreparable

harm," a plaintiff seeking "prospective injunctive relief . . . must show a likelihood of either future

harm or continuing harm." *Krull v. Oey*, No. 19-cv-0142-TJM-CFH, 2019 WL 1207963, at *10

(N.D.N.Y. Mar. 14, 2019). A plaintiff seeking to satisfy the irreparable harm requirement must

demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither

remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits

until the end of trial to resolve the harm." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group

Ltd.*, 437 Fed. App'x 57, 58 (2d Cir. 2011). As discussed above, Plaintiffs do not allege any Article

III injury as to their new claims, much less an injury causing irreparable harm. *See Amidax Trading

Grp. v. S.W.I.F.T. SCRL*, No. 08-cv-5689 PKC, 2012 WL 868691, at *2 (S.D.N.Y. Mar. 13, 2012)

("because . . . the plaintiff lacks standing, the plaintiff also has failed to establish irreparable

harm"). Moreover, the speculative harms identified by Plaintiffs have been addressed, as noted

above, by the multiple nationwide injunctions halting USPS service changes and by New York's

---

[20] Hrg. Tr. 91:14-19 (Conroy Decl. Ex. 5) ("A. Yes, obviously, if you mail—if you drop a ballot in a mailbox after the deadline for the last pickup, you're not going to get an election [day] postmark. Q. As far as you're aware, had either the state board or city board issued caution to voters about that fact? A. Yes.").

legislative and executive reforms.

## IV.    THE PUBLIC INTEREST WEIGHS AGAINST ALTERING THE ELECTION RULES ON THE EVE OF THE ELECTION

The balance of the equities and the consideration of the public interest weigh in favor of the State Defendants. The Supreme Court has stated that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). The injunction requested by Plaintiffs is not in the public interest because it would alter the rules of an election that is now, as of the date of the filing of this brief, just 32 days away and counting. That is already closer to the election than the 33-day timeframe at issue in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), where the Supreme Court vacated a lower court order altering election rules and warned that such late changes were likely to cause "voter confusion and consequent incentive to remain away from the polls." *Id*. at 4-5. Further still, the relief requested here—such as Plaintiffs' demand that local boards create and implement a notice and cure process for ballots with missing postmarks just days before the election—would require a substantial diversion of resources at a time when the State Board and local boards are intensely preparing for the General Election. None of this is in the public interest where Plaintiffs have presented no evidence or specific allegations supporting their prediction that systemic postmark errors will occur, and where the State Defendants have taken aggressive steps to expand and protect the absentee voting process for the General Election and beyond.

## CONCLUSION

For the reasons set forth above, the State Defendants respectfully request that the Court deny Plaintiffs' motion for a second preliminary injunction and their request to file the Second Amended Complaint.

Dated: New York, New York
      October 2, 2020

                                   Respectfully submitted,

                                   LETITIA JAMES
                                   Attorney General
                                   State of New York
                                   *Attorney for State Defendants*

                                   By: /s/ Owen T. Conroy
                                   Owen T. Conroy
                                   Assistant Attorney General
                                   28 Liberty Street
                                   New York, New York 10005
                                   Tel.: (212) 416-6382
                                   Email: Owen.Conroy@ag.ny.gov