**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

Emily Gallagher, Suraj Patel, Katherine Stabile, Jillian Santella, Aaron Seabright, James C. McNamee, Kristin Sage Rockermann, Maria Barva, Miriam Lazewatsky, Myles Peterson, Samantha Pinsky, Christian O'Toole, Tess Harkin, Caitlin Phung, Antonio Pontón-Núñez, *individually, and on behalf of all others similarly situated,*

      Plaintiffs,

 v.

New York State Board of Elections; Peter S. Kosinski, Andrew Spano, and Douglas Kellner, *individually and in their official capacities as Commissioners of the New York State Board of Elections*; Todd D. Valentine, Robert A. Brehm, *individually and in their official capacities as Co-Executive Directors of the New York State Board of Elections*; and Andrew Cuomo *as Governor of the State of New York*,

      Defendants.

Docket No. 20-cv-5504-AT

---

Maria D. Kaufer and Ethan Felder,

      Plaintiff-Intervenors,

 v.

New York State Board of Elections; Peter S. Kosinski, Andrew Spano, and Douglas Kellner, *individually and in their official capacities as Commissioners of the New York State Board of Elections*; Todd D. Valentine, Robert A. Brehm, *individually and in their official capacities as Co-Executive Directors of the New York State Board of Elections*; and Andrew Cuomo *as Governor of the State of New York*, New York City Board of Elections, Patricia Anne Taylor, *individually and as President of the New York City Board of Elections,* and Michael J. Ryan, *individually and as the Executive Director of the New York City Board of Elections*,

      Defendants.

**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

[APPEARANCES ON NEXT PAGE]

J. Remy Green
Jonathan Wallace, *of counsel*
Alex Petkanas, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016

*Attorneys for Plaintiffs*

October 5, 2020

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................................i

TABLE OF AUTHORITIES ............................................................................................................ii

PRELIMINARY STATEMENT......................................................................................................1

FACTUAL RESPONSE ..................................................................................................................2

       A.     City Board Issues...............................................................................................................2

       B.     USPS Slowdowns. ............................................................................................................4

       C.     Postmarking "Problems." ..................................................................................................5

ARGUMENT....................................................................................................................................6

    I.     State Defendants' Standing Arguments are Misguided. .................................................7

       A.     An injunction issued after a complaint does not create a standing defect..........................8

       B.     This case is not moot........................................................................................................10

       C.     Defendants' standing cases are not on point. ..................................................................11

    II.    Defendants' Merits Arguments Ignore the Standard and their Own Statements.....................12

    III.   Defendants' *Purcell* Argument is Misguided, and Should Be Taken With At Least Some Salt ................................................................................................................................13

CONCLUSION................................................................................................................................15

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Anderson v. Tower Amusement Co.*,
  118 Fla. 437, 159 So. 782 (1935) ............................................................................................10

*Azim v. Vance*,
  530 F. App'x 44 (2d Cir. 2013) ............................................................................................9, 10

*Credico v. N.Y. State Bd. of Elections*,
  751 F. Supp. 2d 417 (EDNY 2010) ......................................................................................7, 12

*Dhinsa v. Krueger*,
  917 F.3d 70 (2d Cir. 2019) ........................................................................................................9

*Doe v. Mattis*,
  344 F. Supp. 3d 16 (D.D.C. 2018) ............................................................................................9

*Gallagher v. N.Y. State Bd. of Elections*,
  2020 U.S. Dist. LEXIS 138219 (S.D.N.Y. Aug. 3, 2020) ................................................*passim*

*Jones v. United States Postal Service*,
  2020 U.S. Dist. LEXIS 172430, at *10 (S.D.N.Y. 2020) .................................................*passim*

*Lerman v. Bd. of Elections*,
  232 F.3d 135 (2d Cir. 2000) ....................................................................................................11

*New York v. Trump*,
  2020 U.S. Dist. LEXIS 177083 (D.D.C. 2020) .......................................................................11

*New York v. U.S. Dep't of Homeland Sec.*,
  969 F.3d 42, 2020 U.S. App. LEXIS 24492 (2d Cir. Mar. 2, 2020) .........................................8

*Schulz v. Kellner*,
  2011 U.S. Dist. LEXIS 73088 (NDNY 2011) ........................................................................11

*Strawser v. Strange*,
  190 F. Supp. 3d 1078 (S.D. Ala. 2016) ...............................................................................9, 10

*Trump v. Int'l Refugee Assistance Project*,
  137 S. Ct. 2080 (2017) ............................................................................................................12

*Yang v. Kosinski*,
  960 F.3d 119 (2d Cir. 2020) .............................................................................................13, 14

**Other Authorities**

Brigid Bergin, After Another Colossal Blunder, NYC Board Of Elections To Send
    New Ballots To Nearly 100,000 Brooklyn Voters, GOTHAMIST (Sept. 29, 2020).............................3

Brigid Bergin and Jen Chung, New Yorkers: Here's How To Vote In The 2020
    Election, GOTHAMIST (Oct. 2, 2020) ........................................................................................3

Carl Campanile et al., NYC Voters Are Wrongly Receiving Mail-In Ballots Marked
    for Military Use................................................................................................................2, 3

Dana Rubinstein et al., Nearly 100,000 New York City voters have been sent invalid
    absentee ballots, with wrong names or addresses ...............................................................1, 3

**PRELIMINARY STATEMENT**

Cause and effect *can* sometimes be tricky. Not every effect has a neat, clear cause. And some things are simply inherently unknowable. The State Defendants' opposition, however, tries to inject this kind of existential doubt into every aspect of running an election. Sure, they say, we delivered 34,359 ballots to USPS the day before the election, but that is somehow "untethered from any injury to Plaintiffs or the actual legal claims asserted." Def. MOL at 17. In other words, according to the State Board, even if voters only receive their ballots the day before the election, it is still those pesky voters' fault that they failed to return their ballots with enough time to spare – and in any event, you can't show that late delivery *caused* anything related to the postmarking issue. That kind of postmodern legal reasoning goes too far.

Much of the rest of the State Defendants' opposition sits divorced from reality. While, of course, there *are* injunctions against USPS, it is hard to see – from a voter's perspective – how those injunctions are any different than how, in June, election officials "received assurances from the USPS that ballot return envelopes would be cancelled." *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *12 (S.D.N.Y. Aug. 3, 2020). And, indeed, despite a discussion of USPS litigation, tellingly missing from Defendants' papers is any indication that USPS has returned the State Board's "urgent" communications about the postmarking problem. Similarly, while the State Defendants object that it's speculation to predict that there will be profound issues at the City Board that result in the Postmark Rule disenfranchising voters, shocking errors at the City Board have already begun to emerge. Nearly 100,000 voters – as with the postmark errors in June, mostly confined to Brooklyn – received *the wrong ballot envelopes*. *See* Dana Rubinstein et al., Nearly 100,000 New York City voters have been sent invalid absentee ballots, with wrong names or addresses, NY

TIMES (Sept. 29, 2020).[1] A confusing typographical error on as many as 520,000 ballots lead voters to believe they had accidentally received a military ballot – a move that led Commissioner Kellner to comment, "I'm not happy about this … There are lots of questions of whether there is adequate quality control [at the city BOE]." Carl Campanile et al., NYC Voters Are Wrongly Receiving Mail-In Ballots Marked for Military Use, NY POST (Sept. 28, 2020).[2] And an attitude that these errors will simply evaporate and not lead to any Constitutionally important disenfranchisement is exactly what lead to the problems in June. In short, with a backlog *already piling up*, it is the height of willful blindness for the State Board to pretend similar issues to those that marred New York's June are certain not to recur.

The "right to vote is too vital a value in our democracy to be left in a state of suspense in the minds of voters weeks before a presidential election, raising doubts as to whether their votes will ultimately be counted." *Jones v. United States Postal Service*, 2020 U.S. Dist. LEXIS 172430, at *10 (S.D.N.Y. 2020). Voters have a right to better than that.

## FACTUAL RESPONSE

Defendants' response elides many facts. Given the time available, we briefly provide responses here.

    A.    <u>City Board Issues.</u>

Defendants fail to address the endemic issues at the City Board, arguing only that – somehow – the backlog at the City Board, concentrated more than 50% in Brooklyn, had nothing to do with missing and late postmarks in Brooklyn. Yet City Board errors continue to plague Brooklyn in ways that will once again lead to Brooklyn voters receiving votable ballots far later than their

---

[1] Available at https://www.nytimes.com/2020/09/29/us/nearly-100000-new-york-city-voters-have-been-sent-invalid-absentee-ballots-with-wrong-names-or-addresses.html.
[2] Available at https://nypost.com/2020/09/28/nyc-voters-wrongly-getting-mail-in-ballots-marked-for-military-use/.

2

counterparts in other boroughs.  In the first large batch of Brooklyn ballots, nearly 100,000 inner envelopes were sent *to the wrong voters*.³ Rubinstein, *supra*; *see also,* Brigid Bergin, After Another Colossal Blunder, NYC Board Of Elections To Send New Ballots To Nearly 100,000 Brooklyn Voters, GOTHAMIST (Sept. 29, 2020).⁴ As Mayor de Blasio put it, "I don't know how many times we're going to see the same thing happen at the Board of Elections and be surprised."  Rubinstein, *and compare,* Tr. 400:19-401:8.  Nor is this likely to be the end of City Board errors.  The City Board printed red, sign-here "x" marks on the wrong side of ballots.  *See* Brigid Bergin and Jen Chung, New Yorkers: Here's How To Vote In The 2020 Election, GOTHAMIST (Oct. 2, 2020).⁵ And apparently, the ballots as printed are too heavy – requiring two stamps and sometimes getting bounced back (even though USPS *should* transmit the ballot even with insufficient postage).  *Id.*  As noted above, in addressing *yet another* City Board error in producing ballots (ballots misleadingly stating they are military ballots), Commissioner Kellner simply observed, "There are lots of questions of whether there is adequate quality control [at the city BOE]."  Campanile, *supra*.

Beyond that, as concerns international voters, the City Board – in violation of the law – spent the time until after the UOCAVA deadline insisting on receiving hard copy ballot applications with "wet" signatures.  *See* Rothschild Dec. ¶ 13.  And further, (again, contrary to the law) the New York County Board of Elections has apparently refused to accept Federal Write-In Ballots more than 30 days before election.  *Id.* ¶¶ 14-16.  For international absentee voters, then, this may simply be a bar on voting.

In short, then, the notion that the City Board is an entity that the State Board (and voters)

---

³ As noted in the Brehm Dec. (¶¶ 10, 19), that number is a full *quarter* of the number of New Yorkers that have applied online for absentee ballots across the State, a fifth of the total number of absentee ballots in the 2016 General Election, and a bit under a tenth of the total applications received for the November Election to date.  In any event, it is a massive amount of work that needs to be redone completely.

⁴ *Available at* https://gothamist.com/news/after-another-colossal-blunder-nyc-board-elections-send-new-ballots-nearly-100000-brooklyn-voters.

⁵ *Available at* https://gothamist.com/news/new-yorkers-heres-how-vote-2020-election.

3

can simply rely on without question is absurd. And even on Defendants' rosy view, the "risk of a backlog" has not even been eliminated, only "reduced." Def. MOL at 17 n. 9. Given that Defendants do not assert that the massive failure in sending 100,000 voters the wrong ballot envelopes can be addressed without a backlog,[6] presumably they would concede it will have *some* impact. Indeed, if the initial batch of 100,000 ballots took a month to generate, presumably the need to completely redo that batch has already created a massive backlog. *See also*, Tr. 146:10-24 (testimony that the City Board only has capacity to process 5,000 ballots per day). Thus, there is no real question that – just as happened in June – we are moving quickly towards a situation in which the City Board will "thr[o]w up their hands and sa[y], 'Well, there's nothing more that we can do.'" Tr. 146:10-24. *See also*, Kellner Dec. ¶ 27; FAC Ex. 4 at 4.

      B.        <u>USPS Slowdowns.</u>

While injunctions exist against USPS, it is certainly not guaranteed they will have the intended effect – or that USPS will not successfully appeal those injunctions. In the first instance, in the last two weeks of available data, USPS's First Class delivery standards have begun to tank once more, dropping from 88.74% on time the week beginning September 5 to 84.23% on time the week beginning September 19. Green Reply Ex. 1 at 1. Indeed, despite the injunction in *Washington v. Trump* being in effect the entire week of September 19, service standards dipped 2.5 full points. *Id.* And the time to file an appeal has not passed for those injunctions.

Further, in their submissions on the various cases, USPS has cautioned that they may not be *able* to recover to even June levels of performance – let alone the levels ordered in the various injunctions. *See, e.g.*, "Service Performance Steps," *Jones,* 20-cv-6516, ECF No. 67-1 ¶¶ 1-3 (Oct. 1, 2020) (cautioning that "the [injunction] Order identifies First-Class Mail and Marketing Mail on-time

---

[6] Defendants likely would have addressed this issue if they could, given that it was raised in the exchange of letters around Defendants' request to add another week of briefing to this motion. *See* ECF No. 115. As also noted in that letter, Plaintiff Rockermann is among those who received an envelope for another voter.

4

delivery scores that the Postal Service reached in early 2020," but that "[c]ertain events outside of the Postal Service's control arose after this date, and these events may continue to impact on-time delivery scores.").

Thus, this Court should look to what the situation, in reality, is right now. That situation is that USPS's national on-time score is only 84.23% for First Class mail products. That sits approximately 12 percent below the baseline score, and 14 percent below the score the Court used in evaluating the propriety of an injunction for the June Election. And, indeed, the score is very close to the bottom point reached in July:



Green Reply Dec. ¶ 3.

        C.        <u>Postmarking "Problems."</u>

Defendants also seek to lump a *different*, profound issue with postmarking into a heap with the problems in the June Primary, arguing that it "is of no significance" that significant issues exist with ballots receiving *late* postmarks because "Court already found that a systemic postmarking error occurred in Brooklyn during the June 2020 Primary." Def. MOL at 13. But that is a mischaracterization of the record the Court evaluated: the "systemic postmarking error" the Court

5

found could not account for *late* postmarking. Instead, as the Court explained, if everything is working correctly, after a ballot is dropped off, "[e]ven if [it] is not processed until after midnight it will still receive a postmark with the drop-off date because the automated computer system does not change the date stamp until 6:00 a.m. the following morning." *Gallagher* at *13. Testimony showed that "some return envelopes may lack postmarks because, contrary to policy, the envelopes were not routed to the Morgan Facility, or were misdirected and did not pass through the automatic cancellation machinery," and "[i]t is also possible that the automated process failed to cancel some ballot envelopes because they were folded over, stuck together, or otherwise avoided the stamping process for mechanical reasons." *Id.* at *15-16. But *neither* of these explanations would account for a postmark that was three days late. That is, ballots did not receive postmarks because they somehow bypassed the postmarking equipment, whether by misrouting or because of "mechanical reasons." *That* error could not possibly account for late postmarks. Thus, Defendants fail to rebut the considerable evidence that profound, unaddressed issues suggest postmarks are often inaccurate when they suggest a ballot was mailed too late.

## ARGUMENT

In the first instance, Defendants do not present a *single* argument against the Court entering exactly the same injunction it entered for the June Primary beyond a misreading of the record in *Jones*: that "in some cases [postal employees] have delivered ballots on a same-day basis." Def. MOL at 25 n. 16. But that is exactly the testimony the Court already heard: the referenced testimony in *Jones* discusses exactly the same extraordinary Election Day measures the Court already considered – including the same day delivery of 34,359 ballots delivered to USPS by the City Board the day before the election in June. *See, e.g., Gallagher* at 14-15 ("Tanko directed the Morgan Facility to upgrade the ballots to Express Mail, in order to ensure that voters would receive" them "by the next day"). And so, the fact remains: even if the burden on the right to vote in not counting ballots

6

without postmarks received on the second day after the election is "not … likely to be significant," because there is "no legitimate justification for [the state's rule as applied here]" (or, as the Court put it, the rule "would do nothing to advance the state's interest in ensuring ballots are cast by Election Day," *Gallagher* at \*49-50), the rule is unconstitutional. *See* Pl. MOL at 17; 21, *discussing Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 422-23 (EDNY 2010).[7]

Beyond that, Defendants arguments all fail. Given the space available, Plaintiffs address all those arguments they can below.

## I. State Defendants' Standing Arguments are Misguided.

First and foremost, Judge Marrero's thorough standing analysis in *Jones* addresses nearly all of Defendants' arguments here. *See Jones*, 2020 U.S. Dist LEXIS 172430 at \*34-42. And since the State Defendants rely on the result in *Jones* to make their standing arguments, they cannot assert it is wrong.

Beyond that, given that all injunctions against USPS were issued *after* Plaintiffs amended the complaint and made the present motion, Defendants' standing arguments really are not standing arguments at all – they are mootness arguments. Yet the word "moot" does not appear in State Defendants' brief.[8] Nor do Defendants address candidate standing beyond a surface level denial that injuries are likely to recur.[9] And Defendants fail entirely to address the core problem in their standing arguments: they themselves have predicted the harm at issue. Given that USPS service

---

[7] Defendants "do not cite – much less distinguish – [*Credico*,]" which "can be taken as a concession of the case's applicability." *Gallagher* at \*63 n. 4. Similarly, they fail to even acknowledge the Court's reasoning in the initial decision on this point.

[8] Because Plaintiffs discussed mootness in their opening brief and State Defendants did not respond, this concedes the point.

[9] Defendants (correctly) object that Plaintiffs inadvertently omitted Senator Biaggi's declaration in the initial filing. Def. MOL at 18 n. 10. Plaintiffs obviously intended to file the Declaration with the initial brief. *See, e.g.,* Pl. MOL at 7, *citing* Biaggi Dec. ¶¶ 5-6, 10, 14. Given the error, rather than asking the Court to consider it as part of the initial motion, Plaintiffs have re-submitted it with their Reply papers, and ask the Court to consider it as part of the Reply instead (just as the Court did with the Patel and Gallagher declarations in the initial motion). Additionally, to have addressed Defendants' other argument, the fact that Senator Biaggi co-sponsored legislation that took a compromise position (e.g., ECF No. 132-4) on late postmarks has nothing to do with her rights to seek other relief in her capacity as a candidate.

7

standards have continued to drop despite the existence of injunctions (Green Reply Ex. 1 at 1), Defendants' point that their predictions were "conditional" (Def. MOL at 12-13, n. 6) on USPS service standards remaining below baseline loses what little force it may have otherwise had. Instead, just as explained in the opening brief, "[a]s [the State Board] has itself forecasted the injuries, it is disingenuous for [the State Board] to claim that the injury is not sufficiently imminent." *Jones*, 2020 U.S. Dist. LEXIS 172430, at \*38-39 (alterations adopted), *quoting New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 2020 U.S. App. LEXIS 24492, at \*25 (2d Cir. Mar. 2, 2020) ("*NY v. DHS*").

Finally, the arguments Defendants make are all beside the point given that only one Plaintiff needs to have standing and (among others), Plaintiff Lazewatsky has standing because she plans to vote in person, as explained in a decision Defendants concede is correct. *Compare, e.g.*, *Jones*, 2020 U.S. Dist LEXIS 172430 at \*39 (voters choosing to vote in person during the pandemic "constitutes an injury even if voters['] decisions to vote in person are illogical or unnecessary, by, for example, overlooking the possibility of voting early") (cleaned up), *citing NY v. DHS.*, 969 F.3d at 59; *with* Lazewatsky Dec. ¶ 7 ("While I believe it is safer to vote by mail without any in-person contact during the pandemic, I am worried my vote won't be counted if I use an absentee ballot for the November election, and because of this I will be voting in-person in the upcoming November election."); *and see* Def. MOL at 16 n. 8 (conceding *Jones* was correct in finding standing when a plaintiff took actions that "led them to risk contracting COVID-19").[10]

### A.     An injunction issued after a complaint does not create a standing defect.

Defendants rely on preliminary injunctions that were issued in separate matters to argue that

---

[10] Defendants' gloss on *Jones* here – that *Jones* found standing because "plaintiffs faced an objectively imminent threat of injury" – ignores the plain language of *Jones*, and the binding Second Circuit authority (*N.Y. v. DHS*) it relies on. *See* 2020 U.S. Dist. LEXIS 172430, at \*39.  As *Jones* explained, voters do not have to be "objectively" rational in making the decision to vote in person.  They need only make the decision to suffer an injury.

8

there is no standing. In arguing that Plaintiff lacks standing, Defendants claim that there is no significant risk of error by USPS "because [recent USPS policy changes] have been enjoined by five different nationwide preliminary injunctions." Def. MOL at 12. This is misguided on the facts[11] and on the law.

In short, the existence of a post-complaint (and indeed, post-motion) preliminary injunction, subject to appeal, is fundamentally unrelated to a determination of standing. Standing is not assessed sporadically throughout the long process of a lawsuit, but is instead considered as a threshold issue at the beginning. *Azim v. Vance*, 530 F. App'x 44 (2d Cir. 2013). As Defendants concede, standing is determined "as of the outset of litigation." Def. MOL, *citing Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019). While an amended complaint relates back to the initial date of filing, even using the date of the amended complaint (September 11, 2020), no injunctions existed "as of the outset of litigation." 917 F.3d at 77. Thus, post-filing injunctions against third parties – and preliminary injunctions at that – cannot deprive Plaintiffs of standing. "That Plaintiffs are not being harmed so long as [a] preliminary injunction is in place, of course, does not deprive Plaintiffs of their standing." *Doe v. Mattis*, 344 F. Supp. 3d 16, 27 (D.D.C. 2018). *See also*, *Strawser v. Strange*, 190 F. Supp. 3d 1078, 1083 (S.D. Ala. 2016) ("[d]efendants in this case are not subject to that injunction and the [p]laintiffs in this case lack standing to enforce the [] injunction [in the other case]").

And most importantly, there is absolutely no guarantee that the injunctions in the various Postal Service cases will have their intended effect. As noted above, the most recent data, which includes the first week where the various USPS injunctions were in effect, shows that on time delivery is sitting nearly 14 points below the on-time percentage the Court considered related to June (e.g., 84.23% vs. 98%). *See* Green Reply Ex. 1 at 1; *Gallagher* at *14. While, one *hopes* that the USPS

---

[11] Specifically, (1) the postmarking errors in June happened *before* USPS policy changes even went into place and (2) as noted above, the most recent data available shows USPS's on time delivery score during is sitting more than 10% below the baseline score, despite the injunctions.

9

injunctions will serve their function in restoring on time performance before the election, given that they have not yet, "[t]he right to vote is too vital a value in our democracy to be left in a state of suspense in the minds of voters weeks before a presidential election, raising doubts as to whether their votes will ultimately be counted." *Jones*, 2020 U.S. Dist. LEXIS 172430, at *10.

### B. This case is not moot.

Read generously, Defendants' argument sounds in mootness. Although standing is measured as of the time of filing, "the mootness doctrine requires that 'standing persists throughout the life of a lawsuit.'" *Azim v. Vance*, 530 F. App'x 44, 46 (2d Cir. 2013), *citing Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011). However, preliminary injunctions – even against the *same* parties – do not impact standing across cases. Indeed, the very fact that there are *five* nationwide injunctions against USPS underscores this fact.

While there does not appear to be much authority directly on this subject, the few cases directly addressing this argument seem to reject it. *See, e.g.*, *Strawser v. Strange*, 190 F. Supp. 3d 1078, 1083 (S.D. Ala. 2016); *Anderson v. Tower Amusement Co.*, 118 Fla. 437, 441, 159 So. 782, 784 (1935) (a complainant who shows a need for injunctive relief is "entitled to have it awarded to her in her particular suit, so that it would inure to her benefit in her own name, and be capable of enforcement as her own injunctive process, irrespective of the course or outcome of the separately pending litigation being carried on in the name of others.").

Plaintiffs (aside from Senator Biaggi) lack standing to enforce any injunction issued against USPS. Without considering separately pending litigation, nothing about the Plaintiffs position has changed, and they would be unable to seek relief in their own names. Beyond that, though, and more importantly, the injunctions in the USPS cases *only* restore things to the status quo as it existed during the June Primary. That is, the circumstances have been returned to exactly what they were when the Court found that Defendants had "ignore[d] a … systemic problem that arbitrarily

render[ed thousands of] ballots invalid." *Gallagher* at *53.  In other words, the issues in June are not only capable of repetition, they are likely to recur for exactly the same reasons they happened in the first place.  *See, e.g., Lerman v. Bd. of Elections*, 232 F.3d 135, 141 (2d Cir. 2000) (rejecting Board argument that a case was moot post-election).  And if the Board's arguments on timing are *right* here, that only stresses the need for relief in subsequent elections – New York's next election is on February 9.

And finally, Defendants arguments that to avoid injury, Plaintiffs and those similarly situated need only mail their ballot early have been rejected – at New York State's own urging.  *See New York v. Trump*, 2020 U.S. Dist. LEXIS 177083, *38 (D.D.C. 2020) ("Defendants argue that all residents need to do is 'mail their ballots a reasonable time before the election…'  However, as Plaintiffs point out, the ability of the residents of New York, Hawaii, and New Jersey to mail their ballots is not entirely within the residents' control since ballots are not mailed to the residents two months before the election.") (citation omitted).

### C. Defendants' standing cases are not on point.

Defendants claim that "[i]n the context of election lawsuits, courts routinely dismiss complaints based on predictions that possible error might cause the plaintiff's vote to not be counted."  Def. MOL at 10, *citing Schulz v. Kellner*, 2011 U.S. Dist. LEXIS 73088 (NDNY 2011).  But in *Schulz*, the Court found that the conjecture that machine counting of votes – rather than hand-counting votes – would lead to errors was insufficiently definite.  2011 U.S. Dist. LEXIS 73088 at *35.  The court also noted that the plaintiffs in *Schulz* provided no examples of votes not being counted because of machine errors.  *Id.* at *39.  By contrast, here, application of the postmark rule has already disenfranchised thousands – and uncontradicted by Defendants – significant portions of ballots rejected for *late* postmarks reflect timely mailed ballots.

11

## II.     **Defendants' Merits Arguments Ignore the Standard and their Own Statements.**

In arguing the merits, Defendants simply seem to wish the Court's initial decision did not happen, or that they hadn't themselves predicted that postmarking errors would recur. *See, e.g.*, Def. MOL at 26. Similarly, while Defendants argue there are no facts supporting the prediction that issues will arise relating to ballot timing in ways that impact some boroughs more than others, the fact that Brooklyn once again is seeing absurd mismanagement from the City Board undermines that assertion. Def. MOL at 27. And most critically, Defendants do not *once* assert that USPS answered the State Board's (in their own words) "urgen[t]" letter asking "what steps is USPS going to take to ensure this failure does not happen again?" Kellner Ex. 1; Dec. ¶ 26. *But see generally*, Second Supplemental Brehm Dec. (not once mentioning a response to the letter).

Beyond that, however, State Defendants do not make a sincere attempt to apply strict scrutiny or *Anderson-Burdick*. Their strict scrutiny analysis is anything but strict – and simply asserts without a basis that voters would commit fraud en masse.[12] On *Anderson-Burdick*, they fail seriously "actually 'weigh the burdens imposed on the plaintiff against the *precise* interests put forward by the State,'" particularly for ballots without postmarks received on the second day following an election. *Credico*, 751 F. Supp. at 422 (emphasis in original). In sum, State Defendants do not seriously contest that postmarking issues lead to significant numbers of ballots being thrown out each election. And, at a minimum, a notice-and-cure process would easily solve that issue. The speculation that voters might lie about when they mailed their ballots – and concomitant speculation

---

[12] Defendants' point that a "requirement that voters must swear out an affidavit with their ballot would very likely create new problems with respect to voters who fail to complete the form" misses the point, since that requirement would only disenfranchise voters who both (1) forgot to fill out a date on the form and (2) had their ballot arrive after election day. Such voters would already be disenfranchised under the law as it exists. And beyond that, the fact that the measure identified is only *less* restrictive (rather than completely without restriction) is not a problem – just as Courts may, of course, enter injunctions that only address some portion of a problem. *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (a court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case").

12

that such lies would be *more* frequent than USPS errors in postmarking – is not sufficient under any level of review to meet the State's burden here.

And finally, most of Defendants' arguments are a near verbatim retread of the arguments the Court already rejected in the preliminary injunction decision – and for that matter, that this Court and the Second Circuit both rejected in *Yang*.

### III. Defendants' *Purcell* Argument is Misguided, and Should Be Taken With At Least Some Salt.

Defendants argue that it is now too late for the Court to decide this motion. *See* Def. MOL at 30. To do so, they misconstrue precedent and ask the Court to set aside any conventional notions of fair play and notice. Plaintiffs first teed up this motion on August 28, 2020 – very comfortably before the November election (ECF No. 100). Defendants submitted a full, four-page opposition letter, not once complaining about the timing of the motion (ECF No. 103). Based on those letters, the Court set the current briefing schedule (ECF No. 105). In the month between that Order and their opposition, Defendants did not *once* – privately or in any filing – complain that the briefing schedule posed any problems. As the Court likely knows, the State Board regularly notifies courts when briefing schedules pose timing problems. For example, when the Court set a briefing schedule ending on May 12, 2020 in *Yang*, Commissioner Kellner *immediately* filed a letter requesting the Court "modify the schedule for briefing and argument of plaintiffs' application to no later than Monday, May 4, 2020" (which the Court immediately did). *See Yang*, 20-cv-3325, Letter Motion, ECF No. 4. Yet, here, Defendants even sought to *extend* the period to brief this motion by more than a week – and refused to agree to shorten it when Plaintiffs sought to accommodate their proposed motion to dismiss. *See, e.g.*, ECF No. 114 ("We can't agree to a briefing schedule that is faster than the one already set by the court for the PI motion."). That there is a sensitive time around the election does not require the Court to simply discard all notions of fair play and notice. If the State Defendants

13

seriously believed there were some concern about timing here, they had nearly two months to raise it. They didn't.

Defendants are also simply wrong in how they characterize application of the *Purcell* principle. The Court need only look to the decision in *Yang*, where the Second Circuit upheld this Court's decision, writing just 22 days before the election. *Yang v. Kosinski*, 960 F.3d 119, 123 (2d Cir. 2020). No confusion will result from either a notice-and-cure period or suspension of some portion of the postmark rule (for example, exactly the same portion of it the Court suspended for June). Similarly, given the immense confusion caused by rampant City Board errors and delays in sending ballots to voters, requiring the State Board to set clear rules and deadlines on mailing ballots will cure – not cause – confusion.

Indeed, Defendants argue fully out of both sides of their mouth on this point: Plaintiffs' motion is apparently at once "not ripe" (Def. MOL at 16) and too late (Def. MOL at 30). At the risk of stating the obvious, it cannot be both. And even if it were "not ripe," Defendants own arguments would comfortably place this case into the capable of repetition yet evading review exception to mootness.

In sum, then, Defendants had the better part of two months to raise concerns about timing. They elected to remain silent – inconsistent with their own past practices in cases of this nature. Seen in this light, since surely their opposition brief was in draft form at the point they made it, Defendants' request for an *additional* week seems like a calculated attempt to game the *Purcell* principle for a litigation advantage. The Court need not allow or encourage such gamesmanship.

14

## **CONCLUSION**

For the reasons above, Plaintiffs ask the Court to grant their motion for injunctive relief.

Respectfully submitted,

/s/
_____
J. Remy Green
Jonathan Wallace, *of counsel*
Alex Petkanas, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016
T: (212) 401-6222
F: (888) 370-2397
ali@najmilaw.com